UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA      )        24CR104
                    Plaintiff  )
vs.
                                        Buffalo, New York
NICHOLAS BLOOM                )        October 25, 2025
                    Defendants.           10:30 a.m.
- - - - - - - - - - - - - - - X
**SELL HEARING**
**Transcribed from an Electronic Recording Device**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE H. KENNETH SCHROEDER, JR.
UNITED STATES MAGISTRATE JUDGE


**FOR PLAINTIFF:   MAEVE EILEEN HUGGINS, ESQ.**
                   **CHARLES MARK KRULY, ESQ.**
                   Assistant United States Attorneys
                   168 Delaware Avenue
                   Buffalo, New York 14202


**FOR DEFENDANT:   JEFFREY T. BAGLEY,** ESQ.
                   Assistant Federal Public Defender
                   300 Pearl Street, Suite 200
                   Buffalo, New York 14202


**COURT REPORTER: Karen J. Clark, Official Court Reporter**
                   **Karenclark1013@AOL.com**
                   **100 State Street, 6th Floor**
                   **Rochester, New York 14614**

USA V. N. BLOOM

**I N D E X**
*          *          *

| WITNESS NAME | DX | CX | RDX | RCX |
| --- | --- | --- | --- | --- |
| **M. MARKS** | 4 | 41 | 69 | |
| **S. LEE** | 77 | 107 | 129 | 134 |

**P R O C E E D I N G**
*          *          *

THE CLERK:  United States District Court for the Western District of New York is now in session.  The Honorable H. Kenneth Schroeder presiding.

MAGISTRATE JUDGE SCHROEDER:  Be seated, please.

THE CLERK:  This is the United States versus Nicholas Bloom, docket No. 24CR104.  This is the date set for a *Sell* hearing.  Assistant United States Attorneys Maeve Huggins and Charles Kruly appearing on behalf of the government.  Assistant Federal Public Defender Jeffrey Bagley is appearing with defendant.  Defendant is appearing via video conference.

MAGISTRATE JUDGE SCHROEDER:  Good morning.

MS. HUGGINS:  Good morning, Judge.

MR. BAGLEY:  Good morning.

USA V. N. BLOOM

MAGISTRATE JUDGE SCHROEDER:  We are here for a competency hearing.  Are we ready to proceed?

MS. HUGGINS:  Judge, we're here for a *Sell* hearing today.  We provided the Court with a number of exhibits that the government premarked and provided both to the Court and counsel.  Prior to this proceeding this morning, both counsel and I discussed stipulating to some of the exhibits coming in evidence.  Those are Government's Exhibit 24, 25, 26 and 41.

MR. KRULY:  Those are, respectfully, your Honor, exhibit 24 is the forensic evaluation of the defendant by Dr. Marks.  Exhibit 25 is the addendum to that report, which is the recommended course of treatment by Dr. Lee.  26 are the case notes summarizing the defendant's medical history in BOP.  And 41 is Dr. Marks' CV.

MAGISTRATE JUDGE SCHROEDER:  All right.  Those are received.

MR. KRULY:  Thank you.

MAGISTRATE JUDGE SCHROEDER:  No objection.

MR. BAGLEY:  No objection.

MS. HUGGINS:  And, your Honor, with the Court's permission, I think we discussed that we would question the witnesses here from counsel's table.  If

USA V. N. BLOOM

the Court is ready to proceed, the government is ready to call our first witness, which will be Dr. Megan Marks.

MAGISTRATE JUDGE SCHROEDER:  All right.  Do you want to administer the oath?  Doctor, can you hear me?

THE WITNESS:  Yes.

MAGISTRATE JUDGE SCHROEDER:  Would you kindly raise your right hand?  Do you solemnly swear that the testimony you're about to give will be the truth, the whole truth and nothing but the truth so help you God?

THE WITNESS:  I do.

MAGISTRATE JUDGE SCHROEDER:  Thank you. Please state your name and position.

THE WITNESS:  Megan Marks, I'm a forensic psychologist.

MAGISTRATE JUDGE SCHROEDER:  And Ms. Huggins.

MS. HUGGINS:  Thank you, your Honor.

**DIRECT EXAMINATION BY MS. HUGGINS:**

Q.  Good morning, Dr. Marks.

A.  Good morning.

Q.  With whom are you employed?

5

M. MARKS - DX BY MR. HUGGINS

A.   With the Federal Medical Center Butner.

Q.   Is that sometimes commonly abbreviated "Butner"?

A.   Yes.

Q.   And is that a part of the Federal Bureau of Prisons?

A.   Yes.

Q.   What type of facility is Butner?

A.   It is a medical center.

Q.   What are the types of services and treatments provided there?

A.   For a medical center such as Butner they provide medical services, specialized medical services that could not be provided at other main line institutions; for example, specialized cancer treatments and a variety of other conditions.  Also at the medical center we provide forensic study services so individuals who are undergoing court proceedings and the Court is requesting a psychological evaluation for a variety of reasons such as competency, insanity, dangerousness.

Q.   And you said "main line facilities," by that, what did you mean by that term?

A.   We have in the Bureau of Prisons, we have several other institutions that provide general services such as medical care, psychological care, but not each facility

M. MARKS - DX BY MR. HUGGINS

has practitioners who are trained to provide specialized services such as ones that are provided at the medical facilities.

Q.   How long have you been employed as a forensic psychologist at Butner?

A.   I've been employed almost two years, a little over a year and a half.

Q.   Generally what does a forensic psychologist do?

A.   So a forensic psychologist is asked to provide their opinion, psychological opinion in connection with some type of legal question from the Court.  So it's kind of an intersection between psychology and legal. Again, as I said earlier, oftentimes he we are asked to provide expert opinions based on whether a person is competent to proceed in their case, their criminal case, whether an individual was insane at the time of their offense, whether somebody is actually dangerous and can be released to the community or not following their completion of their sentence or following a determination that somebody was insane at the time of the crime.

Q.   Does the opinions that you render also include a mental health diagnosis?

A.   Yes.

M. MARKS - DX BY MR. HUGGINS

Q.   Let's take a step back and discuss your education to become a forensic psychologist.  What is your highest level of education?

A.   Doctoral degree.

Q.   And what is that Doctoral degree in?

A.   Clinical psychology.

Q.   When did you receive it?

A.   2010.

Q.   From what institution did you receive that Doctorate?

A.   Wright State University.

Q.   Generally did that doctoral program cover clinical hands-on experience in psychology?

A.   Yes, in addition to research experience and course work.

Q.   Okay.  Did you then become a licensed psychologist?

A.   I did.

Q.   When did you become a licensed psychologist?

A.   In 2014.

Q.   In what state?

A.   Colorado.

Q.   What does the Colorado licensure for psychologists require?

M. MARKS - DX BY MR. HUGGINS

A.   It requires that the individual has a certain amount of supervised clinical experience under a licensed psychologist, 1500 hours is typically the amount of clinical experience required.  In addition, the individual has to pass an examination, and, of course, complete all of their required psychology course work in their doctoral program.

Q.   What, if any, continuing education component does the Colorado licensure program require?

A.   It requires 40 hours of continuing education.

Q.   And, Dr. Marks, if I could refer you to what has been received into evidence as Government's Exhibit 41 is that a copy of your CV summarizing your education and professional experience?

A.   Yes.

Q.   Dr. Marks, did you maintain and stay abreast of developments within your field?

A.   Yes.

Q.   How do you do that?

A.   A variety of ways.  We actually in the Bureau of Prisons, we have at least quarterly trainings provided by board certified forensic psychologists.  They provide training on you know the most up-to-date literature information related to forensic psychology.  I also

M. MARKS - DX BY MR. HUGGINS

attend the annual conference, you know, forensic conference that provides the most up-to-date information related to the field.  And I, on my own, will research articles that I find relevant and important that are peer reviewed.

Q.  Let's focus to your duties and responsibilities at Butner.  What do you do there?

A.  As a forensic psychologist, I am assigned a case load of individuals who, who require evaluation.  And as I said earlier, typically at Butner, we receive requests for evaluations related competency to proceed to trial, insanity at the time, insanity at the time of the offense, dangerousness, risk assessments as well as annual risk assessments for those who are currently civilly committed.  There are other evaluations as well, but those are kind of the main evaluations we perform at FCC Butner.

Q.  Approximately how many competency evaluations have you done to date at Butner?

A.  I would say approximately 38.

Q.  Approximately how many 4246 dangerousness evaluations have you done while working at Butner?

A.  For the initial dangerousness evaluations, I've completed three.

M. MARKS - DX BY MR. HUGGINS

Q.   And how many evaluations for dangerousness, and correct me if I'm wrong, the annual risk assessments have you done while working at Butner, if I'm using the correct term there?

A.   Yeah, approximately over 30.

Q.   In the course of your career, have you had experience on occasion to diagnose and treat patients with schizoaffective disorder?

A.   Yes, I have.

Q.   Can you estimate the number of patients with schizoaffective disorder that you've diagnosed and treated during the course of your career?

A.   It's a good question.  I would have a difficult time providing an exact number as I don't keep a tally of diagnosis that I've provided over the years.  Through the course of my career, I've encountered many individuals with psychotic disorder to include schizoaffective disorder.

Q.   Doctor, in the course of your duties at Butner, have you been assigned to a patient named Nicholas Bloom?

A.   Yes.

Q.   Doctor, do you see Mr. Bloom as a part of the remote feed for this proceeding?

M. MARKS - DX BY MR. HUGGINS

A.   Yes.

Q.   Could you please identify him by an article of clothing that he is wearing?

A.   Unfortunately all I can see is Mr. Bloom's head. It looks like there are letters underneath his neck, so I can only see like part of his neck.  Okay.  There I see.  Thank you, Mr. Bloom.  I see he is wearing a kaki shirt and white undershirt.

MS. HUGGINS:  Thank you, Dr. Marks.

Your Honor, may the record reflect that Dr. Marks identified Mr. Bloom.

MAGISTRATE JUDGE SCHROEDER:  Yes, the record will reflect since I've seen Mr. Bloom on the monitor as well.

Q.   Thank you.  Dr. Marks, did you summarize your evaluation, diagnosis and treatment of the defendant in a report?

A.   Yes.

Q.   I'm going to refer you to what has been stipulated in evidence as Government's Exhibit 24.  Do you have a copy of that report in front of you?

A.   Yes.

Q.   Have you had an opportunity to review this report before today's proceeding?

M. MARKS - DX BY MR. HUGGINS

A.   I have.

Q.   Did your evaluation of the defendant include administering procedures such as assessments, observation and interviews?

A.   Yes.

Q.   Did you administer an assessment with the defendant on June 24th, 2025?

A.   Yes.

Q.   What was that assessment?

A.   It was the personality assessment.

Q.   And, Dr. Marks, if I could refer you to page 11 of Government's Exhibit 24.  For those of us not in the psychology field, could you just briefly explain what the personality assessment inventory is?

A.   Sure.  It's a psychological test that provides information as to an individual's personality features, possible clinical problems, their response style, how they kind of approach the test, and their overall functioning.

Q.   Did your evaluation of the defendant include a review of medical and other records, including interviews of family members and prior therapists of the defendant?

A.   Yes.

M. MARKS - DX BY MR. HUGGINS

Q.   And did your evaluation also include in-person meetings with the defendant?

A.   Yes.

Q.   Did your evaluation occur over the period of time from approximately March 25th, 2025 to July 20 or, excuse me, July of 2025?

A.   Yes.

Q.   And did you meet with the defendant on multiple occasions?

A.   Yes.

Q.   Did other medical or correctional staff also observe the defendant?

A.   Yes.

Q.   And did some of their observations inform your report that is Government's Exhibit 24?

A.   Yes.

Q.   Based on your review of records, meetings, observations of the defendant, did you form a diagnoses of the defendant?

A.   I did.

Q.   What did you diagnose the defendant with?

A.   I gave Mr. Bloom a diagnoses of schizoaffective disorder - bipolar type.

Q.   Generally, what does schizoaffective disorder -

M. MARKS - DX BY MR. HUGGINS

bipolar type mean?

A.   So this disorder is under the umbrella of psychotic disorders.  And when an individual has schizoaffective disorder - bipolar type, they have psychotic symptoms, so it depends on the individual what those psychotic symptoms are, but they can include symptoms such as delusions, which are present in Mr. Bloom's case.  Delusions are highly improbable beliefs that are fixed and resistant to change despite contrary evidence.  Some individuals have hallucinations.  In Mr. Bloom's case, I don't have evidence of hallucinations.  Other people with psychotic disorders exhibit disorganized speech and thinking.  And so that is, again, highly relevant to the individual, but disorganized speech tends to look like, you know, speech that is nonsensical, speech that is maybe making up words, providing communication that is just not making much sense.

Also with psychotic disorders, you'll see oftentimes disorganized behavior, so behavior that is inconsistent with the individual's base line.  Bizarre behavior, and, again, it can look differently for each individual.  And sometimes there are negative symptoms as well with the psychotic portion of schizoaffective

M. MARKS - DX BY MR. HUGGINS

disorder.  In addition, schizoaffective disorder there is a mood component.  So these individuals either tend to have manic and/or depressive symptoms.  And in Mr. Bloom's case, I believe he displayed both manic and depressive symptoms in his course of illness.  So manic symptoms typically involve an elevated mood, increased energy and increase in goal directed activities, inflated self esteem, impulsive decision making, symptoms such as that.  And then there are depressive symptoms Mr. Bloom has also exhibited where he has gone through depression suicidal ideations, withdrawing from others.  If I could, if I could refer to my report, other symptoms he received.  But he has a history of also experiencing depressive symptoms.

Q.  Thank you, Doctor.  Are you generally familiar with the term "break in reality"?

A.  Yes.

Q.  How does that relate to your diagnosis of schizoaffective disorder - bipolar type?

A.  A break in reality is basically referring again to the overall umbrella of psychotic disorders.  So the individual in some manner is not -- is not -- is not engaging in a world that normal individuals live in. So, again, that can look at having delusional beliefs or

M. MARKS - DX BY MR. HUGGINS

hearing things that are not really there or seeing things that are not really there.

Q.  Doctor, you referenced your report when discussing the manic and depressive symptoms that you observed.  And Mr. Bloom -- you're welcome to reference it further, if you could just direct us to what page you're looking at in Government's Exhibit 24.

A.  When I was referring to the depressive symptoms.

Q.  Correct, Doctor?

A.  Sure.  So I am looking at page 12 currently.  And so additional depressive symptoms that Mr. Bloom has exhibits, as I said, depressed moods, suicidal ideations, isolation, and withdrawing from others, and finally feelings of worthlessness he has also exhibited.

Q.  Doctor, when you formed this diagnosis, did you consult with other members of the mental health team at Butner?

A.  I did.

Q.  In general, how large is the mental health team at Butner?

A.  The mental health team is very large.  In terms of the forensic psychologists, there are about seven other individuals in addition to we have a chief psychiatrist who has a forensic background as well.

M. MARKS - DX BY MR. HUGGINS

Q.  Are there also members of the mental health team at Butner who are psychiatrists?

A.  Yes.

Q.  Was a psychiatrist consulted for the defendant's case?

A.  Yes.

Q.  Who is that psychologist assigned to the defendants case?

A.  Dr. Lee.

Q.  And, again, for those who are not members of this field, what is the difference between a psychologist and a psychiatrist?

A.  Yeah, so the main primary differences are that psychiatrists have -- they are able to prescribe medications and typically psychologists are not able to prescribe medications.  Additionally, psychiatrists are trained in psychological testing, which is not usually provided by or they are not usually given training in psychological measures in their course work.

Q.  So there are two different roles that a psychologist versus a psychologist does in a mental health treatment of a patient?

A.  Yes.

Q.  Your report, Government's Exhibit 24, was that

M. MARKS - DX BY MR. HUGGINS

reviewed by a supervisor?

A.  Yes.

Q.  Dr. Marks, does Butner utilize an electronic system to document notes regarding clinical encounters and medical treatment of patients there?

A.  Yes.

Q.  What is the name of that system?

A.  We refer to it as beamer (phonetic) and PDS.  So off the top of my head, I think it's Euro electronic medical records and PDS stands for Psychology Database System.

Q.  And was that system utilized during the defendant's evaluation and treatment?

A.  Yes.

Q.  And, in other words, you and other members of the medical and mental health team there document these medial and mental health encounters and treatment related to the defendant?

A.  Yes.

Q.  Do you have a copy of what's been stipulated into evidence as Government's Exhibit 26 in front of you?

A.  I do.

Q.  Are you generally familiar with these case notes for the defendant?

M. MARKS - DX BY MR. HUGGINS

A.   Yes.

Q.   Did you write some of the entries that are in these case notes?

A.   Yes.

Q.   And to be fair, does it also contain entries that you did not write and were not present for?

A.   Correct.

Q.   Let's take a step back now and discuss how you reached your diagnosis for Mr. Bloom.  What records did you review in preparation for your diagnosis?

A.   If it's okay, can I refer to my report?

Q.   Yes.

A.   Going back to Government's Exhibit 24, if I could direct your attention to page two.  Yes, so I reviewed multiple documents.  I reviewed the forensic evaluation completed at NBLCA that was dated 10/28/2024.  I reviewed National Archives Notice of Proposed Removals. I reviewed FBI interviews with Mr. Bloom's acquaintances and his father.  I reviewed the Alta Bates Summit medical records.  I also reviewed Niagara County Sheriff's office voicemail recordings and photos of text messages allegedly sent by Mr. Bloom.

Q.   So fair to say that you reviewed some legal documents and materials related to this case and then

M. MARKS - DX BY MR. HUGGINS

also employment records received relating to the defendant's employment at the national archives?

A.   Yes.

Q.   Now, those medical records that you mentioned, do they include previous diagnoses of the defendant by other doctors?

A.   Yes.

Q.   We'll return to that in a moment.  Did you additionally interview individuals related to the defendant?

A.   I did.

Q.   Who did you interview?

A.   I interviewed Mr. Bloom's parents and his prior therapist, Dr. Laughlin-Presnal.

Q.   Did you summarize the information that you learned in those interviews in your report, Government's Exhibit 24?

A.   Yes.

Q.   Did your evaluation include in-person meetings with the defendant?

A.   Yes.

Q.   Did you discuss treatment options with him as a part of those meetings?

A.   Yes.

M. MARKS - DX BY MR. HUGGINS

Q.  Did those treatment options ever include the administration of medication?

A.  Yes.

Q.  Did you ever discuss alternative treatments with Mr. Bloom?

A.  I attempted an alternative method of treatment and essentially discussed with him that that is what I was doing.

Q.  Can you explain what you mean by attempted alternative methods of treatment?

A.  Yes.  So Mr. Bloom, again, it says, I noted in my report that he has delusional beliefs.  And one of the things that we attempt to do both in diagnosis and attempting to treat individuals who have delusions is we challenge those beliefs, we provide information that is contradictory to that information such as evidence to dispute it.  And in Mr. Bloom's case, I attempted to do that on occasions and Mr. Bloom still held firm in his beliefs that I believe are delusional in nature.

Q.  With regard to discussions of medications, did you have more than one conversation regarding medications with the defendant?

A.  Yes.

Q.  Throughout those multiple conversations, was the

M. MARKS - DX BY MR. HUGGINS

defendant ever open to taking medication for his disorder?

A.   Initially he indicated he -- he did not shut the, shut it down completely, initially.  However, over time, he was very firm that he would not consider psychiatric medication.

Q.   Dr. Marks, let's discuss some of those meetings in more depth.  If I could refer you to page 8 of Government's Exhibit 24, your report.  I'm directing your attention specifically to April 1st, 2025.  Did you meet with the defendant together with Dr. Lee?

A.   Yes.

Q.   During that meeting, were psychiatric medications discussed?

A.   Yes.

Q.   Did you and Dr. Lee encourage the defendant to continue taking psychiatric medication?

A.   Yes.

Q.   And as a part of that meeting, were the benefits of medications explained?

A.   Yes.

Q.   What was the defendant's response on April 1st, 2025 regarding medication?

A.   As I'm reading his quote here, he said, "At least

M. MARKS - DX BY MR. HUGGINS

for a few weeks, my answer on medications won't change." He advised that he preferred to focus on getting his bearing first at the institution and getting his routine down before changing chemicals in his brain.

Q.   And, Dr. Marks, are you referring directly from your report on page 8 of Government's Exhibit 24?

A.   Yes.

Q.   Did the defendant go on to further respond when both you and Dr. Lee advised that he may be involuntarily medicated?

A.   Yes.

Q.   I can rephrase that question if that is confusing.

A.   I understand, yes, we did.

Q.   What was the defendant's response when you said that he could be involuntarily medicated?

A.   On April 1st?

Q.   Following that information on April 1st, Dr. Marks, did you meet with -- let me rephrase my question. Did you meet with the defendant again on April 9th?

A.   I did.

Q.   And was psychiatric medication again discussed?

A.   Yes.

Q.   What was the defendant's response?

M. MARKS - DX BY MR. HUGGINS

A.   I don't have an exact quote from him, but he declined psychiatric medication on that date.

Q.   Directing your attention to April 22nd, 2025, what did you document in your report regarding the defendant's statements regarding medication on that date?

A.   When I asked Mr. Bloom about considering medication, he stated that he "I disagree with the point of the enterprise."  He continued to share that he was unwilling to voluntarily consent to psychiatric medication as he believed that the medication would be medically and physically harmful to him for his research.

Q.   What did he go on to state with regard to his belief if he had taken medication?

A.   Yeah.  He stated that he believed that, a quote from him, "I think it's some form of an admission of guilt me taking medications."

Q.   Dr. Marks, are you referring to page 8 of Government's Exhibit 24?  I don't know if you heard my question fully.  Are you referring to the bottom of page 8 of Government's Exhibit 24 when discussing your meeting on April 22nd?

A.   Yes, I'm sorry.

M. MARKS - DX BY MR. HUGGINS

Q.   No problem.  At that time --

MAGISTRATE JUDGE SCHROEDER:  Did we lose the sound there?

MS. HUGGINS:  Could you repeat, for the sake of the record, Dr. Marks, I think there was a technical glitch there.  Could be repeat your answer?

THE WITNESS:  Yes.

MS. HUGGINS:  Thank you.

Q.   As a part of the meeting on April 22, did you provide education regarding subsequent procedures that would occur if Mr. Bloom was found not competent and not restorable by the Court?

A.   I am reviewing my report, if that is okay.

Q.   Yes.

A.   I did.

Q.   Did the defendant express an understanding of this information?

A.   He did.

Q.   Now, stepping back a little bit more broadly, does Butner provide what are referred to as competency restoration classes?

A.   We do.

Q.   What are competency restoration classes?

A.   They are classes designed to help an individual

M. MARKS - DX BY MR. HUGGINS

learn factual information related to court proceedings, you know, such as the key players, the role players in court proceedings, such as, again, the judge, the jury, attorneys, et cetera, you know, what type of employees that one could enter in Federal Court, a variety of cases of information that is required for an information to know factually to proceed in their case.

Q.   Are those sometimes referred to as competency restoration group?

A.   Yes.

Q.   In the defendant's case, has he attended those classes?

A.   No.

Q.   On April 22, did you discuss with him his refusal to attend competency restoration classes?

A.   I did, referring to my report on page 9.

Q.   What was the defendant's response?

A.   He advised that he did not believe that attendance in those classes was necessary as the prior forensic evaluator had opined that he had sufficient factual knowledge.  And then in addition he stated, and I quote, "I feel disrespected by the Courts and I'm trying to stand up for myself as best as I can."

Q.   Directing your attention to May 12th, 2025, did

M. MARKS - DX BY MR. HUGGINS

you and Dr. Lee again meet with the defendant?

A.  Yes.

Q.  Was medication again discussed during that meeting?

A.  Yes.

Q.  Again, direct your attention to page nine of Government's Exhibit 24, your report.  What did Mr. Bloom state with regard to psychiatric medication on that date?

A.  He stated that he, and I quote "I have lived my life opposite to what the legal documents say.  I'm telling the truth about what happened in my case.  The truth will matter at some point or not.  If not, this" -- and I think he said "this facility is a fine place to be.  I sleep.  I read a lot.  I go to recreation.  Occasionally the food is good here.  That is how firm I am of my assertion of what's happening.  I'm telling the truth."  And then ultimately --

Q.  Sorry, continue, Dr. Marks.

A.  He also stated that he views psychiatric medication as an encouragement to change his story.

Q.  On May 12th, did the defendant acknowledge if the Court were to order -- strike that.  Let me rephrase that.

M. MARKS - DX BY MR. HUGGINS

Did the defendant acknowledge the Court may order medication in his case?

A. Yes.

Q. Dr. Marks, if I could now refer you to the case notes relating to the defendant stipulated into evidence as Government's Exhibit 26. And if you could refer specifically to page 193. Did you meet with the defendant on May 19th, 2025?

A. I'm sorry, what was the date again.

Q. May 19th, 2025. Excuse me. My apologies. May 29th, 2025.

A. Yes.

Q. On that date, what did the defendant say he would be interested in doing if he were released?

A. Could you repeat the question?

Q. Yes. On that date, what did the defendant state to you that he would be interested in doing if he were released?

A. Okay. He stated that if he were released, the first thing he would do is try and find the alleged victim to make sure she is alive and well.

Q. Dr. Marks, referring back to, now, exhibit 24, your report, page nine. Did you meet with the defendant on May 29th, 2025?

M. MARKS - DX BY MR. HUGGINS

A.   Yes.

Q.   Was the defendant again encouraged to consider psychiatric medication during this meeting?

A.   Yes.

MR. BAGLEY:   I'm sorry, what was the date of that again?

MS. HUGGINS:   May 29th.

Q.   Did you attempt to challenge his beliefs again during this meeting?

A.   Yes.

Q.   What was the defendant's response when you attempted to encourage him to consider psychiatric medication?

A.   He stated "I like my brain the way it is even if it is a dangerous game.  If I need to be secluded in a medical center, then that is how it goes."

Q.   Ultimately during that meeting, did the defendant acknowledge if the Court were to order him to take psychiatric medication, whether he would comply?

A.   He said he would, yes.

Q.   If I could direct your attention to page 10 of Government's Exhibit 24.  On June 11th, 2025, did you meet with the defendant again?

A.   I did.

M. MARKS - DX BY MR. HUGGINS

Q.   Did you continue to pursue that alternative treatment of challenging his beliefs?

A.   Yes.

Q.   What did the defendant say on this date regarding psychiatric medication?

A.   He reiterated again that he was not interested in psychiatric medication.

Q.   Directing your attention to June 17th, 2025.  Did you meet with the defendant again?

A.   Yes.

Q.   On that date, what did the defendant say regarding psychiatric medication?

A.   He stated he would continue to decline voluntary psychiatric medication because he stated, I quote "I don't think my dopamine levels need reduced."

Q.   Go on.

A.   In addition, he stated that he didn't want his thoughts to change drastically and that it was his right to decline medication.

Q.   What did you inform the defendant regarding his psychotic and mood disorder on that date?

A.   I advised Mr. Bloom that I believed that he had a psychotic or mood disorder on that date and that he required -- that medication could assist him with those

M. MARKS - DX BY MR. HUGGINS

symptoms.

Q.   Directing your attention to July 3rd, 2025, did you again meet with the defendant as a part of your evaluation and treatment?

A.   Yes.

Q.   What did you observe about any delusional beliefs that the defendant had regarding his legal case on that date?

A.   His delusional beliefs remained.

Q.   Did you advise him regarding his diagnosis?

A.   I advised him that I believed he had a mental illness and that medication would be beneficial.

Q.   What did he express regarding medications on July 3rd, 2025 to you?

A.   He declined interest in medication and stated if it were ordered by the Court, he would appeal the decision.

Q.   Based upon your review of the defendant's records and interview with his prior therapist, was the defendant ever previously diagnosed with a different disorder?

A.   Yes.

Q.   I think you testified previously that you interviewed his prior therapist.  From what period of

M. MARKS - DX BY MR. HUGGINS

time did that prior therapist treat the defendant?

A.   I can refer to my report.

Q.   Absolutely, just identify the page that you are reading from on Government's Exhibit 24.

A.   I am on page five.

Q.   What period of time did Mr. Bloom receive treatment from a prior therapist?

A.   The therapist recorded that he provided therapy for approximately two years, from 2020 to 2022.

Q.   And who was this therapist that you interviewed?

A.   Dr. John Laughlin-Presnal.

Q.   Did the prior therapist diagnose the defendant with persistent depressive disorder and generalized anxiety disorder?

A.   Yes, in addition to ADHD by history.

Q.   How do those disorders differ from schizoaffective disorder - bipolar two that you diagnosed the defendant with?

A.   Well, the main way in which they -- in which they are different is psychotic disorders, psychotic disorder that Mr. Bloom has been diagnosed with is again that break in reality.  Whereas disorders of that were diagnosed by Dr. John Laughlin-Presnal, they were not psychotic disorders.

M. MARKS - DX BY MR. HUGGINS

Q.   Was the defendant involuntary hospitalized in June of 2024?

A.   Yes.

Q.   And, Doctor, I see that you -- it appears that you were referring to pages in your report.  Can you just identify what pages you had turned to?

A.   I'm on page 7.

Q.   Did you review medical records related to that hospitalization?

A.   Yes.

Q.   On or about June 18th, 2024, was the defendant involuntary hospitalized at Alta Bates Summit?

A.   Yes.

Q.   Was this an emergency hospitalization where the defendant was deemed a danger to others?

A.   Yes.

Q.   Based upon your review of those records, do you know the reason why he was deemed a danger?

A.   My understanding from the records is that he allegedly threatened to sexually assault his psychiatric provider.  And, in addition, in the records it reflects that Mr. Bloom had been voicing homicidal ideations to his family and harassing women.

Q.   During that hospitalization, was he administered

M. MARKS - DX BY MR. HUGGINS

an antipsychotic medication?

A.   Yes.

Q.   What medication was that?

A.   Olanzapine.

Q.   Did the defendant refuse additional doses of that medication?

A.   Yes.

Q.   Based upon the records, what reason was provided for his refusal?

A.   Due to negative side effects.

Q.   Was he also administered a dose of Lorazepam for anxiety?

A.   Yes.  I'm not sure how many doses, but that medication was prescribed to him while he was there as well.

Q.   Based on your review of the records, what was the date of his discharge from Alta Bates Summit?

A.   June 21, 2024.

Q.   In total, how long was his admission and evaluation as a part of that involuntary hospitalization?

A.   That would be five days.

Q.   The 18th through the 21st?

A.   I'm sorry, three days, I'm sorry.

M. MARKS - DX BY MR. HUGGINS

Q.   At the time of his discharge, what was the defendant diagnosed with?

A.   He was diagnosed with bipolar one disorder severe with psychotic features.

Q.   What is the difference between bipolar one disorder severe with psychotic features versus the diagnosis of schizoaffective disorder that you reached?

A.   Yes.  With bipolar one disorder with psychotic features, with that disorder, there are manic episodes, sometimes depressive episodes as well.  And during phases of mood symptoms, there is also psychotic symptoms present.  However, when the mood symptoms, those psychotic symptoms only appear when there is a mood phase going on.  So psychotic symptoms existing outside of mood symptoms would not be consistent with a diagnosis of bipolar one disorder with psychotic features.

Q.   Dr. Marks, if you could explain how you reached a different diagnosis than what the two previous medical evaluations reached?

A.   Yeah, I reached my diagnosis based on all of the information I reviewed, including interviews, including interviews with Mr. Bloom, his parents, and all of the records and reviewing the DSM-5 text revision in detail.

M. MARKS - DX BY MR. HUGGINS

Q.   Did your length and depth of evaluation inform your diagnosis?

A.   Yes.

Q.   And, again, your diagnosis included in addition to the collateral records that you reviewed, assessments, observations, and direct multiple interactions with the defendant?

A.   Yes.

Q.   Does the diagnosis that you reached account for the mood symptoms and psychotic symptoms that you observed the defendant exhibit?

A.   Yes.

Q.   As a part of your evaluation reaching your diagnosis, did you consider other diagnoses?

A.   Yes.

Q.   Why were other diagnosis such as delusional disorder not appropriate for the defendant's case?

A.   Well, when we are evaluating an individual, we typically have multiple possibilities of diagnoses in our mind going on, so we are, again, throughout the evaluation trying to determine which is the actual diagnosis.  Specific to delusional disorder, there are a variety of reasons why I don't believe that delusional disorder is the appropriate diagnosis for Mr. Bloom and

M. MARKS - DX BY MR. HUGGINS

that his schizoaffective disorder bipolar type is the actual diagnosis for him.

Would you like me to specify how I arrived at that differential diagnosis?

Q. Yes. Doctor, if I could direct you to page 12 of your report marked and stipulated into evidence as Government's Exhibit 24. How did you decide that the appropriate diagnosis was schizoaffective disorder and not delusional disorder?

A. Yeah. I understand why the previous evaluator considered that diagnosis or diagnosed him. Mr. Bloom's primary symptom, prevalent symptom that has been present at NBLCA and here at FMC Butner has been delusions. If we only considered delusions as the only symptom Mr. Bloom has had, then I can understand why somebody would arrive at that conclusion. However, I think that the previous evaluator neglected to review or consider all of the collateral information from Mr. Bloom's history.

So with delusional disorder, again, the really main symptom is the person has delusions. Outside of that, they don't tend to have other psychotic symptoms and they don't tend to have prevalent mood symptoms. And so in Mr. Bloom's case, again, he has consistent -- had delusional beliefs, but he has also gone through

M. MARKS - DX BY MR. HUGGINS

periods where he exhibits disorganized speech, which is a characteristic of more so than delusional disorder and disorganized behavior.  In addition, with individual delusional disorder, they typically function pretty well in society unless you really poke at those delusions or discuss those delusions, they seem relatively normal. Functional impairment is limited only to the scope of those delusions, and so it's not -- typically they are not really functionally impaired.  Mr. Bloom's case, he had significant impairments in his life.  He lost his job as a result of his mental illness.  He was evicted from his apartment.  He lost relationships.  And he was evicted from his art studio.  So multiple areas of Mr. Bloom's life were impaired by his mental illness and that is not consistent with a diagnosis of delusional disorder.  In addition, excuse me, mood symptoms are not typically prominent with delusional disorder.  And, again, Mr. Bloom's records reflect a history of both manic episodes, manic symptoms and depressive symptoms. And that is not generally consistent with a diagnosis of delusional disorder.  It is most consistent with a diagnosis of -- all of the symptoms we discussed, he has exhibited delusional ideations, disorganized thinking or speech, disorganized behavior and significant functional

M. MARKS - DX BY MR. HUGGINS

impairment in his life, that is consistent with a diagnosis of schizoaffective disorder bipolar type.

Q.  Thank you, Doctor.  If we could focus for a moment on the treatment for someone with schizoaffective disorder specific to Mr. Bloom, did you discuss his case with other colleagues at Butner?

A.  I did.

Q.  And did you discuss generally the treatment that would be appropriate for him specifically with Dr. Lee?

A.  Yes.

Q.  In your evaluation of the defendant, are you aware that Dr. Lee developed a recommended treatment plan for the defendant?

A.  Yes.

Q.  And are you generally aware that Dr. Lee's treatment plan recommended the administration of antipsychotic medication?

A.  Yes.

Q.  Is there a standard course of treatment for someone with schizoaffective disorder?

A.  Could you rephrase that question?

Q.  Sure.  Is it common for those who are diagnosed with schizoaffective disorder to be administered antipsychotic medication as a part of their treatment?

M. MARKS - DX BY MR. HUGGINS

A.  Yes, that is the main form of treatment for that disorder.

Q.  In your clinical experience and research, are antipsychotic medications sometimes necessary to restore someone to competency?

A.  Yes.

Q.  Based upon your evaluation and clinical experience with the defendant in addition to conversations with others at Butner, have you formed an opinion that antipsychotic medications are necessary to restore the defendant's competency in this case?

A.  Yes.

Q.  Based upon your experience and interactions with the defendant, is there any way to restore his competency so that he may stand trial without the administration of antipsychotic medications?

A.  No, I don't believe so.

Q.  Why not?

A.  The main form of treatment that has been researched is antipsychotic medication for schizoaffective disorder.  In addition, I have tried to provide less intrusive means of treatments via challenging his delusional beliefs and I've not made any progress in shifting that.

M. MARKS - CX BY MR. BAGLEY

MS. HUGGINS:  I have no further direct examination of Dr. Marks.

MAGISTRATE JUDGE SCHROEDER:  Mr. Bagley.

MR. BAGLEY:  Yes.  Thank you, Judge.

**CROSS EXAMINATION BY MR. BAGLEY:**

Q.  Good morning, Dr. Marks.

A.  Good morning.

Q.  Let's start with some of your background.  So you have been at the BOP, I think you said on direct, for about a year and a half or two years.  Is it correct that you started in your current position in February of 2024?

A.  If I can refer to my CV.

Q.  Sure.

A.  Yes, that's correct.

Q.  Okay.  We're seeing your CV here?

MAGISTRATE JUDGE SCHROEDER:  Hold on.  I'm looking at the CV of the doctor but not the doctor.  Is there a way we can split the screen?  All right.  I can see the doctor on my court deputy's screen and I can see the curriculum vitae of Dr. Marks on my bench screen.

MR. BAGLEY:  All we've got, Judge, is the CV.

MR. KRULY:  We can hand up a paper copy of

M. MARKS - CX BY MR. BAGLEY

exhibit 41 if it's easier to remove the electronic exhibit from the screen.

(Whereupon, there was a pause in the proceeding.)

MS. HUGGINS:  We attempted to see if it would toggle back to the view of both Dr. Marks and the defendant if we unplugged our laptop.  It was not successful.

MAGISTRATE JUDGE SCHROEDER:  Dr. Marks, can you hear me?

THE WITNESS:  I can.

MAGISTRATE JUDGE SCHROEDER:  Okay.  I just can't see you.  We're working on it.  All right.  I have Dr. Marks on my screen, and I have Mr. Bloom on my screen as well.  All right.  Mr. Bagley.

MR. BAGLEY:  Yes, Judge.

MAGISTRATE JUDGE SCHROEDER:  Dr. Marks, can you hear me?

THE WITNESS:  Yes.

MAGISTRATE JUDGE SCHROEDER:  Mr. Bloom, can you hear me?  All right.  Let the record acknowledge that Mr. Bloom indicated affirmatively by shaking his head in a manner indicating yes, that he could hear me.

MR. BAGLEY:  Okay.  Dr. Marks, I apologize

M. MARKS - CX BY MR. BAGLEY

for the interruptions, but we were talking about your experience, you started at the BOP in your current capacity in February of 2024, correct?

A.   Yes.

Q.   Before that, you had done some competency work in 2009, 2010, is that correct as well?

A.   Yes, it was during my pre-doctoral internship.

Q.   And then you did some sex offender work after that?

A.   I did.

Q.   When you were in 2009 and 2010, that was competency evaluation and criminal responsibility work, correct?

A.   Yes.

Q.   So your competency restoration, which I understand is different than competency evaluations, that experience begins in February of 2024.  Is that correct?

A.   I actually -- this was pre-doctoral training, but if you notice on my CV in 2011, when I worked at Twin Valley Behavioral Healthcare, which is a mental health facility in Dayton, Ohio, I did actually do some work with competency restoration providing treatment to individuals who were not competent at that time.  Again,

M. MARKS - CX BY MR. BAGLEY

this was pre-doctoral level.

Q.   That was part of your education?

A.   Yes.

Q.   So post-doctoral, fully professional, the competency restoration work begins February of 2024?

A.   That's correct.

Q.   Okay.  I kind of lost track of, so I apologize, but you said something about having done 30 forensic evaluations.  Does that include the work you did in 2009 and 2010 period and also your sex offender work, or is that just from 2004 or, I'm sorry, 2024 forward?

A.   Only 2024 forward.

Q.   So that is 30 competency restorations that you've done?

A.   So reports on any competency restoration that resulted in a formal report.

Q.   Okay.  And that formal report was then submitted to a court, I assume?

A.   Yes.

Q.   Okay.  How many times have you testified in a cell hearing like this before?

A.   This is my first cell hearing.

Q.   How many -- of those 30, so let me just get the nomenclature right.  Mr. Bloom is here because you

M. MARKS - CX BY MR. BAGLEY

opined, and another psychiatrist has opined, that he needs to be involuntarily medicated.  How many situations have you dealt with in that respect.  So to rephrase the question, Dr. Marks, how many times have you recommended that a defendant be involuntarily medicated?

A.  It's a good question.  If you mind, I just want to think about it for a moment.  I know of at least two other occasions that I recommended the Court considered involuntary medication under cell.

Q.  And that is two of how many?  How many situations were presented to you where you had to make that determination?

A.  Typically individuals are open to -- I shouldn't say, maybe not typically, typically, in my experience, individuals are open to voluntary medication, so I've only had three cases so far in which psychiatric medication was indicated and the individuals were not, were not willing to consider psychiatric medication voluntarily and they were not -- we were not able to consider involuntary medication through other means such as (inaudible).

Q.  So the answer to that was three, is that right?

A.  Yes.

M. MARKS - CX BY MR. BAGLEY

Q.   And you recommend, of those three, you recommended the Court order involuntary medication in two of them?

A.   No.  In all three cases, I recommended the Court consider ordering involuntary medication.

Q.   Okay.  So has there been any cases in which a defendant did not want to take medication that you thought appropriate and you concluded the Court should not order that he do it or she do it?

A.   Sorry.  Would you mind rephrasing that again?  I want to make sure that I was following.

Q.   Sure.  Have there been any cases in which you believed medication to be necessary, the defendant did not want to engage in that medication, and you made a recommendation to the judge that involuntary medication would not be appropriate?

A.   Not me personally.  Again, when we're recommending psychiatric medication pursuant to *Sell*, there are other considerations that are made by psychiatry.  So there may be some contraindications that psychiatry considers such as medical conditions that would not -- that would deteriorate with medications, et cetera.  So it's a combined consultation.  Sorry, I'm trying to remember if I answered your question or not.

M. MARKS - CX BY MR. BAGLEY

Q.   I think you did.  I think you're saying to me that in every instance in which a defendant has been presented to you where you believe medication is necessary, the defendant refuses, you have not ever opined the Court should not order that medication?

A.   That's correct.

Q.   In those three circumstances that you've identified, what are the alternative treatments that you attempted both with Mr. Bloom and in those other cases?

A.   The alternative treatment methods, did you say?

Q.   Correct.

A.   So with Mr. Bloom specifically, the main concern currently impairing his competency is related to his delusions.  So one of the non-medication treatments that we attempt is challenging those beliefs to see if there is any flexibility and that was not, Mr. Bloom did not exhibit any flexibility in his belief system.  In other cases, I would need to -- I would need -- I would need to refer to my reports.  Offhand, I don't recall what other treatment was utilized.

Q.   As a psychologist, do you have a tool box of medications that you can dip into in cases such as Mr. Bloom's other than the one that you've identified?

A.   I just want to make sure you said alternative

M. MARKS - CX BY MR. BAGLEY

medications.

Q.   Alternative therapies, excuse me.

A.   Typically, individuals with psychotic disorders, the main treatment approach to have any movement is medication.  Therapy can be beneficial in conjunction with it, but medication is typically what is necessary to show any progress in individuals with psychotic disorders.

Q.   Correct to say then and you would agree with me that once Mr. Bloom is diagnosed with schizoaffective disorder, there is really not much that can be done aside from giving him medication?

A.   In terms of competency restoration?

Q.   Yes.

A.   I think that in terms of competency restoration and improvement in psychotic symptoms, psychiatry treatment through medication is necessary.

Q.   So Mr. Bloom arrived at your facility Butner on 3/25/25 according to your report on page 8?

A.   Referring to my report, yes.

Q.   And then you met with him, was that -- the first date that is in your report is on April 1st, 2025, was that the first time that you met with Mr. Bloom?

A.   No.  On page 8 under "hospital course," that very

M. MARKS - CX BY MR. BAGLEY

first paragraph there, I met with Mr. Bloom when he first arrived on March 25th, 2025.

Q. Okay. So you were a part of that interview that occurred in receiving and discharge?

A. Yes.

Q. And did you meet with him in between 3/25 and 4/1, if you recall?

A. I don't recall off the top of my head. I do want to -- I do want to clarify that not every contact that I had with Mr. Bloom or with other patients is documented. The sessions or encounters that I typically document in my reports are sessions in which I think are helpful in terms of speaking to the legal question that he had or diagnostically.

Q. Right. So you've identified the significant encounters that you've had with Mr. Bloom?

A. Correct.

Q. And in the first significant encounter would have occurred on April 1st, 2025 after the initial interview?

A. Yes.

Q. And on that date, according to your report, you encouraged Mr. Bloom to consider psychiatric medication, correct?

A. Correct.

M. MARKS - CX BY MR. BAGLEY

Q.   Okay.  Did you -- I mean, there is nothing in the report here about having you challenged his beliefs at this point, right, on 4/1/2025?

A.   If I could just review my report.

Q.   Sure.

A.   That's correct.  I did not challenge his beliefs on 4/1/25.

Q.   And at some point in that conversation, you told him the Court would most likely consider involuntary medications in the future?

A.   I advised him that was a possibility.

Q.   So the next significant encounter occurs on 4/22/25 according to your report, is that correct?

A.   Actually, on April 9th, 2025, I had another encounter with him.

Q.   Okay.  Fair enough.  So on April 9th, you again asked him if he considered psychiatric medications, correct?

A.   Yes.

Q.   On April 22, that is the next significant encounter, am I correct in saying that?

A.   Yes.

Q.   And, again, you asked him about psychotropic medications?

M. MARKS - CX BY MR. BAGLEY

A.   Yes.

Q.   You were part of the treatment team that met with him on May 12th?

A.   Yes.

Q.   And for your benefit, I'm on page nine of your report.  And, again, you asked him he remained unreceptive to psychiatric medication, correct?

A.   Correct.

Q.   And you've made no indication here on 5/12 that you challenged any of his beliefs, correct?

A.   That's correct.  I do want to say it is possible that I may have gently challenged his beliefs or asked questions contrary to what he believed, but it was not explicitly noted in my notes.

Q.   And if it was important, you would have put it in these notes, right?  I mean, this is the report you're sending to the Judge.

A.   Yes.  I think I really wanted to highlight how much I challenged it later in the records, but it's not here in my report, but I should have.  I agree I should have notated if I had done so in my report earlier.

Q.   So then you do note on May 29th, 2025 that you challenged Mr. Bloom's delusional beliefs regarding his legal case.  That's right.  Correct?

M. MARKS - CX BY MR. BAGLEY

A.   Yes.

Q.   Mr. Bloom discussed something about the FBI and you countered explaining how that wouldn't make sense, something to that affect?

A.   Yes.

Q.   That is a rough estimation, but you essentially challenged his beliefs.  So explain to me what it is, if you could and to the court, Dr. Marks, what does challenging beliefs entail?

A.   Essentially providing evidence to the contrary to suggest that one's beliefs are not accurate.

Q.   So you challenged Mr. Bloom discussed that if the FBI had investigated his case he would be open to the possibility that his beliefs are inaccurate right?

A.   Yes.

Q.   And you pointed out that a FBI Officer signed his Criminal Complaint and he responded that it was just a task force officer and so not truly the FBI, correct?

A.   Yes.

Q.   Was that the extent of you challenging his belief in that regard?

A.   That is what I have documented.

Q.   And again, we've been over this, but this is a report that you're sending to the judge, correct?

M. MARKS - CX BY MR. BAGLEY

A.   Correct.

Q.   And it's 16 pages long, correct?

A.   Correct.

Q.   And you're including everything that you believe to be significant and important for the judge to consider, correct?

A.   Correct.

Q.   Okay.  So you meet with him again on 6, 11, June 11th.  And you note that you challenged his beliefs at this point.  And for the record and for your benefit Dr. Marks we're on page 10 of your report and I don't think I've said the exhibit number yet so just to be safe exhibit No. 24.  He pointed out, Mr. Bloom that is, pointed out that the Criminal Complaint had factual inaccuracies and which was evidenced to him that his friend did not file the complaint and you challenged those beliefs.  How did you challenge those beliefs?

A.   I provided feedback to Mr. Bloom that sometimes inaccuracies can happen.  If I recall off the top of my head, I think he was talking about like the name of an employer or something to that affect and I pointed out that mistakes can be made factual mistakes can be made, but that may not, you know, that happens with any professional and that was something that he was

M. MARKS - CX BY MR. BAGLEY

unwilling to consider.

Q.   And that is the only thing noted on 6, 11 regarding challenging his beliefs, correct?

A.   I don't recall if it was on this date or another date, but I also know that I reviewed with Mr. Bloom, showed him communications from the alleged victim that she was telling Mr. Bloom to stop communicating with him.  And again I don't remember if that was this date or another date but when I advised here is some evidence to show that this individual did not want to communicate with you further, he was unwilling to consider that that was actually the victim communicating that.

Q.   Okay.  And that is not included in this report, correct?

A.   That specific statement, I did not explicitly state that.

Q.   Well, let's be clear, you just mentioned you challenged his beliefs in a certain way by presenting some evidence to him, correct?

A.   Correct.

Q.   But that strategy wasn't identified in this report, correct?

A.   I wouldn't agree with that statement.

Q.   So there is a point in this report in which you

M. MARKS - CX BY MR. BAGLEY

say that you confronted Mr. Bloom with evidence?

A. The Criminal Complaint.

Q. And did you ever confront Mr. Bloom with evidence that would suggest the Criminal Complaint is correct or accurate?

A. Could you restate that question.

Q. Did you ever confront Mr. Bloom with evidence to suggest that the Criminal Complaint is accurate?

A. I'm not, I'm sorry I'm not understanding your question.

Q. Well, Mr. Bloom believes that the Complaint is inaccurate, correct?

A. Yes.

Q. You know what a Criminal Complaint is, I assume, is that right?

A. Yes.

Q. Okay. And that is a charging document that presents allegations to, that Mr. Bloom committed certain crimes, correct?

A. Yes.

Q. And the factual, at least as the government sees it and the agent producing the report, the factual allegations that support the charge, correct?

A. Correct.

M. MARKS - CX BY MR. BAGLEY

Q.   And Mr. Bloom reviewed that Complaint and told you that certain information in there was inaccurate, correct?

A.   Yes.

Q.   Did you ever present any evidence to Mr. Bloom that what -- that what was put forth in the Complaint was indeed accurate?

A.   No.  I did not do the investigation, so, no.

Q.   And then again on 6/11, Mr. Bloom reiterated that he was not interested in psychiatric medication.  I assume that was because you asked him again if he would like to partake in psychiatric medication.  Is that right?

A.   Correct.

Q.   A few days later, June 17th, you ask him again about taking medication, correct?

A.   Yes.

Q.   He was educated, according to the report, how psychiatric medication could assist him, correct?

A.   Yes.

Q.   A couple weeks after that, July 3rd, 2025, you note that he was again advised that I believe he had a mental health diagnosis that would benefit from psychotropic medication, correct?

M. MARKS - CX BY MR. BAGLEY

A.   Yes.

Q.   Let's talk a little bit about these competency education classes.  You note in the record that Mr. Bloom did not attend any of these sessions that were offered to him and you also noted on direct that they pertain to, essentially, the key players in a courtroom, the basic facts needed to -- basic facts that a defendant would need in order to be competent.  Is that correct?

A.   Correct.

Q.   Later on in your report on page 13, there are several paragraphs that discuss those types of things.  Is that right?

A.   Yes.

Q.   For instance, the second paragraph down, the first full paragraph, Mr. Bloom is able to describe his current charge pretty accurately.  Would you agree with that?

A.   Yes.

Q.   If you go to the second paragraph of the full paragraph of that page, he knew what my role as the public defender was.  Though he didn't think I was doing a great job, but he knew what my role was, right?

A.   Correct.

M. MARKS - CX BY MR. BAGLEY

Q.   He knows what the prosecutor's role was?

A.   Correct.

Q.   And he was even aware of the jury, the witnesses and he knew he of the defendant, right?

A.   Yes.

Q.   Getting a little more complex.  Mr. Bloom was able to identify the types of resolutions that occur in a criminal setting to include guilty, not guilty, no contest and NGRI.  What is NGRI?

A.   Not guilty by reason of insanity.

Q.   So Mr. Bloom was able to identify all that?

A.   Correct.

Q.   He knew, for instance, that if he was to be found guilty, he could face incarceration?

A.   Correct.

Q.   And he knew what a plea bargain was?

A.   Yes.

Q.   This type of understanding continues on page 14, and the report is in the record, so I won't belabor it too much, but he also knew that you didn't -- you could but didn't have to testify in his own defense, correct?

A.   Yes.

Q.   He knew what the purpose of cross examination was?

M. MARKS - CX BY MR. BAGLEY

A.   Yes.

Q.   He even knew the difference between a bench trial and a jury trial?

A.   Correct.

Q.   And, finally, again, I'm just kind of skipping ahead for purposes of expediency, he knew in a courtroom you have to act with decorum, and when addressed questions posed to you, you need to answer and when you're testifying, right?

A.   Yes.

Q.   Okay.  Let's talk now, Dr. Marks, a little bit about your diagnosis.  And remind me again what that is. I always forget the second piece of it, psychoaffective disorder?

A.   Schizoaffective disorder.

Q.   And what is the second part of that?

A.   Bipolar type.

Q.   Bipolar type.  Would you agree that in your field, diagnosing a mental health disorder is a little bit art and a little bit science?

A.   I guess I would need to know your definition of art, but I think it's not always easy.

Q.   And it's not always easy because it's not as if you can run somebody's brain through a CAT scan and

M. MARKS - CX BY MR. BAGLEY

produce a result that we know with a high degree of certainty what the issue is with that individual?

A.   I agree.

Q.   You agree with that statement.  Okay.  In fact, in Mr. Bloom's case, he, as you testified on direct, received some therapy in early 2020.  He then went to a hospital and he then was evaluated by Dr. Morris in LA. And all three of those providers diagnosed him with something different, correct?

A.   That's correct.

Q.   And then he saw you, Dr. Marks, and you provided yet another, so a fourth diagnosis for Mr. Bloom, correct?

A.   That's correct.

Q.   And that is over the span of, I think the first diagnosis was in 2010, so over the span of 15 years. Actually, it wasn't that far back, was it?  2020.  Let me get that right, Doctor, unless you know it.

A.   He actually had been diagnosed with ADHD, I think, earlier than, I'm sure earlier than Dr. John Laughlin-Presnal's diagnosis.

Q.   Right.  So even if we ignore that and talk about Dr. Laughlin-Presnal's diagnosis in 2020 to 2022, so over the course of five and a half years, Mr. Bloom's

M. MARKS - CX BY MR. BAGLEY

been diagnosed with almost as many, four, mental health disorders, correct?

A.   Correct.

Q.   And, Doctor, what I want to focus on is Dr. Morris' diagnosis because she is also a BOP psychologist like yourself, correct?

A.   Yes.

Q.   She works in Los Angeles, you work in North Carolina.  But Dr. Morris is also a forensic psychologist like yourself, correct?

A.   Yes.

Q.   And Dr. Morris diagnosed Mr. Bloom with delusional disorder, persecutory type, right?

A.   Correct.

Q.   When you did your evaluation over the course of meeting with Mr. Bloom in your capacity, did you call Dr. Morris and discuss Mr. Bloom's case at all?

A.   I did not.

Q.   You didn't confer with her at all about why she diagnosed Mr. Bloom the way she did?

A.   I did not.

Q.   You gave -- on direct, the government had asked you why it is that you arrived at your diagnosis and one thing that you mentioned is that you think that she

M. MARKS - CX BY MR. BAGLEY

neglected certain aspects of the way Mr. Bloom presented, right?

A.   Historically.

Q.   One way to be able to confirm whether or not she neglected those things would be to reach out to her and ask her, correct?

A.   That could have been a way, yes.

Q.   You conclude that your role in this process, if I understand it correctly, is to make -- render an opinion as to whether you think folks like Mr. Bloom are restorable.  Is that fair to say?

A.   Yes.

Q.   So you have to have some understanding of what that means in a legal context, I assume?  You are a forensic psychologist, so is that a safe assumption?

A.   Yes.

Q.   You conclude on page 15 of your report, and I'll just read that for purposes of making it easy for everybody, "Based upon data that the vast majority of individuals with psychotic disorders experience improvement in the symptoms of their illness and are restored competency, it is my opinion that Mr. Bloom's prognosis for competency restoration with adherence to a medication regiment is good."

M. MARKS - CX BY MR. BAGLEY

Are you aware that -- are you aware the Court must make a determination that Mr. Bloom's potential for competency restoration -- let me rephrase that.  I'm sorry, Dr. Marks.

Are you aware that the standard for the Court to consider is whether there is a substantial likelihood that Mr. Bloom be restored to competency?

A.   Yes.

Q.   How would you quantify substantial likelihood?

A.   Because it is a legal definition, I don't have a psychological equivalent, but, again, when we look at the research, the majority of individuals with psychotic disorders are restored competency with medication and so that is the basis that I believe that he is likely to be restored.

Q.   So you say that his prognosis is good, is that better than substantial likelihood or is that worse than substantial likelihood?

A.   Again, because I don't have an equivalent definition of "substantial likelihood," I don't know that I can give you a firm answer in that.  I just think it's definitely, I think he would be restored to competency.

Q.   And that is based on -- tell me again, based on

M. MARKS - CX BY MR. BAGLEY

what?

A.   Based on research that most individuals are restored competency with individuals consistent with Mr. Bloom's diagnosis.

Q.   Can you identify that research?

A.   There is a lot of literature.  I don't have -- I can't cite that off the top of my head which articles.

Q.   Are you aware of any articles that -- are you aware what of any articles that discuss the negative effects of the type of medication that you think Mr. Bloom should have?

A.   When you say the negative effects, can you -- can you tell me more what you mean?

Q.   Sure.  So are you aware of any studies that suggest that there are serious side effects to the types of medication?

A.   I'm aware that there is a potential for serious side effects from medication.

Q.   Are you aware of any studies that indicate that long term maintenance on these types of drugs may, in fact, worsen outcomes?

A.   Worsen outcomes in which way?

Q.   Well, are you aware of these studies that suggest that drugs, these types of drugs can lead to dementia?

M. MARKS - CX BY MR. BAGLEY

A.   I'm not familiar with the particular research you're referring to, but I would be interested in reviewing it.

Q.   Are you aware that the World Health Organization has published guidance to eliminate involuntary psychiatric treatment all together?

A.   I'm not familiar with that.

Q.   Do you know that they suggest that involuntary treatment can harm a person's mental and physical health, exacerbate crisis situations, damaging relationships with the clinicians, family members and others involved in coercive measures and driving people away from the mental health care system?

A.   I'm not intimately familiar with what you're citing.

Q.   Would you agree with any of those sentiments that the WHO expressed?

A.   I would like to go through each of them individually if that would be possible.

Q.   Well, let's just go through them real quickly here.  Do you think it's possible that involuntary treatment can harm a person's mental and physical health?

A.   I think it depends on the individual.  We have to

M. MARKS - CX BY MR. BAGLEY

look at each individual to make that decision.

Q.   Do you think it could exacerbate a crisis situation?

A.   Again, that is so vague that I don't -- I don't have an answer to that.

Q.   Well, let's move onto the next one.  Do you think it could damage clinicians and others involved in the system?

A.   I think it has the potential initially, but I also think in seeing this in my own experience that when individuals are medicated, following that medication, they see things differently and they understand that help was trying to be provided.

Q.   But you recognize that as a possibility that these negative things can happen?

A.   I'm sure that there is a possibility.

Q.   I mean, because what we're talking about, as I'm sure you're aware, is taking somebody's liberty away, right?

A.   Yes.

          MS. HUGGINS:  Objection.

          MAGISTRATE JUDGE SCHROEDER:  Was there an objection, I wasn't sure.

          Correct me if I'm wrong, Mr. Bagley, but I'm

M. MARKS - CX BY MR. BAGLEY

taking your question to be whether the forced medication could amount to taking someone's liberties away to mean if competency is restored and they go to trial and are convicted, they may be incarcerated, which would equate to taking some liberties away.  Is that the way you meant it?

MR. BAGLEY:  It is not, Judge.

MAGISTRATE JUDGE SCHROEDER:  Then I don't understand the question.  Sustained, so rephrase it.

MR. BAGLEY:  Understood, Judge.

Q.   We're talking about involuntary medication here, right, obviously, Doctor?

A.   Yes.

Q.   So involuntary means that the person to whom -- the person that is receiving the medication does not want the medication?

A.   Yes.

Q.   And that person, if ordered by the Court to receive that medication, is doing it against their will, correct?

A.   Yes.

Q.   And so when I ask could this type of involuntary medication damage relationships with clinicians and family members, attorneys, there is a world in which you

M. MARKS - CX BY MR. BAGLEY

see that as a possibility, correct?

A.   Yes.   But I can see the exact opposite as well.

Q.   Okay.

A.   I have seen the exact opposite.

Q.   Just a moment.   Just two more questions or two more lines that I think should be brief, Doctor.

Number one, there is no history here of Mr. Bloom being restored in the past, right?

A.   Correct.

Q.   And if he were to have been restored in the past, that would be a factor that would suggest that it is more likely that he could be restored again in the future?

A.   Correct.   Such an opportunity had not presented itself with Mr. Bloom's case.

Q.   Right.   And, finally, there is no history -- well aside from, I think he took one course of medication or took one dose of medication at one point, other than that, there is no history of Mr. Bloom receiving medication for the disorder that you diagnosed him with, correct?

A.   If you are referring to antipsychotic medications, correct.

Q.   Right.   So is it correct to say that if Mr. Bloom

M. MARKS - RDX BY MS. HUGGINS

or anybody had received antipsychotic medication in the past had shown that that benefited him, that would be an indicator to you that it would work again in the future, correct?

A.   That's correct.

Q.   But that is not the case with Mr. Bloom because we have no history of him receiving antipsychotic medication?

A.   On an ongoing basis.

Q.   So that is correct?

A.   Yes, on an ongoing basis, correct.

Q.   That is all the questions I have.

MS. HUGGINS:  Briefly, your Honor.

MAGISTRATE JUDGE SCHROEDER:  All right.

**REDIRECT EXAMINATION BY MS. HUGGINS:**

Q.   Dr. Marks, is your report, Government's Exhibit 24, a summary of a multi-month evaluation and individualized assessment of the defendant?

A.   Yes.

Q.   Are there greater detail provided in the case notes that have been stipulated into evidence as Government's Exhibit 26?

A.   Yes.

Q.   So, for example, referring you to page 48 of that

M. MARKS - RDX BY MS. HUGGINS

exhibit, and I'll give you a moment to arrive at that page?

A.   Okay, I'm there.

Q.   Dr. Marks, does page 48 of Government's Exhibit 26 refer to the team meeting with both yourself, Dr. Lee and the defendant on May 12th, 2025?

A.   Yes.

Q.   And is there greater detail in this note than what appears in your summary admitted as Government's Exhibit 24?

A.   Yes.

Q.   And is that representative of the detail that is contained within all of the case notes that make up Government's Exhibit 26?

A.   That there might be additional details in the case notes versus on the report, is that what you're asking?

Q.   Yes, Dr. Marks?

A.   Yes.

MS. HUGGINS:   No further examination.

MR. BAGLEY:   I have no recross, Judge.

MAGISTRATE JUDGE SCHROEDER:   I'm sorry?

MR. BAGLEY:   No recross.

MAGISTRATE JUDGE SCHROEDER:   All right.

M. MARKS - RDX BY MS. HUGGINS

Doctor, do you have your report which has been marked Government's Exhibit 24 in front of you?

THE WITNESS:  I do.

MAGISTRATE JUDGE SCHROEDER:  And I refer you to page 10 of your report with the paragraph starting on June 11th, '25.

THE WITNESS:  Okay.

MAGISTRATE JUDGE SCHROEDER:  The sentence begins "when challenged about his beliefs," and that was in the context of the Criminal Complaint, correct?

THE WITNESS:  Yes.

MAGISTRATE JUDGE SCHROEDER:  When you were discussing the Criminal Complaint with the defendant, did it include and did you have access to the affidavit that was in support or attached to the Criminal Complaint?

THE WITNESS:  Off the top of my head, your Honor, I don't know.  I mean, I reviewed what I've reviewed in my report to check that.

MAGISTRATE JUDGE SCHROEDER:  Well, the Criminal Complaint has attached to it, and I'm referring to case No. 24-MJ-73 starting on page two and this would be the affidavit of Jeffrey Mcauliffe, a task force officer with the Federal Bureau of Investigation, where

M. MARKS - RDX BY MS. HUGGINS

he starts describing the history of the investigation that he swears under oath provides probable cause for the charge to be made.  And in pages 3 and 3, 4, 5, 6, 7, 8, 9, and 10, there is a detail, 11 and 12, detailed references made to alleged actions of the defendant, alleged statements and information provided by victim one and references made to a victim two and the husband of victim one.  Do you recall using any of that type of information when you were discussing the challenging aspects with the defendant as to his concept of the Complaint and what you understood the Complaint to involve?

THE WITNESS:  Your Honor, I am not definitively sure whether I did that or not.  I might be able to review the discovery information and maybe that might jog my memory, but I can't say for certain whether I used that information in challenging Mr. Bloom's beliefs.

MAGISTRATE JUDGE SCHROEDER:  Let me ask it this way, did you have an actual copy of the Criminal Complaint?

THE WITNESS:  Yes.

MAGISTRATE JUDGE SCHROEDER:  Normally a Criminal Complaint is a one-page document and doesn't

M. MARKS - RDX BY MS. HUGGINS

travel around by itself because it's really based on an affidavit.  In this case, the affidavit consisted of 21 typed pages, which has a descriptive history of the things that led up to this Complaint being charged.  And so I'm just trying to discern whether that would have utilized information when you make reference to challenging the defendant as to what he says the facts of the situation were in the context of the Complaint and what you understood them to be.

THE WITNESS:  I, in terms of the history of the case, I recall asking information, showing Mr. Bloom information regarding communication that was detailed in records, and so I'm not sure, your Honor, if that is the affidavit that you're referring to or not.  I don't remember what it was titled.

MAGISTRATE JUDGE SCHROEDER:  Okay.  Because part of the contents of the affidavit that I've been making reference to does include what appear to be screen shots of text messages or e-mails or conversations, that type of thing.

THE WITNESS:  It is likely that what I'm referring to, but I can't say definitively.

MAGISTRATE JUDGE SCHROEDER:  All right.  I understand.  Thank you.

M. MARKS - RDX BY MS. HUGGINS

MS. HUGGINS:  Judge, if I may just ask one follow-up question based on the Court's questions.

MAGISTRATE JUDGE SCHROEDER:  Yes.

**CONTINUING REDIRECT EXAMINATION BY MS. HUGGINS:**

Q.  Dr. Marks, do you recall the Criminal Complaint that you viewed being a multi-page document?

A.  Yes, it was definitely more than one page, for sure.

Q.  Whether that was a Complaint and included an affidavit or not, are you sure of the terms of the documents were titled?

A.  No, I'm not sure what the documents were titled.

Q.  Is greater detail provided in the case notes, Government's Exhibit 26, that gets into the factual allegations supporting the charge in the Criminal Complaint?

A.  Sorry, do I have exhibit 26?

Q.  Let me rephrase that and ask it a different way.

On the various times that you discussed the Criminal Complaint with the defendant, did you challenge his beliefs using information that you gained from the Criminal Complaint?

A.  And in addition to other investigative documents, yes.

M. MARKS - RDX BY MS. HUGGINS

Q.   And was some of that information facts that were alleged that you, in your role, you understand to support the charges from the Criminal Complaint?

A.   Yes.

MS. HUGGINS:  Nothing further, your Honor.

MAGISTRATE JUDGE SCHROEDER:  Mr. Bagley?

MR. BAGLEY:  Nothing further.

MAGISTRATE JUDGE SCHROEDER:  Thank you, Doctor.

THE WITNESS:  Thank you, your Honor.

MAGISTRATE JUDGE SCHROEDER:  You're excused.

THE WITNESS:  Thank you.

MAGISTRATE JUDGE SCHROEDER:  I'm anticipating a grand jury report and I thought they were on their way up.  And I was going to take a break while I tended to that business.  Didn't you tell me 10 minutes?

Off the record.

(Whereupon, there was a discussion off the record.)

All right.  So we'll take a short recess in the case of United States versus Bloom.  I don't want to lose contact with our Zoom.

THE CLERK:  We won't.

M. MARKS - RDX BY MS. HUGGINS

MAGISTRATE JUDGE SCHROEDER:  All right.  My courtroom deputy assures me nothing can go wrong, nothing can go wrong, nothing can go wrong.  I'll address the other matter and when the grand jury foreman or foreperson comes, I'll tend to that and then we'll pick back up with the Bloom case.

MR. KRULY:  Yes, your Honor.  And we'll have Dr. Lee, our next witness, ready to go when the Court resumes.

MAGISTRATE JUDGE SCHROEDER:  All right.  Thank you.

MR. KRULY:  Thank you.

(Whereupon, there was a break in the proceeding.)

THE CLERK:  We're back on the record here in the case of United States versus Nicholas Bloom.

MR. KRULY:  Your Honor, the government calls Dr. Sandy Lee.

MAGISTRATE JUDGE SCHROEDER:  Good afternoon.  Dr. Lee, can you hear me?

THE WITNESS:  Yes I can.

MAGISTRATE JUDGE SCHROEDER:  All right.  Do you solemnly swear that the testimony that you are about to give and make in this proceeding will be the truth

S. LEE - DX BY MR. KRULY

the whole truth and nothing but the truth?

THE WITNESS:  Yes.

MAGISTRATE JUDGE SCHROEDER:  All right. Would you kindly state your name for the record, please, and spell your last name?

THE WITNESS:  Sandy Lee, L-e-e.

MAGISTRATE JUDGE SCHROEDER:  Mr. Kruly.

MR. KRULY:  Thank you, your Honor.

**DIRECT EXAMINATION BY MR. KRULY:**

Q.  Good afternoon, Dr. Lee.

A.  Hello.

Q.  Where are you employed?

A.  At the Federal Medical Center in Butner, North Carolina.

Q.  What is your job at Butner?

A.  I am a staff psychiatrist.

Q.  How long have you been a psychiatrist at Butner?

A.  Since May of 2023.

Q.  Let's step back for a moment.  Can you describe your education?

A.  I went to medical school at Texas A&M, and thereafter I did my adult psychiatry residency training at Baylor College of Medicine and then I did my child and adolescent fellowship at Baylor College of Medicine

S. LEE - DX BY MR. KRULY

as well.

Q.   When did you graduate from medical school?

A.   In 2014.

Q.   And when did you complete your residency?

A.   For the full training, including fellowship, in 2019.

Q.   Would it be fair to say that you have been practicing psychiatry for around a decade?

A.   Yes.

Q.   Can you tell the Court about the jobs that you've held prior to working at Butner?

A.   After I graduated, I worked at an outpatient clinic working with adults and children.  And then during my time in residency, I also was moonlighting at the Menninger Clinic.

Q.   And in those positions, did you work as a psychiatrist?

A.   Yes.  I saw patients, I did evaluations, I recommended medications, if needed.  I did a little bit of therapy as well.

Q.   And is that similar to what you do now at Butner?

A.   Yes.  I'm a consultant here, so I mainly -- I'm given a consult to see patients that are typically pretrial, sometimes they have already been sentenced, to

S. LEE - DX BY MR. KRULY

see if they have a psychiatric condition that warrants medications.

Q.   And are you board certified in anything, Dr. Lee?

A.   Yes.  I'm board certified in adult and child and adolescent psychiatry.

Q.   And can you briefly summarize how you keep abreast of developments in psychiatry?

A.   We are required to do continuing medical education, which includes courses to stay current on new medications or knew treatments in the psychiatric field.

Q.   Now, in the course of your career, both at Butner and prior to your work at Butner, have you treated patients with schizoaffective disorder?

A.   Yes.

Q.   Can you summarize briefly what schizoaffective disorder is?

A.   Schizoaffective disorder is a disorder consisting of psychotic and mood disorder symptoms, so in the psychotic piece, that may include hallucinations, delusions, disorganized speech or behaviors, and that is commonly throughout their time with schizoaffective disorder.  And then they may have a mood disorder piece along with that, which may be a depressive episode or a manic episode.  So there may be a two-week time frame

S. LEE - DX BY MR. KRULY

where they don't show mood disorder symptoms, but they continue to show the psychotic symptoms.

Q.   Can you estimate the number of patients over the course of your career whom you've treated with schizoaffective disorder?

A.   I don't have an exact number, but it's been hundreds, if not thousands.  I've seen so many patients at this point.

Q.   And, again, would it be fair to say that you've treated patients with schizoaffective disorder prior to your work at Butner?

A.   Yes.

Q.   Now, you touched on this briefly earlier, but can you summarize your day-to-day responsibilities at Butner?

A.   I see new patients and I also follow up with patients I've already been consulted on to see if -- so in the evaluation, I will assess if they have a psychiatric condition, and then from there, does that condition warrant a medication that could help decrease the symptoms, and in this setting to restore them competency.

Q.   Now, in the course of your employment at Butner, have you been assigned to a patient named Nicholas

S. LEE - DX BY MR. KRULY

Bloom?

A.   Yes.

Q.   And is there anyone else at Butner who is assigned to Mr. Bloom's case?

A.   No.

Q.   Are there any psychologists assigned to Mr. Bloom's case?

A.   Dr. Marks is his evaluator.

Q.   And have you consulted with Dr. Marks during the course of your evaluation of Mr. Bloom?

A.   Yes.

Q.   Now approximately when did you first encounter Mr. Bloom?

A.   He admitted to Butner on March 25 of 2025 and then I first evaluated him on March 28th of 2025.

Q.   And can you describe that first meeting you had with Mr. Bloom on March 28th of 2025?

A.   In that meeting, Mr. Bloom was quite talkative. Whenever he spoke about the persecutory delusions, he spoke continuously, but he was able to be interrupted, but it was difficult to redirect because he would continue to speak about those delusions.

Q.   Were you able to draw any initial impressions or conclusions from your first meeting with Mr. Bloom?

S. LEE - DX BY MR. KRULY

A.   The first meeting, I did believe he had a psychotic disorder.  It wasn't flushed out until later on as we got more information, but in that meeting, I did recommend medications because I did believe that he had at least a psychotic disorder.

Q.   And what was that conclusion based on?

A.   So in the end, I also agreed with Dr. Marks that he had schizoaffective disorder based on his history, looking through the records, and also the collateral that she received from the his parents.

Q.   But stepping back and focusing on this March 28th, 2025 meeting, what happened during that meeting that led you to the conclusion that Mr. Bloom had a psychotic disorder?

A.   He spoke quite a bit about how he was abused or targeted, not just by his parents, but by friends and how his life had really turned upside down in 2024, which, in his words, were uncharacteristic of his life prior.  He even spoke about losing his apartment because he was evicted and how he also lost his job and he did describe some of the circumstances.  But later on, I received a little bit more detail about what occurred that led to the decline of his life.  And so --

Q.   Go ahead.

S. LEE - DX BY MR. KRULY

A.   It appeared he had more persecutory delusions.

Q.   And you testified in that first meeting with Mr. Bloom you discussed the possibility of medication?

A.   Yes.

Q.   And what was Mr. Bloom's response?

A.   He declined.  He said that he wanted to acclimate to the setting and that he would think about it, but in the first meeting, he did not accept medications.

Q.   Now, did you meet with Mr. Bloom again after that first meeting on March 28th?

A.   I did.  So thereafter we met with him on April 1st for a treatment team with Dr. Marks and then we also recommended medications and he declined as well.

Q.   Did you discuss at that April 1st meeting, did you discuss with Mr. Bloom the possibility of involuntary medication?

A.   I did.

Q.   What was Mr. Bloom's response?

A.   He stated that the Criminal Complaint, they were half truths, and so he did not -- he also did not have full faith in his attorney's intentions and he wanted to prove his story, so he did decline medications in that meeting.

Q.   And we're not going to go through, Dr. Lee, each

S. LEE - DX BY MR. KRULY

of the meetings you had with Mr. Bloom, but would it be fair to say that you met with Mr. Bloom on several occasions after those initial meetings?

A.   Yes.

Q.   What was the purpose, generally speaking, what was the purpose of those subsequent meetings?

A.   When we believe that they have a psychiatric disorder and medications could benefit them, we continue to meet with them to offer medications and that is the reason why I continued to meet with him.

Q.   And over the course of your meetings with Mr. Bloom, what was his response to the topic of medication?

A.   He declined each time.  Eventually the answer that was most consistent was that he wanted to exercise his legal rights before considering medications only if they were court ordered.

Q.   So Mr. Bloom did express a willingness to take medication?

A.   If it was court ordered, yes.

Q.   And did you discuss with Mr. Bloom in any of your meetings the type or form of medication that were available for his disorder?

A.   In general, but not specific medications because, at the time, he wanted to go through the legal process.

S. LEE - DX BY MR. KRULY

And I informed him in July that we could discuss it if at some point there was a court order for involuntary medications.

Q. Did you discuss in general terms with Mr. Bloom the possibility of injectable medication versus oral medication?

A. Yes.

Q. Can you describe that conversation?

A. That conversation was in July and he had remarked that he would be willing to consider a long-acting injectable based on another peer that he had spoke to. But he also said that he is fairly open minded and would also consider oral medications.

Q. Would it be fair to say, Dr. Lee, that your meetings with Mr. Bloom have been less frequent than perhaps Dr. Marks meetings with Mr. Bloom?

A. Yes.

Q. And is that because your role is to consult and provide consultation services to Dr. Marks?

A. Correct.

Q. Nonetheless, have you reviewed Mr. Bloom's medical records maintained by the Bureau of Prisons?

A. Yes.

Q. Have you reviewed other records related to Mr.

S. LEE - DX BY MR. KRULY

Bloom?

A.   I also reviewed the forensic evaluations from Dr. Marks and also the previous psychologist and then he also had Alta Bates records from the Emergency Room.

Q.   And have you discussed Mr. Bloom's case with Dr. Marks?

A.   Yes.

Q.   And have you discussed Mr. Bloom's case with other colleagues at Butner?

A.   Not specifically, so no.

Q.   But are you nonetheless familiar with Dr. Mark's diagnosis for Mr. Bloom?

A.   Yes.

Q.   And you said that was schizoaffective disorder bipolar type?

A.   Correct.

Q.   Do you agree with that diagnosis?

A.   I do.

Q.   After your evaluation of Mr. Bloom and your review of these records, did you develop a recommended treatment plan for Mr. Bloom?

A.   I did.

Q.   And, Dr. Lee, you have in front of you what has been marked and introduced into evidence as exhibit 25.

S. LEE - DX BY MR. KRULY

A.   Yes.

Q.   And what is exhibit 25?

A.   That is the forensic addendum.  It is the individualized treatment plan I created for Mr. Bloom.

Q.   So you wrote this report?

A.   I did.

Q.   And prior to your testimony today, did you have a chance to review this report?

A.   I did.

Q.   We're going to go through the report in a minute, but, generally speaking, what sort of medication did you recommend for Mr. Bloom?

A.   Generally within the antipsychotics category.

Q.   And can you summarize what antipsychotic medication is?

A.   Antipsychotic medications treat psychotic disorders, but these days we also treat it for mood disorder symptoms.

Q.   And why do you recommend that Mr. Bloom take antipsychotic medications?

A.   Based on his diagnosis and symptoms that he exhibited in the past to present, so we're looking to start to get his psychotic symptoms, but also his mood symptoms that he exhibited in the past.

S.  LEE - DX BY MR. KRULY

Q.   In your medical opinion, is there a standard course of treatment for someone with a psychotic disorder?

A.   Yes.  We would treat them with antipsychotic medications.

Q.   And in your medical opinion, are antipsychotic medications substantially likely to restore Mr. Bloom to competency?

A.   Yes.

Q.   And in your medical opinion, are antipsychotic medications necessary to restore Mr. Bloom to competency?

A.   Yes.

Q.   What are your opinions based on?

A.   These are based on articles, these are based on standard treatment, the FDA has also approved certain medications for schizoaffective disorder, also based on my experience treating patients.

Q.   You referenced medical studies, correct?

A.   Correct.

Q.   Can you identify which studies you've relied on in forming your opinions?

A.   The two studies that added to the support of my opinion was the Cochran study, the Sellfect and the

S. LEE - DX BY MR. KRULY

Bailey study "Do antipsychotic medications work."

Q.   And are you familiar with both of those studies?

A.   I am.

Q.   Can you summarize the conclusions of those studies as it relates to Mr. Bloom's case?

A.   Both studies look at antipsychotics and their role in competency and how there is actually a high rate of improvement and where they end up being competent to stand trial when treated with medications.

Q.   And you testified as well that your experience -- you based your opinion on your experience, correct?

A.   Correct.

Q.   Did your experience and being a psychiatrist support the conclusions in those studies?

A.   They do.

Q.   Now, based on your experience and in your opinion, is there any way of restoring Mr. Bloom to competency without medication?

A.   No.

Q.   Why not?

A.   Schizoaffective disorder, in a nutshell, is a condition where there is neurobiological -- where you need medications to help regulate that.  So therapy would not work for this, he would need medications.

S. LEE - DX BY MR. KRULY

Q.   Is there -- I don't want to oversimplify it, but would it be fair to say that a psychotic condition is a result of some kind of chemical imbalance?

A.   Yes.

Q.   And in your opinion, can that chemical imbalance be treated with anything other than medication?

A.   No.

Q.   So, in your opinion, are antipsychotic medications appropriate to treat schizoaffective disorder?

A.   Yes.

Q.   Now, are there different types of antipsychotic medications that are typically or generally prescribed for schizoaffective disorder?

A.   Yes.  There is the first-generation antipsychotics which came out in the 1950s, and second generation antipsychotics, but they came out in the 1980s; but both of them generally treat psychotic disorders.

Q.   And generally speaking, what is the difference between first and second generation antipsychotic medications?

A.   Like I said earlier, one came out a little bit earlier, but first generation antipsychotics, they have

S. LEE - DX BY MR. KRULY

a little bit more propensity for neuromuscular side effects, versus second generation antipsychotics have a little bit more propensity for metabolic issues like increased sugar levels or cholesterol issues over time.

Q.   Do second generation antipsychotics also -- can they also be used to treat mood disorders?

A.   Yes, they can.

Q.   And although we're using the term "second generation," I believe you testified that second generation antipsychotics are well established at this point, correct?

A.   Correct.

Q.   And they've been used for decades?

A.   Yes.

Q.   Now, you developed a recommended course of treatment for Mr. Bloom, is that correct?

A.   Correct.

Q.   And I'm going to refer you back to exhibit 25, which is your forensic addendum, and direct you to pages four to six.

A.   Okay.

Q.   Can you summarize what is found on pages four to six of your report?

A.   Four to six, they are options that I believed

S. LEE - DX BY MR. KRULY

would be best for Mr. Bloom to take.  They go in the order of preference, but there is -- and then at the very end, I add a mood stabilizer if needed as an adjustment to one of the antipsychotics.

Q.  So you've listed multiple medications on pages four to six, correct?

A.  Correct.

Q.  Are you recommending that Mr. Bloom take all of these medications?

A.  No.  These are in the order that I would try them, unless we have a conversation and there is a preference that he would rather try.

Q.  And are you familiar with the term mono therapy?

A.  Yes.  So I would try to treat him with one medication because we try to treat with the most minimum dose and the most minimum amount of medications.

Q.  So you would begin with the least intrusive treatment plan before ramping it up.  Would that be fair?

A.  Correct.

Q.  Now, on pages four to six, we have, I believe, six medications listed.  Are each of these medications antipsychotics?

A.  Yes.

S. LEE - DX BY MR. KRULY

Q.   So would you expect, based on your experience and the studies that you reviewed, would you expect each of these medications to restore Mr. Bloom to competency?

A.   Yes.

Q.   I'm going to go through these recommended medications now.  And the first medication you have listed here, I'm going to spell this first for the record, P-a-l-i-p-e-r-i-d-o-n-e.  Paliperidone.  Did I pronounce that correctly?

A.   Yes.

Q.   What is Paliperidone?

A.   That is an antipsychotic medication within the second generation.  It does have a couple different formulations.  One being the pill form, but it also has an injectable formulation.

Q.   Can you explain why you recommend the Paliperidone first?

A.   The reason why I recommended that one first is because, based on our conversation, Mr. Bloom indicated that he would be willing to take an injectable formulation, but also because it is FDA approved for schizoaffective disorder, and I've had many patients that have taken this before and they've done quite well on it.

S. LEE - DX BY MR. KRULY

Q.  So Paliperidone is FDA approved for the disorder that Mr. Bloom has been diagnosed with, correct?

A.  Correct.

Q.  And you testified that Paliperidone is available in both injectable and oral form, correct?

A.  Correct.

Q.  Are there any medical benefits to an injectable versus an oral medication, at least in this context?

A.  It helps with adherence so they don't have to come to a pill line on a daily basis because it's taken once a month.  The other advantage, it provides a stable and consistent drug level so that may help with also reduced side effects, but also a consistent improvement in symptoms.

Q.  So would it be your preference as a doctor that a patient with schizoaffective disorder take an injectable form of Paliperidone rather than an oral form?

A.  That is correct.

Q.  And based on your conversation with Mr. Bloom, he expressed a willingness to take long-acting injectable forms of medication if ordered to do so, correct?

A.  Yes.

Q.  Based on your experience and your review of the medical literature, how long would you expect that Mr.

S. LEE - DX BY MR. KRULY

Bloom would have to take Paliperidone before he is restored competency?

A.    It's variable.  Some people we start to see large improvements within two to three months, but in literature, they typically say it's less than five months.

Q.    Is there anything in Mr. Bloom's background or history that may lead you to think he would be on the longer or shorter end of that time frame?

A.    No, I would expect about five months.

Q.    And are there any common side effects to Paliperidone?

A.    There is a possibility, like I said earlier, about metabolic side effects.  So we would monitor his sugar levels and cholesterol.  We usually get labs about once a year.  We can do it more frequently if needed. The other thing is he may show some neuromuscular side effects and we have medications to help treat that or help alleviate those side effects if need be.

Q.    And the metabolic side effects, can you describe some of those possible side effects?

A.    Right.  So he may, over time, have an increase in sugar levels.  So some of them become prediabetic.  That can usually be alleviated with exercise, diet choices,

S. LEE - DX BY MR. KRULY

not eating as many snacks, and so that can be attenuated with that. And the other thing we can have medical come see him if he does become prediabetic and they will add a medication to help regulate the sugars.

Q. And you testified that there is the possibility as well of neuromuscular side effects, correct?

A. Correct.

Q. We talked earlier about the difference between first and second generation antipsychotics. Do you recall that?

A. Yes.

Q. Are neuromuscular side effects more common in first generation antipsychotic medications?

A. Yes.

Q. Which one?

A. For the one that I recommended, Haloperidol.

Q. And that was a poor question, I apologize. Are neuromuscular side effects more common in first generation antipsychotics?

A. Yes, they are more common in first generation side effects.

Q. And is Paliperidone a first or second generation antipsychotic?

A. That is a second generation antipsychotic.

S. LEE - DX BY MR. KRULY

Q.   Now, what would you do if Mr. Bloom developed any of the side effects you just described, the neuromuscular side effects or metabolic side effects?

A.   We could reduce the dose, we could add a medication to assist with that or we could change the medication if it was causing quite a bit of issues.

Q.   In your experience, are any of the side effects you've just described so severe that they would impair Mr. Bloom's ability to function?

A.   No.

Q.   In your experience, are any of the side effects that you just described so severe that they would impair Mr. Bloom's ability to work with his attorney?

A.   No.

Q.   In your experience, are any of the side effects you just described so severe they would impair Mr. Bloom's ability to perceive what is happening and what's going on?

A.   No.

Q.   I'm going to move on now to the second medication you've recommended, which is oral Risperidone, R-i-s-p-e-r-i-d-o-n-e.

     Can you explain why you listed Risperidone second?

S. LEE - DX BY MR. KRULY

A.   The reason why I listed Risperidone or oral Paliperidone second, because its formulation as oral it takes a little bit longer to get to a steady state or therapeutic level.  The other reason is because he would be required to come to pill line on a daily basis.  And if we were suspecting that he was diverting the medication, we would have to get lab levels to see where he is at, and, in general, it's just a little bit more cumbersome to take an oral medication daily.  But if he preferred that, we could go with the oral form.

Q.   So in your experience, oral Risperidone would lead to the same result as Paliperidone, but there are different administerability concerns.  Would that be fair?

A.   Yes.

Q.   The third medication you've recommended is Aripiprazole.  I'll spell it for the record, A-r-i-p-i-p-r-a-z-o-l-e.

Can you please explain what Aripiprazole is?

A.   That is also antipsychotic medication that is used for psychosis or mood disorders and also has an oral and long-acting injectable formulation.

Q.   Can you explain why you recommended this medication third?

S. LEE - DX BY MR. KRULY

A.   That was third on my list because if -- because, well, one, the oral form, it may take a little bit longer to get to a steady state, but also, if he decides to take the long-acting injectable formulation, in the beginning when he starts the long-acting injectable formulation, he would, in the beginning, when he starts the long acting injectable, he would need to take 21 days of the oral formulation as well.

Q.   So, again, there is more practical difficulties in administering Aripiprazole than say per person?

A.   Correct.

Q.   But, again, Aripiprazole is an antipsychotic medication?

A.   Yes.

Q.   And you would anticipate, based on your experience, that it would restore Mr. Bloom to competency?

A.   Yes.

Q.   Next on the list is Olanzapine, O-l-a-n-z-a-p-i-n-e.  Can you please explain what Olanzapine is?

A.   Olanzapine is also a second generation antipsychotic, but it's also used in disorder symptoms. This also has an oral and long-acting injection

S. LEE - DX BY MR. KRULY

formulation.  The reason I have it lower on the list, because if he were to decide on the long-acting injectable formulation, there is a particular potential but rare side effect possibility, so I put that a little bit lower.  However, it is a very good medication and it closely resembles another medication lower on the list, Clozapine, which is often used for what are considered treatment refractory.

Q.   Now, based on Mr. Bloom's medical records, do you know if he is experienced with Olanzapine?

A.   He has tried it one time per records at the Alta Bates Emergency Room.

Q.   And do you know whether he reported any side effects from that dose of Olanzapine?

A.   Records report that he did have side effects, but they did not document what specific side effect he had.

Q.   And you've reviewed those records, correct?

A.   Correct.

Q.   And based on your review of those records, have you formed an opinion as to why Mr. Bloom reported side effects?

A.   My best guess is they started him on a moderate dose of medication based on his presentation.  He was quite psychotic and manic at the time, so they wanted to

S. LEE - DX BY MR. KRULY

quickly have him calm down so they gave him a moderate dose, which probably led him to be a bit sedated, which he probably did not like.

Q.   And if you were to treat Mr. Bloom with Olanzapine, would you begin him on that same dosage that he received at Alta Bates?

A.   No, we would start at a lower dose like five milligrams and have him acclimate to that dosage and then go up on the dosage.

Q.   And you testified that there are some practical considerations involved in the prescribing Olanzapine?

A.   Correct, for the long-acting injectable.

Q.   Can you describe those?

A.   There is a potential side effect of something called post injection delirium sedation syndrome where he would have to be observed for three hours and that would showcase as him being very, very tired and sleepy. It usually resolves after 24 to 72 hours, but because we would need to monitor him for three hours, that requires quite a bit of staffing.

Q.   And is that why you recommended Olanzapine lower on your list than some of the other medications we've described?

A.   Yes.

S. LEE - DX BY MR. KRULY

Q.   Would you anticipate that that side effect, that drowsiness, that long-term drowsiness with Paliperidone, for example?

A.   Not, no, so for Paliperidone, you would not to need to observe him for three hours after he gets the injection.  And maybe the first day he may be a little bit tired, but it's not as if they are so sedated that they can't participate in an interview and speak to others.

Q.   The next recommendation that you recommend is Haloperidol, H-a-l-o-p-e-r-i-d-o-l.  Could you please explain what Haloperidol is?

A.   That is a first generation antipsychotic medication.  It also has an oral and long-acting injectable.  It's commonly used for psychotic disorders, but we also use it for mood disorder symptoms.

Q.   Why did you rank this lower on your list rather than other medications?

A.   Generally because we use second generation antipsychotics a little bit more these days because they have a little bit more flexibility and more options.  However, I've treated others on Haloperidol with schizoaffective disorder and they've done quite well on it, too.

S. LEE - DX BY MR. KRULY

Q.   Second to last, I'll spell it first, C-l-o-z-a-p-i-n-e.  Clozapine.  Can you please explain Clozapine, what that is?

A.   That is a second generation antipsychotic medication.  We use it, again, for psychotic and mood disorder symptoms.  This one only has an oral formulation.  And the reason why it's a little bit lower on the list is because of when you first start this medication, he would need to get labs on a weekly basis to monitor for low white blood cell count, but this is a very good medication.  We use it for treatment refractory cases where they failed like two or more antipsychotics.

Q.   I apologize, a refractory case is one where a patient has failed out of their medications?

A.   Yes, at least two antipsychotic medications.

Q.   And Clozapine, you said, would also require regular blood draws, correct?

A.   Correct.

Q.   And does that reasoning help with why you placed this lower on your list?

A.   That's correct.

Q.   And, finally, the last medication you listed here was lithium?

S. LEE - DX BY MR. KRULY

A.   Yes, lithium or valproic acid.

Q.   Is lithium an antipsychotic medication?

A.   No.  Lithium is a mood stabilizer.

Q.   Can you explain the circumstances under which you might prescribe lithium?

A.   So if Mr. Bloom were on a dose of the antipsychotic and he had been taking it for, let's say, three months, but he then displayed a manic episode and we needed to get that manic episode under control, we may add lithium or valproic acid.

Q.   Now, we've gone through a number of medications over the last few minutes.  But in your opinion, would each of these medications be substantially likely to restore Mr. Bloom to competency?

A.   Yes, all of them, all of the antipsychotics.

Q.   So all of the medications other than lithium?

A.   Correct.

Q.   And would you anticipate, based on your experience and your review of the medical literature, each of these medications to have the roughly the same chance of success?

A.   Yes.

Q.   So is the main difference between his medications practical administration and also some potential side

S. LEE - DX BY MR. KRULY

effects?

A.   Yes.

Q.   And we've talked briefly about side effects, you testified that the common side effects for second generation antipsychotic are often metabolic, correct?

A.   Correct.

Q.   But, again, I'll ask you again, in your experience, would any of the potential metabolic side effects Mr. Bloom may experience from taking a second generation antipsychotic medication impair his ability to function?

A.   No.

Q.   Would any of those side effects impair his ability to work with his attorney?

A.   No.

Q.   And would any of those side effects impair his ability to perceive reality?

A.   Could you repeat that again?

Q.   Yes.   Would any of those side effects impair Mr. Bloom's ability to understand what's happening to him?

A.   No.

Q.   And, again, Dr. Lee, are any of the medications that we've gone through substantially likely to restore Mr. Bloom to competency?

S. LEE - DX BY MR. KRULY

A.   Yes.

Q.   And that is based on your medical training and your medical experience and your review of the medical literature?

A.   Yes.

Q.   And are each of these medications necessary to render Mr. Bloom competent?

A.   Yes.

Q.   And are each of these medications appropriate, in your experience, in your opinion?

A.   Yes.

Q.   And, finally, are there any less intrusive means to render Mr. Bloom competent?

A.   No.

Q.   And will you once again explain why that is?

A.   It's schizoaffective where there is a chemical imbalance, so we would need the medications to help restore him where he is more functional and therefore more competent to stand trial.

Q.   Is there any way, in your opinion, to treat a chemical imbalance without medication?

A.   No.

MR. KRULY:  No further direct examination, your Honor.

S. LEE - CX BY MR. BAGLEY

MAGISTRATE JUDGE SCHROEDER:  Mr. Bagley.

MR. BAGLEY:  Yes, Judge.  If I may just have a moment.

MAGISTRATE JUDGE SCHROEDER:  Certainly.

(Whereupon, there was a pause in the proceeding.)

MR. BAGLEY:  Okay thank you.

**CROSS EXAMINATION BY MR. BAGLEY:**

Q.   Okay.  Dr. Lee, you testified you're a psychiatrist, you're authorized to prescribe medication. That is one of the main differences between a psychologist and psychiatrist, correct?

A.   Correct.

Q.   And you are now a forensic psychologist however, is that correct?

A.   Correct.

Q.   And there is such a thing as forensic psychology that you could get a degree in, but that is not what you -- that is not what you are board certified in, is that correct?

A.   Correct.

Q.   I guess let's move right to the medications, Doctor.  First of all, the list of medications is rather long.

S. LEE - CX BY MR. BAGLEY

Doctor, are you still there?  I just lost you in my screen.

THE CLERK:  We lost her.

MR. BAGLEY:  Are you there?

THE WITNESS:  Yes.

Q.  I'll ask where I left off, list of medications one, two, three, four, five, six.  Is that correct?  Is that plus the lithium?  So six plus that -- is the recommended -- that is the amount of medications you would go through if each, in success, didn't -- if you didn't see benefit from each in the successive way?

A.  Yes.

Q.  Okay.  How long would it take to get all the way to the lithium or to, and I'm terrible at, just awful, at pronouncing medication names.  Clozapine, how long would it take to get to Clozapine if you were to go through the others before you got there?

A.  You could probably do six or seven months if we were to go through all of the list, but usually after two months, I have a good idea if, with Dr. Marks, if it's beneficial or not.

Q.  So the first, Paliperidone, I believe you testified that you would see a benefit or you expect Mr. Bloom to be restored to competency in about five months.

S. LEE - CX BY MR. BAGLEY

Is that right?

    A.   Correct.

    Q.   So if you didn't see any progress after five months, you would move onto Risperidone?

    A.   We wouldn't wait the full five months.  Usually at two to three months, we have an idea of whether he is progressing enough or not.

    Q.   Okay.  And then you would move on, let's say, for purposes of the argument that it's the higher end of that you wait three months, you move onto Risperidone and that is difficult, as you testified on direct, because that has an oral component, right?  Is that correct?

    A.   Right.  But if we have -- can you state the question again, please?

    Q.   I just restated the question.  I'll ask it all over again.

        After the three months that you wait for the first antipsychotic and then you move to Risperidone, what I asked was Risperidone is difficult because it also has an oral component in addition to an injectable component.  Is that correct?

    A.   Right.  But I would like to explain that further.

    Q.   Go ahead.

S. LEE - CX BY MR. BAGLEY

A.   So I actually would not move to Risperidone next if he had tried Paliperidone because they are quite similar medications.  Paliperidone is actually -- it's a -- it's a metabolite of Risperidone.  So if he was not improving on Paliperidone, I would not move to Risperidone.

Q.   So you would skip that?

A.   Correct.

Q.   Okay.  So then you would move to -- this one might be the best test -- for Aripiprazole?

A.   Correct.

Q.   Okay.  That one -- you would administer that assuming that Paliperidone did not work, correct?

A.   Correct.

Q.   Okay.  So what is the -- how long would you have to see him, Mr. Bloom that is, on this particular medication Aripiprazole before you determined that that was not effective?

A.   Maybe, probably two months, depending on which formulation he tried.

Q.   Okay.  Would you then move onto the next medication in your report, Olanzapine?

A.   Right.  So I would ask him if he would be willing to take Olanzapine or Haloperidol.

S. LEE - CX BY MR. BAGLEY

Q.   So it would be one or the other?

A.   Correct.

Q.   And does Olanzapine, according to the report, it does have an injectable component to it, right?

A.   Yes.

Q.   Let me rephrase that because I guess that was confusing.  But Olanzapine can be administered through an injection, correct?

A.   Correct.

Q.   The same is true of Haloperidol?

A.   Yes.

Q.   And why would you choose one or the other and not both?

A.   Well, we would like to keep him on one medication, if possible, so that he is not on too many medications.  But in this case, Olanzapine he has tried before, I don't know his specific side effect because it was not commented in the records, but, I mean, we could go directly to long-acting injectable, assuming that he didn't have any issues with that oral dose that he tried in the Emergency Room.  I mean, he could try Haloperidol as well.  And the reason I put it lower on the list was to decrease the possibility of neuromuscular side effects, but I've had many patients on Haloperidol as

S. LEE - CX BY MR. BAGLEY

well that don't have any.

Q.   So I guess I'm so confused and it's only probably my questioning, so I apologize.  We're in a world where the medications are not effective for Mr. Bloom.  And Mr. Bloom, by the way, does have a Doctorate, so no offense to him by calling him "Mr. Bloom," but we're in this world where none of these medications are working, so we've gone through -- we've gone through Paliperidone, we've skipped Risperidone, we've gone through Aripiprazole, and next would be Olanzapine.  So let me ask you this, is that -- is that the next medication that you would, in your judgment, administer to Mr. Bloom?

A.   If he were to be compliant on the oral formulation.  If not, then I would have put Haloperidol above Olanzapine because of the long-acting injectable formulation.

Q.   And would you skip Olanzapine all together then?

A.   I could.

Q.   And you could, but would you?

A.   I would.

Q.   So you now are in Haloperidol, we're attempting, we're hoping that this works for Mr. Bloom, at least the BOP, that is.  And how long until you can make a

S. LEE - CX BY MR. BAGLEY

determination as to whether the Haloperidol is working?

A.   Usually we start to see results within two to three months, usually two and a half months.

Q.   Okay.  And, finally, you testified on direct, and I believe the term you used was a refractory case, did I have that right?

A.   Correct.

Q.   So none of these medications are working, the last option would be Clozapine?

A.   Correct.

Q.   And how long until you administer Clozapine where you can decide whether or not that one is working?

A.   That would take a bit longer; so maybe like three months.

Q.   Okay.  And then, finally, lithium.  You could just -- you could just administer lithium, correct?

A.   No.

Q.   Lithium alone, no?

A.   No.  That is a pure mood stabilizer.  So that would only be added as an adjunction to one of the antipsychotics if we saw improvement, but we needed to -- let's say he had a manic episode and we needed to help regulate that a little bit more.

Q.   What if Mr. Bloom had a different diagnosis, what

S. LEE - CX BY MR. BAGLEY

if he were diagnosed with delusional disorder, could you prescribe just lithium in that case?

A.   No.

Q.   Okay.  These medications, would you agree with me, and I know you're a psychiatrist, so you probably don't like these general formulations, but they are serious drugs, right?  This isn't your 10 milligram blood pressure pill that you take every morning, this is a significant impact on an individual when taken, would you agree with that?

A.   I'm not sure what you mean by significant impact.

Q.   Well, changes.  You've testified that -- you've testified that what is wrong with Mr. Bloom and folks in his situation is that there is an imbalance in his brain chemistry, correct?

A.   Correct.

Q.   And these drugs are meant to balance out someone's brain chemistry, correct?

A.   Yes.

Q.   So what we're doing when we're administering these drugs and taking these drugs is we're changing somebody's brain chemistry?

A.   We are helping their brain or their neurotransmitter to be at a level that does not cause

S. LEE - CX BY MR. BAGLEY

these psychotic and mood disorder symptoms that are decreasing his ability to function.

Q.   So it's not correct to say that we're altering Mr. Bloom's brain chemistry?

A.   Not permanently, no.

Q.   Not permanently, but we are altering it?

A.   For his benefit, yes.

Q.   So you didn't like the way I said it, but these are, I think, significant drugs.  You don't have to agree with that, but they have also -- they come with significant side effects.  Would you agree with that?

A.   They have potential side effects, yes.

Q.   And I want to go through some of these potential side effects.  You can agree with me that they are potential or disagree.  But a potential side effect of Paliperidone is something called Parkinsonism, which is a tremor, a shaking, stiffness, slow movements or a shuffling walk.  Is that correct?

A.   Yes.

Q.   Another potential side effect is tardive dyskinesia, which is uncontrollable movements of the tongue, face, mouth, jaw or limbs.  And that can sometimes become permanent.  Is that correct?

A.   Yes.

S. LEE - CX BY MR. BAGLEY

Q.  You testified on direct that one possible side effect is neuroleptic malignant syndrome, NMS.  Did I say that right?

A.  Yes.

Q.  And that is a possible side effect as well, right?

A.  A very rare side effect.

Q.  Very rare, but also life-threatening?

A.  Yes.

Q.  Okay.  You talked about the metabolic changes, metabolic I guess is what I'm trying to say, so that -- that we're talking here about weight gain, right?

A.  Yes.

Q.  And it can be significant weight gain, not just a few pounds?

A.  It depends.  Some actually gain very little weight.

Q.  But it can be significant?

A.  If, for example, like Olanzapine, he would be more likely to gain more weight.

Q.  And a significant amount of weight is possible, 20 pounds?

A.  Possible, yes.

Q.  Is 30 pounds possible?

S. LEE - CX BY MR. BAGLEY

A.   I generally have not seen 30, it's usually about 20.

Q.   We're still on the Paliperidone.  That can also cause heart and blood pressure problems, is that right?

A.   For Paliperidone, generally no.

Q.   Okay.  Let's move onto Risperidone.  Those can have the same movement related issues including shaking and restlessness, stiff, ridged muscles, correct?

A.   Yes.

Q.   But you said you wouldn't prescribe this if we went through Paliperidone first, right?

A.   Correct.

Q.   The serious side effect like Paliperidone and because they are similar drugs, they have similar side effects, right?

A.   Correct.

Q.   And so a serious side effect of this particular drug Risperidone is also tardive dyskinesia, correct?

A.   Possible, yes.

Q.   And then Aripiprazole, I think I've seen this called Abilify, the brand name Abilify, something like that?

A.   Abilify.

Q.   Abilify.  These also have some common side

S. LEE - CX BY MR. BAGLEY

effects to include this sense of restlessness or the need to move in the nervous system, is that correct?

A.   Yes.

Q.   It can cause nausea, vomiting and constipation?

A.   Rare, and we could treat that.

Q.   Does it cause potentially weight gain and fatigue?

A.   It's one of the antipsychotics that has much less weight gain.

Q.   Is another serious side effect, although I understand you're going to say it's rare, but a serious side effect is tardive dyskinesia, is that correct?

A.   Yes.

Q.   With this particular drug, is there a warning that children, adolescents and young adults should be weary of risk of suicidal thoughts if taking this drug?

A.   There is a warning about that, but it's uncommon and based on the studies, it wouldn't really apply to Mr. Bloom based on his age.

Q.   Okay.  Moving onto Olanzapine.  We have the common hitters here, weight gain, correct?

A.   Correct.

Q.   Drowsiness or sedation while on this particular medication, is that correct?

S. LEE - CX BY MR. BAGLEY

A.   Right, it tends to improve over time.

Q.   And then restlessness or the feeling, the need to move constantly, that is another common side effect, is that right?

A.   Yes.

Q.   Is a serious side effect of this particular drug the same as we discussed before, NMS?

A.   Yes.

Q.   Okay.  Haloperidol, have you ever heard of a symptom called extrapyramidal, EPS?

A.   Right.  Those are the neuromuscular side effects.

Q.   Same thing?

A.   Correct.

Q.   Thank you.  And that is a side effect potentially of this particular drug as well, correct?

A.   Correct.

Q.   Okay.  Finally Clozapine.  Potential here for a drop in a neutrophil count, is that correct, white blood cell count?

A.   Yes.

Q.   Which can increase the risk of a serious infection?

A.   Correct, which is why we monitor on a weekly basis.

S. LEE - CX BY MR. BAGLEY

Q.   Is myocarditis and cardiomyopathy a potential side effect of this particular drug?

A.   Possibly, yes.

Q.   And that is an enlargement of the heart muscle which can be life-threatening, and it often occurs early in treatment.  Are both of those statements true?

A.   Correct.

Q.   Okay.  Thank you.  I want to talk about some of the nitty-gritty details, if you will, about how this would actually be administered to Mr. Bloom.  So I know that Mr. Bloom has said that if court ordered, he would comply.  But if he were to not comply, if he didn't want to take oral medication, what process would you and others go through in order to inject him with these drugs?

A.   So we would show him the Court order, we would give him some time to think about it, and then typically staff would escort him to the nurse's station, and most people do not fight that and get an injection.  Usually it's a very orderly and calm process.

Q.   But if necessary, you would restrain him?

A.   So typically what happens is, similar to how you bring your child to get a vaccine, usually they -- there is a couple of staff members and they hold their

S. LEE - CX BY MR. BAGLEY

shoulder down, but they are not put in like four-point restraints.

Q.   Okay.   Then a needle is taken out, I assume?

A.   It would be an injection, yes.

Q.   Where would that injection occur on Mr. Bloom's body?

A.   In the deltoid muscle, so the arm.

Q.   Okay.   Would it be -- is this one injection?

A.   Correct.

Q.   How often, I guess it would depend on which medication we're using as to how often he is going to get injected.   Is that right?

A.   Typically it's every four weeks.

Q.   So for all of these medications that you listed, it would be once a month that he would get an injection?

A.   Correct.

Q.   And then you would have to take blood draws as well to monitor his health and reaction to these medications?

A.   It's typically about once a year.

Q.   So you only do a blood draw once a year.   So if this whole process took one year, you would take one blood draw?

A.   Right.   But sometimes after the first injection,

S. LEE - CX BY MR. BAGLEY

after three months, we would take a second blood draw.

Q. Let's talk a little bit about the studies that you relied on to determine that it's likely that Mr. Bloom get restored. So the first is the Cochran study. You're familiar with that study, I assume?

A. Yes.

Q. So how many -- I had difficulty finding exactly how many folks were looked at in this study. Do you know how many folks we're talking about? What is the full sample size?

A. 132.

Q. 132. And we're talking about a six-year time period where 287 requests were made to courts like the one that we're in front of now for involuntary medication, correct?

A. Correct.

Q. And of those 287, 132 or looks like maybe 133 were granted, is that correct?

A. Correct.

Q. So about 46 percent?

A. Yes.

Q. And later on it says 132, so I'm not sure which one was correct. But, in any event, are you aware there was two deaths of these 132 or 133 people?

S. LEE - CX BY MR. BAGLEY

A.   Yes.

Q.   So just to be clear, the 133 people that we're talking about those are the folks who are defendants like Mr. Bloom who were ordered to take involuntary medication through the Bureau of Prisons.  Is that right?

A.   That is a bit general of a statement.  But they do explain what they passed from.

Q.   No, no.  I'm talking about the full group, 133 people, right?

A.   Right.

Q.   So just so the record is clear, I think we understand each other, but I am making it clear for the record, those 133 people are folks who were ordered to take medication after a *Sell* hearing or by a court?

A.   Correct.

Q.   Okay.  So, and of those 133, two died after having undergone involuntary medication?

A.   Correct.

Q.   What are the draw backs of a study like this?  I know you recognize that this is a retrospective approach, right.  Is that correct?

A.   Yes.

Q.   It's not the gold standard in science, but we

S. LEE - CX BY MR. BAGLEY

have a double blind type study, that is not what this is, correct?

A.   Correct.  But I have more to say about that.

Q.   Okay.  I'm sure the government will explore that on redirect.

So these are two studies which you put forth to the Court because, in your opinion, they suggest that Mr. Bloom can be restored through antipsychotic medication.  Is that a fair summary?

A.   Correct.

Q.   Are you aware of other studies that that focus on some of the adverse effects of antipsychotic medication?

A.   That is a vague question.

Q.   Well, you're a psychologist or psychiatrist, excuse me, your profession is the prescription of these types of medications, correct?

A.   Correct.

Q.   And you, I assume, have -- I know that, for instance, you have a Ph.D. in this, and I assume that you can keep up with the literature and studies and you can have continuing education in your field.  Is that correct?

A.   Correct.

Q.   So, are you aware of any studies in the process

S. LEE - CX BY MR. BAGLEY

of keeping up with your education that focus on adverse effects of antipsychotic medications?

A.   There are studies out there that speak of side effects.

Q.   Okay.  And you're aware of them?

A.   Correct.

Q.   Are you aware that there are studies that suggest that there is no strong evidence to say that any mental health problems are caused by a chemical imbalance in our brains?

A.   No.

Q.   Are you aware of any studies that cast out of any clear or direct neurobiological or genetic cause or association with mental illness?

A.   There are different theories, but we have seen how antipsychotic medications do treat psychotic disorders.

Q.   There is no blood test, for instance, to diagnose a condition such as Mr. Bloom's, correct?

A.   Correct.

Q.   No scans that can be done?

A.   Not for his specific disorder.  But there are commonalities.

Q.   Are you aware of the study published in 2024 that

Case 1:24-cr-00104-RJA-HKS    Document 40    Filed 12/09/25    Page 126 of 151

126

S. LEE - CX BY MR. BAGLEY

says that there is not one gene that has been found that can be casually linked to schizophrenia?

A.   I'm not aware of that specific study.

Q.   Are you aware of another study also from 2024 that confirmed that there are no promising biomarkers that have been identified for something like ADHD?

A.   I'm not aware of that study.

Q.   Okay.  Would you agree with me that more recently, studies have seemed to suggest that claims about efficacy and safety of antipsychotics have been exaggerated?

A.   No.

Q.   So if I listed six studies to you that made this claim or similar claims, you don't think you would have familiarity with them?

A.   No.

Q.   Are you aware of any studies that suggest that industry sponsored studies produced more positive results when it came to antipsychotic drugs?

A.   That could be a limitation, but there is also other studies without drug sponsors.

Q.   Finally, are you aware of a study that found no difference in symptom severity between those taking and not taking antipsychotics and that the non-medicated

S. LEE - CX BY MR. BAGLEY

people had a higher level of social functioning?

A.   I'm not aware of that study.

Q.   I'm sorry, you said not aware?

A.   Not aware.

Q.   Okay.  If I told you that it was authored by E. Jung, M. Wiesjahn, H. Wendt, T. Bock, W. Rief and TM Lincoln entitled "Symptoms, Functioning and Coping Strategies in Individuals with Schizophrenia Spectrum Disorders Who Do Not Take Antipsychotic Medication:  A Comparative Interview Study" published in Psychology Medicine Review, would that help you recall that study or no?

A.   No.

Q.   Are you aware that the World Health Organization has suggested that we should eliminate involuntary psychiatric treatment all together?

A.   I'm not aware of that.

Q.   Would you agree with the World Health Organization's, a Michelle Fung, who said that involuntary treatment can harm a person's mental and physical health and can exacerbate crisis situations, and I'll stop there, but it goes on, but would you agree with that sentiment at all?

A.   No, because the alternative is your life being

S. LEE - CX BY MR. BAGLEY

completely changed like in certain cases.

Q.   Would you agree, she goes onto say that it can damage relationships with clinician, family members, and others involved in the person's life, would you agree with that sentiment?

A.   Partially.

Q.   Are you aware of any studies that suggest that the long-term use of the type of antipsychotic medication that Mr. Bloom would take would have adverse effects?

A.   Yes.

Q.   Who would make the decision in the end, Dr. Lee, that Mr. Bloom has been restored and can face trial?

A.   Dr. Marks.

Q.   Finally, Dr. Lee, if doctor -- if Mr. Bloom were diagnosed differently, I assume your course of treatment would also be different, is that right?

A.   It depends on the diagnosis.

Q.   But, I mean, it's fair to say that your course of treatment is tailored toward to the diagnosis that Dr. Marks and you arrived at, right?

A.   Correct.

Q.   And if there were to be a different diagnosis, your course of treatment could be different, correct?

S. LEE - RDX BY MR. KRULY

A.   The general medications would be the same, but the ordering might be different.

Q.   So it doesn't matter what he would have been diagnosed with, you're going to prescribe these six or seven medications no matter what?

A.   No, it depends on the specific diagnosis.

MR. BAGLEY:   That's all the questions I have.

MAGISTRATE JUDGE SCHROEDER:   Mr. Kruly.

MR. KRULY:   Thank you, your Honor.   Just a few questions.

**REDIRECT EXAMINATION BY MR. KRULY:**

Q.   Dr. Lee, you were asked on cross examination about the, I believe, six medications or six antipsychotic medications that you recommended for Mr. Bloom, correct?

A.   Correct.

Q.   And you were asked a series of questions about whether, in summary, you might have to prescribe all of those medications in series.   Do you recall that?

A.   Yes.

Q.   In the course of your career as a psychiatrist, have you ever had a schizoaffective disorder patient that required a series of six different antipsychotic

S. LEE - RDX BY MR. KRULY

medications?

A.   No.

Q.   In your experience, what is the largest number of medications you recall having to prescribe for a schizoaffective disorder patient?

A.   At once, it's usually two at the most, but in terms of the possibilities, if I had an individualized treatment plan, we usually got down to the third bullet point.

Q.   And that is based on your 10-year career as a psychiatrist?

A.   Correct.

Q.   You were also asked a series of questions of possible side effects, correct?

A.   Correct.

Q.   And a number of those side effects were what you characterized as neuromuscular side effects, is that correct?

A.   Correct.

Q.   And including something called drug induced Parkinsonism?

A.   Correct.

Q.   It now you testified on direct about the difference between first generation and second

S. LEE - RDX BY MR. KRULY

generation antipsychotic medicine cases, correct?

A.   Correct.

Q.   Are neuromuscular side effects more common or less common in second generation antipsychotic medications?

A.   They are less common in second generation antipsychotics.

Q.   And of the medications you recommended for Mr. Bloom, are most of them second generation antipsychotics?

A.   They are.

Q.   And is the first medication you've recommended, Paliperidone, a second generation antipsychotic?

A.   Yes.

Q.   Finally, Dr. Lee, you were asked about some of the studies that you relied on in forming your opinion. Do you recall that line of questioning?

A.   Yes.

Q.   Let's going back for a moment.  Is your recommendation based purely on these medical studies?

A.   Not purely, but they support it.

Q.   What else is your opinion based on?

A.   My experience, treating patients with schizoaffective disorder, and specifically my experience

S. LEE - RDX BY MR. KRULY

here as well.  I've had quite a few patients with schizoaffective disorder and a majority of them were restored to competency on medication.

Q.   And I believe you testified on direct examination that over the course of your career, you've treated hundreds of patients with schizoaffective disorder?

A.   Correct.

Q.   And does that experience inform your recommendation for Mr. Bloom?

A.   Correct.

Q.   Now, you were asked about the Cochran study in particular and whether it was a retrospective study or double blind study.  Do you recall that question?

A.   Yes.

Q.   And you said you had more to say about this being a retrospective study?

A.   Yes.

Q.   What did you want to explain about that?

A.   So this was something that they talked about in the study as well is that it would be unethical for us to do a prospective double blind study for individuals that are here for pretrial.  We just can't do that.  We have to do, based on medical recommendations, if we believe they have a psychiatric disorder that can be

S. LEE - RDX BY MR. KRULY

helped or treated with a medication, that we offer that. So we cannot put people in a control group where we or others don't know if they are taking medications. Therefore, we have to rely on retrospective studies and there have been quite a few retrospective studies that have informed us of things to come, but in this particular case, we cannot do a double blinded study.

Q.   You were also asked, Dr. Lee, on cross examination about referencing the Cochran study to two individuals who died after receiving *Sell* orders.  Do you recall that?

A.   Correct.

Q.   Does the -- you're familiar with the Cochran study, correct?

A.   Yes.

Q.   Does the Cochran study explain the circumstances of those deaths?

A.   Yes.

Q.   And what were the circumstances of those deaths?

A.    In one individual, he was in his 50s and he already had multiple medical problems.  In Mr. Bloom's case, he is 37 years old and he has no medical problems. The case -- the individual died from an autoimmune condition, and I do not believe Mr. Bloom had an

S. LEE - RCX BY MR. BAGLEY

autoimmune medical condition.

Q.  And I'm going to direct your attention to exhibit 45, which is the Cochran study, at page 111.  Do you have that in front of you, Dr. Lee?

A.  Yes.

Q.  And you referenced one of these patients who passed away who had an autoimmune disease?

A.  Correct.

Q.  And does the Cochran study identify the, I guess, the rarity of that condition?

A.  9.8 cases per million.

MR. KRULY:  I have no further redirect, your Honor.

MR. BAGLEY:  Judge, I have a couple of questions.

MAGISTRATE JUDGE SCHROEDER:  Certainly

**RECROSS EXAMINATION BY MR. BAGLEY:**

Q.  With respect to the individual that you testified that you were just speaking about that died, you testified that they "had an auto immune disorder," but that is not entirely correct.  Isn't it true that the defendant developed an autoimmune disorder after beginning Olanzapine therapy?"

A.  Right, but they said in there that it was not

USA V. N. BLOOM

necessarily causal.

Q.   Okay.   But they didn't have this immune disorder, he or she didn't have the immune disorder before beginning the Olanzapine therapy, correct?

A.   They were not aware that he had it.

Q.   Well, the study says that one defendant in his 30s developed Wegener's Granulomatosis.   Isn't that what the study says?

A.   Yes.

MR. BAGLEY:   I have no further questions.

MR. KRULY:   Your Honor, the parties have stipulated to admit exhibit 45, which is the study we were just referencing with Dr. Lee the Cochran study.

MAGISTRATE JUDGE SCHROEDER:   Government's Exhibit 45.

MR. KRULY:   Correct.

MAGISTRATE JUDGE SCHROEDER:   Dr. Lee.

THE WITNESS:   Yes.

MAGISTRATE JUDGE SCHROEDER:   Can you hear me?

THE WITNESS:   Yes.

MAGISTRATE JUDGE SCHROEDER:   In your report, do you have your report in front of you?

THE WITNESS:   Yes.

USA V. N. BLOOM

MAGISTRATE JUDGE SCHROEDER:  Page six, paragraph "expected benefits of treatment."  Do you see that?

THE WITNESS:  Yes.

MAGISTRATE JUDGE SCHROEDER:  You say "the above recommended medications are expected to reduce the intensity of Mr. Bloom's psychotic symptoms and decrease the risk of another moved episode.  This will assist in returning him to a more functional state so that he may be able to work with his lawyer, participate in the Court process, and rebuild his life."  I realize that your role is not to determine the legal issue of competency, but the words "may be able" indicate to me that there is a question of doubt.  Am I incorrect in that?

THE WITNESS:  Right.  So I cannot say 100 percent that the medications will work.  But there is a very high percentage, based on my experience and based on the studies.

MAGISTRATE JUDGE SCHROEDER:  So then use of the term "there would be a likelihood that he would be able to change or be in a courtroom," is what you're saying with the administration of the antipsychotic medications, is there a likelihood that that would bring

USA V. N. BLOOM

him to a point where he could assist his lawyer and return to a more functional state and participate in the Court process?

THE WITNESS:  Yes, a substantial likelihood.

MAGISTRATE JUDGE SCHROEDER:  Okay.  Now I'm going to burden you with what I'm burdened with all of the time and this is a logistical issue.  You've indicated that the medications listed in your report, most of them, give or take, would run -- you would run them for about five months to get results.  Is that correct?

THE WITNESS:  Not each one of them.

MAGISTRATE JUDGE SCHROEDER:  Okay.  On average.

THE WITNESS:  Meaning the whole -- usually if we're granted this order, it's usually for, depending on the judge, sometimes they give four, sometimes they give five, sometimes they give six months of restoration.  But for the medication, if we are starting it, we usually give a trial run of like two to three months.

MAGISTRATE JUDGE SCHROEDER:  Okay.

THE WITNESS:  And we make changes as it's needed.

USA V. N. BLOOM

MAGISTRATE JUDGE SCHROEDER:  Here is my problem, and I'm hoping that you can enlighten me to some extent.  Hypothetically speaking, let's say that Mr. Bloom, either voluntarily or by forced medication, is administered one of the medications for whatever period of time would be necessary for you and Dr. Marks to agree that he is now at a state where he can assist his lawyer and understand the court process.  That occurs at Butner, but our experience has been the time that will elapse from his transportation from Butner to the Western District of New York and actually getting to a trial may be substantial, months.  Would this medication have to continue during that period of time?

THE WITNESS:  Yes.

MAGISTRATE JUDGE SCHROEDER:  And then who does it in the Western District of New York or what happens if the defendant says, "I'm no longer going to voluntarily do it"?

THE WITNESS:  So if he voluntarily takes medications, then it is within his right to discontinue, let's say if he were to return to the Western District of New York.  However, a *Sell* order would encompass that he be involuntarily medicated throughout the entirety of his legal case.

USA V. N. BLOOM

Q.   Right.  Now I've had instances where a defendant began voluntarily taking medication, but then when that person got back to the Western District of New York and was detained awaiting trial, stopped taking medications and lapsed back into a state of incompetency and that is my concern logistically about what happens between the time if he were found to be restored for purposes of trial and he actually gets to trial if there is not a continuation of medication?

THE WITNESS:  Right.  So if there is an involuntary order, the next facility is supposed to continue administering the medication.

MAGISTRATE JUDGE SCHROEDER:  That would have to take place at a jail facility?

THE WITNESS:  Correct.

MAGISTRATE JUDGE SCHROEDER:  Have you ever had any experiences where that has happened or been involved as far as the monitoring process?

THE WITNESS:  Not specifically because I work here, but the individuals who I have seen restored competency on voluntary or involuntary medications, if they do continue at the jail facility, they continue to maintain competency.  But, yeah, I would agree with you, it is more difficult if they are voluntary.

USA V. N. BLOOM

MAGISTRATE JUDGE SCHROEDER:  Do you have an opinion, based on experience and your training, that if this medication process is utilized to the point that it's been, of you and Dr. Marks, that there has been an improvement and a restoration, would that also increase the defendant's ability to realize that the medications were beneficial and increase his agreeableness to do it voluntarily, in other words?

THE WITNESS:  Sometimes.

MAGISTRATE JUDGE SCHROEDER:  In other words, like the frame of mind.

THE WITNESS:  I think if they see the benefit.  I've had some patients where they realize that they should have started the medication earlier.  But it's up to, really, the individual to see how it benefits them and what their goals are and what they hope to achieve at the very end.

THE COURT:  Based on what you have reviewed in the records of the defendant where he has indicated, at least to Dr. Marks, and I assume perhaps you have some knowledge of it by way of your renewing of the records at Butner, he has indicated he does not agree to medication voluntarily and that he believes in one instance by agreeing to do so would be an indication of

USA V. N. BLOOM

guilt and in another instance he believes that would interfere with his freedom or it would have adverse effects that he does not wish to be subjected to that type of thing, is it your opinion that he, if he were involuntary medicated, some of those concerns that the defendant has expressed would either be alleviated or eliminated by reason of improvement?

THE WITNESS:  Yes.  I do think he may have a change of mind.

MAGISTRATE JUDGE SCHROEDER:  Thank you, Doctor.

THE WITNESS:  Thank you.

MR. KRULY:  No further questions.

MR. BAGLEY:  Could I just ask a couple of questions about that, Judge?

MAGISTRATE JUDGE SCHROEDER:  Sure.

MR. BAGLEY:  Doctor, in your experience, when somebody is restored competency and then they leave your facility, is it correct to say that those folks will then go to, in your experience, if you know, another federal facility.

THE WITNESS:  I am not entirely sure where they go.  I think some go to a county and I think some, it just depends on the district.

USA V. N. BLOOM

MR. BAGLEY:  Okay.  Okay.  That's all I have.

MAGISTRATE JUDGE SCHROEDER:  Thank you, Doctor.  You're excused.  Government rest?

MR. KRULY:  The government rests.

MAGISTRATE JUDGE SCHROEDER:  Mr. Bagley?

MR. BAGLEY:  Judge, we rest as well.

MAGISTRATE JUDGE SCHROEDER:  All right. What is your --

THE DEFENDANT:  Your Honor, is it possible for me to make --

MAGISTRATE JUDGE SCHROEDER:  I'm sorry, Mr. Bloom.  I'm not trying to prevent you from speaking, but I want to advise you that everything here is being recorded and anything you might say could be used against you.  You do have your attorney here to represent you and --

THE DEFENDANT:  Sure.

MAGISTRATE JUDGE SCHROEDER:  And I just don't want you to say something without having cleared it with your attorney because I'm trying to protect you as far as your personal rights are concerned.

THE DEFENDANT:  I hear you.  And I want to be sure.

USA V. N. BLOOM

MAGISTRATE JUDGE SCHROEDER:  So I would suggest that you not say anything at this point until such time as you can confer with your attorney, Mr. Bagley.

MR. BAGLEY:  Judge, in that respect, is there a way, you know, back in the Zoom days, we used to be able to have a breakout room.

MAGISTRATE JUDGE SCHROEDER:  I don't know whether we can do it here other than I'll ask government counsel to leave the courtroom and we'll basically close the courtroom and I'll leave.

THE DEFENDANT:  Would that be possible?

MR. KRULY:  We also have no objection to holding the hearing open for a brief period of time if Mr. Bagley wants to confer with Mr. Bloom privately and we can return in a day or two if Mr. Bloom --

MAGISTRATE JUDGE SCHROEDER:  That is not as simple as it sounds because setting this thing up with the Butner people and so forth is a little bit of a logistical challenge.  I see no reason why we can't let Mr. Bagley discuss whatever it is Mr. Bloom wants to discuss with him while just the two of them are in the courtroom.

MR. KRULY:  We're agreeable.

USA V. N. BLOOM

MS. HUGGINS:  We're agreeable to that.  For the sake of nomenclature, we're not closing the courtroom, we'll adjourn for a brief recess and Mr. Kruly and I will step out.

MAGISTRATE JUDGE SCHROEDER:  I'm trying to give him an attorney and client, their confidential privilege rights that they are entitled to.

MS. HUGGINS:  Absolutely.

MAGISTRATE JUDGE SCHROEDER:  And then when you're done, Mr. Bagley, will you let my Chambers know?

MR. BAGLEY:  Yes, of course.

MAGISTRATE JUDGE SCHROEDER:  So, Mr. Bloom, what we're going to do is the attorneys for the government are going to leave the courtroom, my courtroom deputy is going to leave and I'm going to leave so the only people that will be here in the courtroom will be your attorney and you.  Even the court officer will be outside of the courtroom.  So that you can discuss whatever it is that you wish to discuss with him in confidence.  All right?  And then after that --

THE DEFENDANT:  Thank you very much, sir.

MAGISTRATE JUDGE SCHROEDER:  After that is completed, then the attorneys will let me know that now it's time for you to come back into Court and we'll

USA V. N. BLOOM

finish this up.  All right?

THE DEFENDANT:  Understood.  Thank you so much.

MAGISTRATE JUDGE SCHROEDER:  Okay.  Wait until your attorney says the courtroom has been cleared.

THE DEFENDANT:  I will.

(Whereupon, there was a break in the proceeding.)

THE CLERK:  We're back on the record in United States versus Nicholas Bloom.

MAGISTRATE JUDGE SCHROEDER:  Let the record reflect the Court and the court deputy and counsel for the government and the court officer left the courtroom so as to allow counsel to communicate in confidence with the defendant who is still on Zoom from Butner, North Carolina.

Mr. Bagley, were you able to confer with Mr. Bloom?

MR. BAGLEY:  Yes, I was, Judge.  Thank you for that opportunity.  So I was able to speak with my client.  And, Judge, without getting into the details of our confidential conversation, there is certain argument that I think we intend to make with respect to the *Sell* hearing itself and the involuntary medication.  So we'll

USA V. N. BLOOM

- we want to present that through argument.  We have nothing further to present for purposes of the hearing.

MAGISTRATE JUDGE SCHROEDER:  And, Mr. Bloom, do you agree that you were allowed to speak in confidence with Mr. Bagley?

THE DEFENDANT:  I do.

MAGISTRATE JUDGE SCHROEDER:  All right.  Is it anticipated that a transcript is going to be ordered?

MR. KRULY:  Yes.  The government will order a transcript, your Honor.

MAGISTRATE JUDGE SCHROEDER:  And is it anticipated that both sides would file post-hearing briefs.

MR. KRULY:  Yes.  And I think it's our burden, so I anticipate that the government would file a brief and Mr. Bagley would file a response.

MAGISTRATE JUDGE SCHROEDER:  All right. What I'm going to do then is I'm going to require the government to submit its Memorandum of Law within 30 days after the filing of the transcript.  And how much time then do you think you'll need, Mr. Bagley, to file a reply?

MR. BAGLEY:  Can I have 30 days from that point, Judge?

USA V. N. BLOOM

MAGISTRATE JUDGE SCHROEDER:  Certainly. Just so you know, Mr. Bloom, the testimony that was taken today of Dr. Marks and Dr. Lee has been electronically recorded.  That will then be transcribed into a transcript.  A copy of it will be given to your attorney and a copy of which will be given to the attorneys for the government.  The attorneys will then use that transcript and make references to it as they deem fit while they submit their Memorandum of Law as to their respective positions and cite whatever they wish to cite from the testimony of both witnesses.  And as you heard, the first order of business is to get the transcript -- the transcripts themselves.  That may take a little bit of time because we have to send out the recording to a reporter and the reporter has to then do the work.

THE DEFENDANT:  Okay.

MAGISTRATE JUDGE SCHROEDER:  And then the attorneys need time to review the transcript to do whatever it is that they are going to do.  And so is it the position of the defendant, Mr. Bagley, that that time will be utilized in such a way so as to operate and enure to his benefit, and, therefore, such time should continue to be excluded for purposes of the Speedy Trial

USA V. N. BLOOM

Act.

MR. BAGLEY:  Yes, Judge.

MAGISTRATE JUDGE SCHROEDER:  And Mr. Kruly and Ms. Huggins, is it the government's position that the time will also operate in the interest of justice in this case, and, therefore, should be validly excluded?

MR. KRULY:  It is, your Honor.  And, your Honor, for the record, the government's position is also that pursuant to 3161(h)(1)(A).

MAGISTRATE JUDGE SCHROEDER:  I was about to do that.

MR. KRULY:  I apologize.

MAGISTRATE JUDGE SCHROEDER:  And the Court notes, for the record, that these proceedings have been conducted pursuant to a motion that had been made by the government seeking a hearing as to whether there should be a finding of forced medication or medication of the defendant for purposes of restoring competency.  The making of that motion and the holding of that hearing brings into play the provisions contained in Title 18 of the U.S.C. Section 3161(h)(1)(A), which caused the speedy trial clock, and it will remain stopped, until such time as that motion has been resolved.  For all of those reasons then the time is justifiably excludable

USA V. N. BLOOM

and is hereby so included pursuant to and in accordance with the provisions contained in Title 18 of the United States Code Section 3161(h)(1)(A), sections 3161(h)(7)(A) and 3161(h)(7)(B)(iv).

And either Ms. Huggins or Mr. Kruly, will you provide that order to that effect, please?

MR. KRULY:  Yes, your Honor.

MS. HUGGINS:  Yes.

MAGISTRATE JUDGE SCHROEDER:  Anything else at this time?

MR. KRULY:  Not from the government.  Thank you.

MAGISTRATE JUDGE SCHROEDER:  Judge, with respect to the briefing.

MAGISTRATE JUDGE SCHROEDER:  Yes.

MR. BAGLEY:  My recollection is that, you know, we had submitted arguments on prong one of the *Sell* factors as to whether or not the government -- whether or not there is a significant government interest.

MAGISTRATE JUDGE SCHROEDER:  Right.  And where (inaudible) the issue of forced medication would contribute to enforcing it.

MR. BAGLEY:  Is that -- in the briefs that

USA V. N. BLOOM

we file, do you anticipate us addressing that issue?

MAGISTRATE JUDGE SCHROEDER:  No.  I only anticipate the issue of whether the government has met its burden and the issue of whether medication, either voluntary or forced, will likely restore competency.

MR. BAGLEY:  So just so I'm clear, you've already -- you're telling me, Judge, that you already ruled that the government has satisfied the first prong?

MAGISTRATE JUDGE SCHROEDER:  No.

MR. BAGLEY:  No.

MAGISTRATE JUDGE SCHROEDER:  I'm saying no sense in re-briefing it.

MR. BAGLEY:  I see.  Thank you.

MAGISTRATE JUDGE SCHROEDER:  In other words, I'll address all four elements under *Sell*.

MR. BAGLEY:  Understood.  Thank you.

MR. KRULY:  That is our understanding as well.

MAGISTRATE JUDGE SCHROEDER:  Pardon me?

MR. KRULY:  That is our understanding as well.

MAGISTRATE JUDGE SCHROEDER:  All right.

MR. BAGLEY:  Thank you.

MR. KRULY:  Thank you.

                          USA V. N. BLOOM

              MS. HUGGINS:  Thank you.

              MR. KRULY:  Thank you, your Honor.

              MAGISTRATE JUDGE SCHROEDER:  Thank you, Mr.

Bloom.

              THE DEFENDANT:  Thank you.


                  CERTIFICATE OF REPORTER


   I certify that the foregoing is a correct transcript

of the record to the best of my ability of proceedings

transcribed from the audio in the above-entitled matter.



S/ Karen J. Clark,  RPR

Official Court Reporter