IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      v.                                                      24-CR-00104

NICHOLAS BLOOM,

                Defendant.

**GOVERNMENT'S POST-HEARING BRIEF IN SUPPORT OF MOTION TO FORCIBLY MEDICATE DEFENDANT TO RESTORE COMPETENCY FOR TRIAL**

**THE UNITED STATES OF AMERICA**, through its attorneys, Michael DiGiacomo, United States Attorney for the Western District of New York, and the undersigned attorneys, hereby files its post-hearing briefing with respect to the *Sell* hearing held on October 29, 2025. For the reasons set forth below and the record, this Court should grant the government's motion and order that the defendant be forcibly medicated for the purpose of restoring him to mental competency for trial in this action.[1]

## BACKGROUND AND PROCEDURAL HISTORY

### A. Procedural History

On June 20, 2024, the defendant was charged by criminal complaint with violating 18 U.S.C. § 2261A(2)(B) (cyberstalking). *See* Doc. 1. The defendant made his Rule 5 initial appearance on June 27, 2024, in the Northern District of California and was ordered detained. *See* 24-mj-70950, Doc. 3. Several weeks later, the defendant made his initial appearance in the

---

[1] The government expressly incorporates herein all arguments in its *Sell* motion. Doc. 28, 32.

Western District of New York, and on August 1, 2024, a grand jury returned a two-count indictment, charging the defendant with two counts of violating 18 U.S.C. § 2261A(2)(B) (cyberstalking). Doc. 7.

On August 15, 2024, the government filed a motion for a hearing to determine the defendant's mental competency pursuant to 18 U.S.C. § 4241(a). Doc. 11. The government's motion was based on, among other things, the allegations in the criminal complaint, as well as similar behavior that the defendant had engaged in with his former co-workers at the National Archives and Records Administration. *See id.* On that same day, the defendant was arraigned on the indictment. *See* Minute Entry 8/15/2024. With no opposition from the defendant, the Court granted the government's motion. *Id.*; Doc. 13. On August 19, 2024, the Court entered an order finding that there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect to the extent that he is unable to understand the nature and consequences of the proceedings against him and to assist properly in his defense, and ordered a psychiatric or psychological examination of the defendant pursuant to 18 U.S.C. § 4241(b). Doc. 14.

On September 14, 2024, the defendant filed notice of his intention to assert a defense of insanity pursuant to Rule 12.2(a) of the Federal Rules of Criminal Procedure (Doc. 15), and the government and defense jointly moved for a psychiatric examination under 18 U.S.C. § 4242 (Doc. 16). The Court granted the joint motion. Doc. 17, 18.

Several weeks later, Dr. E. Morse, Psy. D., completed psychological evaluations of the defendant pursuant to 18 U.S.C. §§ 4241(b) and 4242 and concluded that the defendant was incompetent to proceed. The Court then granted the government's unopposed motion to

adopt the evaluation's finding and remanded the defendant to the custody of the Attorney General for restoration treatment. *See* Minute Entry 10/31/2024; Doc. 23.

From March 25, 2025, to July 22, 2025, the defendant was admitted to the Federal Medical Center in Burtner, North Carolina (Butner). Dr. Megan Marks, Psy. D., issued a forensic evaluation report, dated July 30, 2025.[2] The defendant's psychiatrist, Dr. Sandy Lee, M.D., concurred with Dr. Marks' conclusion and submitted an addendum individualized treatment plan.[3] The defendant refused to voluntarily accept the recommended medication treatment, despite repeated attempts to encourage him to do so. Gov. Ex. 24 at 15-16.

On August 28, 2025, the government filed the instant motion pursuant to *Sell v. United States* to forcibly medicate defendant to restore competency for trial. Doc. 28. The defendant opposed on September 19, 2025 (Doc. 31), and the government replied (Doc. 32). On September 23, 2025, the Court heard oral argument and concluded that the government had met its burden of establishing the need for a *Sell* hearing. *See* Minute Entry 09/23/2025.

**B. Overview of evidence introduced at *Sell* hearing**

At the October 29, 2025, *Sell* hearing, the government presented the testimony of Dr. Marks and Dr. Lee via videoconference. *See* Minute Entry 10/29/2025. In addition to the forensic evaluation report and addendum, the parties stipulated and admitted into evidence the Bureau of Prisons DEMR PDS system case and administrative notes summarizing the defendant's medical history (Gov. Ex. 26), a medical study relied on by Dr. Lee (Gov. Ex.

---

[2] At the October 29, 2025, *Sell* hearing, the parties stipulated and admitted into evidence Dr. Marks' forensic report as Government's Exhibit 24 (Gov. Ex. 24).

[3] At the October 29, 2025, *Sell* hearing, the parties stipulated and admitted into evidence Dr. Lee's addendum to the forensic report as Government's Exhibit 25 (Gov. Ex. 25).

45), and Dr. Marks' curriculum vitae (Gov. Ex. 41). The defendant presented no evidence or testimony. *Id*.

Dr. Lee and Dr. Marks both credibly testified about their role in the defendant's diagnosis and treatment, as well as their expert opinion on the best way to restore him to competency. Dr. Marks is a forensic psychologist at Butner, where she has worked for nearly two years.[4] In her capacity as a forensic psychologist, she provides a psychological opinion relating to legal questions posed by a court, including whether a person is competent to proceed in a criminal case, whether he or she was insane at the time of the offense, or whether someone is actually dangerous and can be safely released into the community. *Id*. at 6. As part of providing her expert opinion, Dr. Marks renders a mental health diagnosis (*id*. at 6) and an opinion as to whether an individual is restorable to competency (*id*. at 62). At the time of the *Sell* hearing, Dr. Marks had completed approximately 38 competency evaluations, approximately three § 4246 dangerousness evaluations, and approximately 30 annual risk assessments. *Id*. at 9-10. Dr. Marks is experienced in the diagnosis and treatment of patients with psychotic disorders, including schizoaffective disorder. *Id*. at 10.

Dr. Marks consulted with staff psychiatrist Dr. Lee. *See* Doc. 41 at 17, 81. Dr. Lee has been employed at Butner since May 2023. *Id*. at 77. She has been practicing psychiatry for

---

[4] Dr. Marks earned a doctoral degree in clinical psychology from Wright State University in 2010. Doc. 41 at 7; Gov. Ex. 45. Her educational experience included clinical, research, and course work. *Id*. As part of her pre-doctoral training, Dr. Marks worked at Twin Valley Behavioral Healthcare and provided treatment to individuals who were not competent as part of competency restoration. Doc. 41 at 43-44. She became licensed as a psychologist in 2014 in the state of Colorado. Doc. 41 at 7; Gov. Ex. 45. She stays abreast of developments in the forensic psychology field through continuing education, quarterly Bureau of Prisons trainings taught by board certified forensic psychologists, attendance at annual conferences, and self-directed research through peer reviewed journals. Doc. 41 at 8-9.

approximately a decade.[5] *Id.* at 78. As part of her career, she has treated hundreds, if not thousands, of patients with schizoaffective disorder. *Id.* at 79-80. As a staff psychiatrist at Butner, Dr. Lee consults with patients, assesses if they have a psychiatric condition, and determines whether the condition warrants medication to help decrease symptoms and restore them to competency. *Id.* at 80.

### C. Dr. Marks and Dr. Lee's diagnosis of the defendant

Both Dr. Marks and Dr. Lee diagnosed the defendant with schizoaffective disorder, bipolar type.

Dr. Marks summarized her evaluation in a forensic evaluation report, dated July 30, 2025. *Id.* at 11; Gov. Ex. 24. Her evaluation occurred from approximately March 25, 2025, to July 2025, and included the administration of assessments, observation, in-person interviews of the defendant, and review of his medical, mental health, court, employment, and other records, such as interviews of the defendant's family members and prior therapists, and discovery and other evidence from the case provided by the government. Doc. 41 at 12, 13, 20, 48-49; Gov. Ex. 24 at 2. On June 24, 2025, Dr. Marks administered the personality assessment inventory to assess the defendant's response style, clinical syndromes, and personality functioning, and on July 7, 2025, she administered the revised-competency assessment instrument. Gov. Ex. 24 at 11; Doc. 41 at 12. As part of her evaluation, she met with the defendant on multiple occasions. Doc. 41 at 12. Observations made by other Butner

---

[5] Dr. Lee graduated medical school from Texas A&M in 2014 and then completed her adult psychiatry residency training followed by a child and adolescent fellowship at Baylor College of Medicine in 2019. Doc. 41 at 77-78. Prior to working at Butner, Dr. Lee saw patients, completed evaluations, and recommended medications, if needed, in clinical settings with both adults and children. *Id.* at 78. She is board certified in adult and child and adolescent psychiatry. *Id.* at 79. Dr. Lee stays current on medical developments through courses. *Id.* at 79.

5

medical and correctional staff throughout the evaluation period also informed Dr. Marks's forensic report. *Id.*

Based on the totality of her evaluation, Dr. Marks diagnosed the defendant with schizoaffective disorder, bipolar type, multiple episodes, currently in acute episode.[6] Gov. Ex. 24 at 11; Doc. 41 at 12. Dr. Marks explained the defendant's manifestation of this particular disorder:

> [W]hen an individual has schizoaffective disorder - bipolar type, they have psychotic symptoms, so it depends on the individual what those psychotic symptoms are, but they can include symptoms such as delusions, which are present in [the defendant's] case. Delusions are highly improbable beliefs that are fixed and resistant to change despite contrary evidence. Some individuals have hallucinations. In [the defendant's] case, I don't have evidence of hallucinations. Other people with psychotic disorders exhibit disorganized speech and thinking. And so that is, again, highly relevant to the individual, but disorganized speech tends to look like, you know, speech that is nonsensical, speech that is maybe making up words, providing communication that is just not making much sense.

---

[6] Dr. John Loughlin-Presnal previously provided therapy to the defendant from approximately 2020 to 2022. Gov. Ex. 24 at 5. He diagnosed the defendant with persistent depressive disorder and generalized anxiety disorder in addition to ADHD by history. *Id.* These disorders are not psychotic disorders. Doc. 41 at 33.

From June 18, 2024, to June 21, 2024, the defendant was involuntarily hospitalized at Alta Bates Summit after the defendant was deemed to be a danger to others. *Id.* at 33-34; Gov. Ex. 24 at 7. Based on records, it appears the determination as made after the defendant allegedly threatened to sexually assault his psychiatric provider, voiced homicidal ideations towards his family, and harassed women. Doc. 41 at 33. During this involuntary hospitalization, the defendant received the antipsychotic medication olanzapine, as well as lorazepam for anxiety, and then refused additional doses because he claimed negative side effects. *Id.* at 33-34. At the time of his discharge following his three day involuntary hospitalization, the defendant was diagnosed for bipolar one disorder severe with psychotic features. *Id.* at 35. In 2024, Dr. Morse with the Bureau of Prisons diagnosed the defendant with delusional disorder, persecutory type. *Id.* at 61.

Dr. Marks reached a different diagnosis based upon the totality of information, records, interviews, and based on a detailed review of the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition. *Id.* at 35. Her diagnosis reflected the length and depth of her evaluation, totality of collateral materials, interactions with and observations of the defendant. *Id.* at 36. While she considered other disorders, the diagnosis of schizoaffective disorder, bipolar type, multiple episodes, currently in acute episode accounted for the psychotic symptoms, prevalent mood observed in the defendant, impairments in his life, and consistent with the collateral information reviewed. *Id.* at 37-38.

6

> Also with psychotic disorders, you'll see oftentimes disorganized behavior, so behavior that is inconsistent with the individual's base line. Bizarre behavior, and, again, it can look differently for each individual. And sometimes there are negative symptoms as well with the psychotic portion of schizoaffective disorder. In addition, schizoaffective disorder there is a mood component. So these individuals either tend to have manic and/or depressive symptoms. And in [the defendant's] case, I believe he displayed both manic and depressive symptoms in his course of illness. So manic symptoms typically involve an elevated mood, increased energy and increase in goal directed activities, inflated self esteem, impulsive decision making, symptoms such as that. And then there are depressive symptoms [the defendant] has also exhibited where he has gone through depression suicidal ideations, withdrawing from others . . . [H]e has a history of also experiencing depressive symptoms.

*Id*. at 14-15. Dr. Marks observed that the defendant exhibited depressive symptoms, including depressed moods, suicidal ideations, isolation, withdrawing from others, and feelings of worthlessness. *Id*. at 16. Dr. Marks consulted with other members of the Butner mental health team to help reach this diagnosis. *Id*. at 16. Her supervisor also reviewed her forensic report. *Id*. at 17-18.

> Dr. Lee agreed with Dr. Marks' diagnosis and defined schizoaffective disorder as:
>
> > a disorder consisting of psychotic and mood disorder symptoms, so in the psychotic piece, that may include hallucinations, delusions, disorganized speech or behaviors, and that is commonly throughout their time with schizoaffective disorder. And then they may have a mood disorder piece along with that, which may be a depressive episode or a manic episode. So there may be a two-week time frame where they don't show mood disorder symptoms, but they continue to show the psychotic symptoms.

Doc. 41 at 79-80.

### D.   Dr. Lee's treatment plan

Dr. Lee formulated an individualized treatment plan that recommended the administration of antipsychotic medication. Doc. 41 at 39, 86-87; Gov. Ex. 25. She recommended medications in the antipsychotic category, which are generally used to treat both psychotic disorders and mood disorder symptoms. Doc. 41 at 87. Dr. Lee's treatment

7

plan provided multiple options, in order of medical preference, along with a mood stabilizer (lithium) if needed. *Id*. at 91-92, 104, 113; Gov. Ex. 25 at 4-6. Dr. Lee would begin with the least intrusive treatment option with the smallest dose and lowest number of medications. Doc. 41 at 92. Each of the medications Dr. Lee recommended are expected to restore the defendant to competency and have roughly the same degree of success in doing so. *Id*. at 93, 104-106. Likewise, any potential metabolic side effects that the defendant may experience would not impair his ability to function, his perception, or ability to work with his attorney. *Id*. at 97, 105.

In order of medical and treatment preference, Dr. Lee's first treatment option was paliperidone, a second-generation antipsychotic that comes in injectable and pill formulations. *Id* at. 93. This medication is FDA approved for the defendant's diagnosis, and its availability as an injectable allows for better adherence, stable drug level, and reduced side effects, and Dr. Lee has previously had many patients do well on it. *Id*. at 93-94. Typically, patients experience large improvements in two to three months, and literature supports improvements in less than five months. *Id*. at 95. Any possible metabolic side effects, such as prediabetes, would be controlled by monitoring the defendant's sugar levels and cholesterol as well as lifestyle and diet changes, and any possible neuromuscular side effects would be treated through a reduction in dose or other medications, if needed. *Id*. at 95.[7]

---

[7] Dr. Lee recommended several other medications in decreasing order of preference based on, among other things, practical considerations (such as administrability and whether the medication requires extended observation) and potential side effects. As noted, however, Dr. Lee testified that each of the recommended medications was likely to restore the defendant to competency. Dr. Lee's treatment plan (Ex. 25), and the reasons for her plan, are incorporated by reference.

## LEGAL DISCUSSION

In *Sell v. United States*, 539 U.S. 166 (2003), the Supreme Court recognized that the Constitution permits the government involuntarily to administer antipsychotic drugs to a mentally ill defendant. To satisfy due process, *Sell* requires courts to make a series of four findings prior to ordering forcible medication: whether "(1) there are important government interests in trying the individual; (2) the treatment will significantly further those interests; (3) the treatment is necessary to further those interests, considering any less intrusive alternatives, and (4) the treatment is medically appropriate." *United States v. Magassouba,* 544 F.3d 387, 396 (2d Cir. 2008) (*citing Sell*, 539 U.S. at 180-81). The Court's findings in support of involuntary medication must be supported by clear and convincing evidence. *United States v. Gomes,* 387 F.3d 157, 160 (2d Cir. 2004).

## ARGUMENT

**1. The serious nature and circumstances surrounding the defendant's crimes underlie the important government interests in the defendant's prosecution.**

As to the first *Sell* factor—and as the Court found in granting a *Sell* hearing—important governmental interests are at stake in the defendant's prosecution. The defendant is charged with committing a serious crime against two different victims, one of whom is a judge. Cyberstalking, 18 U.S.C. § 2261A(2)(B), is a felony punishable by up to five years' imprisonment. The government's preliminary calculation of the defendant's post-trial Sentencing Guidelines range is 63-78 months' imprisonment. *See, e.g.*, *United States v. Baschmann*, 2015 WL 346719, at *6-7 (W.D.N.Y. Jan. 23, 2015) (using anticipated Guideline range as a proxy for seriousness of offense and concluding that first *Sell* factor was satisfied where Guideline range was 57-71 months' imprisonment).

9

The defendant's criminal conduct underlying the Indictment (Doc. 7) is detailed in the Criminal Complaint (Doc. 1). The text, voicemail, and other communications together with other evidence demonstrates that the defendant engaged in a disturbing and escalating pattern of harassing and threatening conduct towards the two victims in this case. *See generally* Doc. 1. In January 2024, the defendant began sending Victim 1, a former co-worker who lives in Niagara County, hundreds of unwanted text messages and email. Over time, those messages became increasingly incoherent, violent, and sexual. The defendant continued this behavior despite multiple requests that he stop. When Victim 1 contacted the Niagara County Sheriff's Office, the defendant began leaving numerous bizarre voicemails for the Niagara County Sheriff's Office requesting—in expletive-laden and often incoherent tirades—that he be allowed to see or contact his "friend," i.e., Victim 1. *See id.* at 2-16. In June 2024, after the defendant's behavior had escalated severely, he began contacting Victim 1's aunt, a Niagara County Family Court Judge ("Victim 2"). The defendant filled Victim 2's chambers voicemail with messages that, once again, were often incoherent and violent. The defendant also began texting Victim 2's personal cell phone with numerous violent texts and, on one occasion, a photo of Victim 2's home. *See id.* at 17-20. In short, the behavior catalogued in the criminal complaint (which captures only a portion of the defendant's conduct) demonstrates that the defendant poses a danger to others, such that the government has a plain interest in prosecuting him.

Underpinning the government's prosecution are important and compelling reasons in seeking justice for the victims and protecting their basic security and dignity. *Sell*, 539 U.S. at 180; *United States v. Gillenwater*, 749 F.3d 1094, 1098, 1101 (9th Cir. 2014) (concluding no error where the district court authorized the defendant's involuntary medication after finding

sufficient governmental interest in prosecuting a defendant that made voluminous violent, lurid, and distressing threats against multiple government officials and employees); *see also United States v. Khoundara*, No. 22-CR-00061-DKW, 2024 WL 4276673, at *4 (D. Haw. Sept. 24, 2024) (finding the government had an important interest in prosecuting a defendant for cyberstalking were he engaged in an approximately five-month long "campaign to harass and intimidate" the victim that he apparently believed was being sex trafficked by "bombard[ing] her and others with text messages, posted information about her online forums, made multiple reports about her to law enforcement, and, at one point," armed and brandished a weapon claiming to work for law enforcement).

Moreover, the deterrence achieved by prosecuting the defendant presents a compelling interest. "[T]here is an important distinction between incarceration itself, and the significance for society of gaining a criminal conviction for a defendant's violation of the law." *Khoundara*, 2024 WL 4276673, at *5 (internal citation omitted). "[B]eyond the specific deterrence, punishment, and rehabilitation of the individual defendant, general deterrence for the benefit of society is served when a person is convicted of a serious crime, thus deterring others from making the same mistake." *Id*. (internal citation and quotation marks omitted).

There are no circumstances that would "lessen the importance of [the government's] interest." *Sell*, 539 U.S. at 180. The defendant has been in pre-trial detention for approximately 19 months. If the defendant is forcibly medicated, and even if forced medication takes the entire four-month period authorized by statute, *see* 18 U.S.C. 4241(d)(1), the defendant will go to trial in a period of time that is far less than his predicted 57-71-month Guidelines range.

11

Finally, the defendant's anticipated Guidelines range is higher than the 57–71-month sentence that Judge Arcara has found sufficient to satisfy the first *Sell* factor. *See, e.g.*, *United States v. Baschmann*, 2015 WL 346719, at *6-7 (W.D.N.Y. Jan. 23, 2015) (using anticipated Guideline range as a proxy for seriousness of offense and concluding that first *Sell* factor was satisfied where Guideline range was 57-71 months' imprisonment); *see also Gillenwater*, 749 F.3d at 1101 (while the government calculated the guidelines range to be 33 to 41 months' imprisonment, no error because the offense conduct of threatening government officials and employees is serious).

**2. Involuntarily medicating the defendant will significantly further those important interests at stake in the prosecution.**

As to the second factor, "the government must make a two-part showing to establish that involuntary medication will significantly further the important governmental interests at stake." *Gillenwater*, 749 F.3d at 1102; *Sell*, 539 U.S. at 181. Specifically, the government must prove: (1) "that administration of the drugs is substantially likely to render the defendant competent to stand trial;" and (2) that it is "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Sell*, 539 U.S. at 181.

There is no dispute that the defendant is currently rendered incompetent by his current diagnosis. Gov. Ex. 24. The defendant offered no competing medical opinions, diagnosis, or experts that claim the defendant is competent. Until restored, the prosecution cannot proceed, and the important interests remain unfulfilled.

There is also no dispute that course of antipsychotic medications recommended by Dr. Lee is substantially likely to render the defendant competent to stand trial. Antipsychotic medication is the standard course of treatment for those experiencing schizoaffective disorder.

Doc. 41 at 40, 48, 90; Gov. Ex. 25 at 7. Following their extended evaluation, record review, clinical experience, and interactions with the defendant, both Dr. Marks and Dr. Lee agree that antipsychotic medications are necessary to restore the defendant's competency. *Id*. at 40, 88.

While therapy can be beneficial in conjunction with medication, antipsychotic medication is the main form of treatment for schizoaffective disorder. *Id*. at 40, 48, 90. Here, Dr. Marks and Dr. Lee testified, based on their training and experience, that antipsychotic medications are necessary to restore the defendant's competency. *Id*. at 40, 88. Moreover, administering medication will have a very high likelihood of success. *Id*. at 136-137. This conclusion is based on clinical studies and research, the standard treatment, FDA medication approvals, and Dr Marks and Dr. Lee's clinical experience. *Id*. at 40, 88-89, 131-132. Based upon their clinical experience and interactions with the defendant, both Dr. Marks and Dr. Lee do not believe that there is any way to restore the defendant's competency without antipsychotic medications. *Id*. at 40, 89, 106. That is because, according to Dr. Marks, "medication is typically what is necessary to show any progress in individuals with psychotic disorders." *Id*. at 48. Put another way, Dr. Lee noted the chemical imbalance inherent in the defendant's disorder that cannot be addressed through therapy. *Id*. at 89, 106; Gov. Ex. 25 at 6 ("The above recommended medications are expected to reduce the intensity of [the defendant's] psychotic symptoms and decrease the risk of another moved episode. This will assist in returning him to a more functional state so that he may be able to work with his lawyer, participate in the Court process, and rebuild his life.").

Indeed, the two studies that helped inform Dr. Lee's treatment further support the high likelihood of restoration. *Id*. at 88-89; Gov. Ex. 45. One study concluded that more than 70%

of patients treated were restored to competency (Ex. 45 at 115), and the other concluded that more than 80% of patients with schizoaffective disorder were restored to competency after treatment. Ex. 46 at 4. Both studies directly focus on the question before this Court and therefore are persuasive from a broader perspective. *See Khoundara*, 2024 WL 4276673, at *7.

In addition, Dr. Lee's extensive clinical experience treating hundreds, if not thousands *(id.* at 79-80), of individuals suffering from the same disorder as the defendant and that have later been restored add confidence to belief that Dr. Lee's treatment plan will lead to successful restoration. *See Baschmann*, 2015 WL 346719, at *11 (giving weight to an expert who "has, through his experience and judgment, been able to gauge which patients will respond well to medication and which will not"); *United States v. Decoteau*, 904 F. Supp. 2d 235, 241 (E.D.N.Y. 2012) (finding "strong" evidence to support a substantial likelihood of restoration where "the government called to the stand an experienced BOP professional with direct knowledge of the defendant's condition" who "drew on his experience treating patients with psychotic disorders to formulate his opinion."); *Khoundara*, 2024 WL 4276673, at *7.

The Second Circuit has held that the second *Sell* factor (whether there is a "substantial likelihood" of restoration) is satisfied where there was a "70 percent change that [the defendant] could be rendered competent through treatment." *Gomes*, 387 F.3d at 159. Dr. Lee's report noted, based on research, that more than 80% of defendants similar to the defendant have been successfully restored to competency. Gov. Ex. 25 at 3. And Dr. Lee testified that these studies' conclusions are consistent with her professional experience. Doc. 41 at 89.

Dr. Lee's philosophy is to treat with monotherapy (Doc. 41 at 92) and the medications she recommended all are expected to restore the defendant to competency and have roughly

14

the same degree of success in doing so. *Id*. at 93, 104-106. While potential side effects may occur with any medication, Dr. Lee considered the defendant's statements that he would be open to an injectable long-acting medication and balanced the potential side effects to minimize risks. Should a side effect occur, Dr. Lee explained that laboratory monitoring, lifestyle changes, and other medications that can be administered to neutralize side effect impact. Notwithstanding the potential for side effects, Dr. Lee was clear that any potential metabolic side effects that the defendant may experience would not impair his ability to function, his perception, or ability to work with his attorney. *Id*. at 97, 105.

Finally, the defendant presented no evidence otherwise and proposed no alternative treatment. Dr. Lee's proposed treatment plan (Gov. Ex. 25) stands as a well-informed and conservative plan that follows the standard course and is designed to minimize other medicals risks while focusing on addressing the defendant's psychotic and mood symptoms that render him incompetent.

3. **The recommended treatment is necessary to further those interests, considering any less intrusive alternatives.**

The third *Sell* factor considers whether involuntarily medication is "necessary" to further the government's interests, that is, whether "any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Sell*, 539 U.S. at 181. The Court must also "consider less intrusive means for administering the drugs, e.g., a court order to the defendant, backed by the contempt power, before considering more intrusive methods." *Id*.

For schizoaffective disorder, antipsychotic medication is the standard course of treatment. Doc. 41 at 40, 48, 90. Both Dr. Marks and Dr. Lee do not believe that there is any way to restore the defendant's competency without antipsychotic medications. *Id*. at 40, 89, 106; Gov. Ex. 25 at 7-8. In large part that is because of the nature of psychotic disorders. Doc.

15

41 at 48. Persistent in psychotic disorders is a chemical imbalance that cannot be addressed through therapy. *Id*. at 89, 106. In other words, medication is the only way to correct that chemical imbalance underlying psychotic disorders. *Id.* at 90.

Not only are antipsychotics the standard treatment for patients, in the case of the defendant, less intrusive treatments have been unsuccessful. Dr. Marks has repeatedly sought to challenge the defendant's delusional beliefs with no result. *Id*. at 29, 31, 51-52; Gov. Ex 24 at 9. Likewise, the defendant refused to attend competency restoration classes or group. Doc. 41 at 25-26, 57. Both Dr. Marks and Dr. Lee have concluded that the only effective available treatment is antipsychotics. *Id*. at 40, 89, 106.

Thus, there are no less intrusive means of restoring the defendant to competency. Multiple attempts at less intrusive treatment options have failed. As part of her in-person meetings with the defendant, Dr. Marks discussed treatment options, including the administration of medication. Doc. 41 at 20. Dr. Lee also participated in multiple meetings. *Id*. at 22, 84. Generally, when an individual has a psychiatric disorder and would benefit from medication, Butner psychologists and psychiatrists continue to meet with the individual to offer medication. *Id*. at 84. Here, the defendant declined medication at each meeting and eventually indicated that he wanted to exercise his legal rights before considering medication. *Id*. at 84. If ordered to do so by the Court, the defendant indicated that he would take medication. *Id*. at 84. Dr. Lee discussed injectable versus oral medications, and the defendant expressed a preference for a long-acting injectable but would also consider an oral medication. *Id*. at 84.

On April 1, 2025, Dr. Marks and Dr. Lee met with the defendant, encouraged him to take psychiatric medication, explained the benefits of the recommended medications, and

raised the issue of involuntary medication. *Id.* at 22, 50, 83. The defendant responded that, "At least for a few weeks, [his] answer on medications won't change," and expressed an interest in settling in at the facility first. *Id.* at 22-23; Gov. Ex. 24 at 8. The defendant's view, however, has not changed after months of attempting to convince the defendant of the benefit of medication. For instance, on April 9, 2025, Dr. Marks met with the defendant, and again recommended psychiatric medication, which he declined. Doc. 41 at 23-24, 50. On April 22, 2025, the defendant indicated that he "disagree[d] with the point of the enterprise" of medication, was unwilling to voluntarily take medication, and he believed that the medication would be medically and physically harm to him based on his research. *Id.* at 24, 50-51. He stated that he "think[s] it's some form of an admission of guilt" if he took medication. *Id.* at 24; Gov. Ex. 24 at 8.

In addition to refusing medication in individual meetings, the defendant refused to attend competency restoration classes or group. Doc. 41 at 25-26, 57. He expressed that he would not attend those classes because the prior forensic evaluator opined that he had sufficient knowledge of the court process. *Id.* at 26. On April 22, 2205, the defendant stated that, "I feel disrespected by the Courts and I'm trying to stand up for myself as best as I can." Gov. Ex. 24 at 9; Doc. 41 at 26.

On May 12, 2025, Dr. Marks and Dr. Lee met with the defendant and discussed medication again. Doc. 41 at 27, 51. The defendant stated that he views psychiatric medication as an encouragement to change his "story" regarding his case:

> I have lived my life opposite to what the legal documents say. I'm telling the truth about what happened in my case. The truth will matter at some point or not. If not, this facility is a fine place to be. I sleep. I read a lot. I go to recreation. Occasionally the food is good here. That is how firm I am of my assertion of what's happening. I'm telling the truth.

17

*Id*. at 27. However, the defendant acknowledged that the Court may order medication. *Id*. at 28. Dr. Marks again met with the defendant on May 29, 2025. Gov. Ex. 26 at 193; Doc. 41 at 28. He indicated that if released, the first thing that the defendant would do is try and find the victim to make sure she is alive and well. *Id*. Dr. Marks encouraged the defendant to consider psychiatric medication and challenged his delusional beliefs. *Id*. at 29, 51-52; Gov. Ex 24 at 9. The defendant again refused medication stating, "I like my brain the way it is even if it is a dangerous brain. If I need to be secluded in a medical center, then that is how it goes." Doc. 41 at 29; Gov. Ex. 24 at 9. The defendant again acknowledged that should this Court order his medication, he would comply. *Id*.

On June 11, 2025, Dr. Marks met with the defendant. Doc. 41 at 29, 53; Gov. Ex 24 at 10. Dr. Marks challenged his delusional beliefs and encouraged medication. Doc. 41 at 30, 53-54. The defendant refused. *Id*. at 30, 56. Likewise, on June 17, 2025, Dr. Marks met with the defendant, who continued to decline medication because he did not "think[s his] dopamine levels need reduced," did not want his thoughts to change drastically, and wished to exercise his right to decline. *Id*. at 30. Dr. Marks advised the defendant that he had a psychotic or mood disorder, and that the medication could assist his symptoms. *Id*. at 30-31, 56-57. Dr. Marks found that the defendant's delusional beliefs remained during their July 3, 2025, meeting. *Id*. at 31. She again advised him that medication would be beneficial given his mental illness. *Id*. He stated that if the Court would order his medication, he would appeal the decision. *Id*.

In short, over their multiple discussions regarding medication, the defendant held "very firm" that he would not consider psychiatric medication. *Id*. at 22. Attempts at less intrusive alternative methods of treatment—such as challenging his delusional beliefs and

providing contradictory information—were unsuccessful. *Id.* at 21, 29, 40, 47. The defendant received education regarding the involuntary medication process and indicated that he understood. *Id.* at 25. The defendant has refused all less-intrusive means of restoration; he has refused medication and attendance at group for an extended period of time notwithstanding the efforts of his medical team. Indeed, the defendant declared: "I like my brain the way it is even if it is a dangerous game. If I need to be secluded in a medical center, then that is how it goes." Doc. 41 at 29; Gov. Ex. 24 at 9. Accordingly, a court order short of involuntary medication would be insufficient and no less restrictive means are available for restoring the defendant to competence. *See Baschmann*, 2015 WL 346719, at *13.

**4. The recommended medication treatment is medically appropriate.**

The final *Sell* factor requires that the Court "conclude that administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of his medical condition." *Sell,* 539 U.S. at 181 (emphasis in original). The Eighth Circuit has suggested that this "requires the district court to consider all of the circumstances relevant to the particular defendant and to consider the entirety of the consequences of the proposed involuntary medication." *United States v. Curtis,* 749 F.3d 732, 737 (8th Cir.2014). *See also United States v. Breedlove,* 765 F.3d 1036, 1043 (7th Cir. 2014) (noting that the fourth *Sell* factor "requires that the district court's finding recognize the defendant's diagnosis and personal medical history").

Here, Dr. Marks and Dr. Lee are intimately familiar with the defendant, his history, and health, in part due to their lengthy period of evaluation and treatment and knowledge of his medical history. *See* Gov. Ex. 24, 25, 26. Dr. Lee developed an individualized treatment plan in light of the defendant's medical history and presentation. Gov. Ex. 25 at 3-8. If left untreated, the defendant would suffer "increased intensity and frequency of symptoms that

have led to negative outcomes in all aspects of his life." *Id.* at 3. The proposed treatment is anticipated to "reduce the intensity of [his] psychotic symptoms and decrease the risk of another mood episode. This will assist in returning [the defendant] to a more functional state so that he may be able to work with his lawyer, participate in the court process, and rebuild his life." *Id.* at 6. No major medical conditions would impact the proposed treatment plan. *Id*. While risks, particularly of neuromuscular or metabolic side effects exist, none are anticipated to be so severe that they cannot be monitored and appropriately managed through other treatments or medication. *Id*. The treatment plan is medically appropriate and safe. Gov. Ex. 25 at 8. *See Baschmann*, 2015 WL 346719, at *15.

## CONCLUSION

For the foregoing reasons, the Court should grant the government's motion because clear and convincing evidence exists to order the Bureau of Prisons to forcibly medicate the defendant to return him to competency.

DATED:   Buffalo, New York, January 11, 2026.

MICHAEL DIGIACOMO
United States Attorney

BY:  *s/ CHARLES M. KRULY*
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5836
Charles.Kruly@usdoj.gov

BY:  *s/ MAEVE E. HUGGINS*
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5872
Maeve.Huggins@usdoj.gov