UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

v.

**DECISION AND ORDER**
24-CR-104-A

NICHOLAS BLOOM,

                    Defendant.

_____

## INTRODUCTION

Before this Court are Defendant Nicholas Bloom's objections (ECF

#51) to United States Magistrate Judge H. Kenneth Schroeder's Decision

and Order (ECF #48)[1] authorizing the involuntary administration of

antipsychotic medication, pursuant to *Sell v. United States*, 539 U.S. 166

_____

[1] While captioned as a Decision and Order, both parties urge this Court to treat
Magistrate Judge Schroeder's decision as a Report, Recommendation, and Order
(RR&O) subject to *de novo* review by this Court. (ECF #51, p.2; ECF #54, p.2). "[T]he
authority of a magistrate judge to issue competency decisions with or without a referral
order has not been addressed by the Second Circuit." *United States v. Brennan*, 354 F.
Supp. 3d 250, 258 (W.D.N.Y.)(citations and quotations omitted), *aff'd*, 928 F.3d 210 (2d
Cir. 2019). In light of the lack of guidance from the Second Circuit and "in an abundance
of caution," this Court will adopt the parties' view, treat Magistrate Judge Schroeder's
decision as an RR&O, and review it *de novo*. *Id*.  In *United States v. Gomes*, 387 F.3d
157, 160 (2d Cir. 2004) ("*Gomes II*"), the Second Circuit, relying on *United States v.
Gomes*, 289 F.3d 71 (2d Cir. 2002) ("*Gomes I*"), *judgment vacated and remanded sub
nom Gomes v. United States*, 123 S. Ct. 2605 (2003), determined that, in the context of
an application for forcible medication, "the relevant findings must be supported by clear
and convincing evidence."  Consequently, this Court will undertake a *de novo* review of
Magistrate Judge Schroeder's RR&O to determine whether the government has
established the *Sell* factors by clear and convincing evidence.

1

(2003), designed to restore Bloom's competency to stand trial. In his objections, Bloom maintains that Magistrate Judge Schroeder erred in concluding: (1) that there are important governmental interests in trying Bloom, *see*, ECF #51, pp. 4-9; (2) that forced medication will significantly further important government interests, *id.*, pp. 10-19; (3) that that such treatment is necessary to further those interests, considering any less intrusive alternatives, *id.*, pp. 19-26; and (4) that forcibly mediating Bloom is appropriate. *Id.*, p. 26.

For the reasons which follow, this Court determines that the government failed to establish by clear and convincing evidence, as it must, the first *Sell* factor, *i.e.*, that there are *important* governmental interests at stake that support the prosecution.  *Sell*, 539 U.S. at 180.  Accordingly, Defendant's objections are granted.  This Court declines to adopt Magistrate Judge Schroeder's decision (ECF #48) and denies the government's motion (ECF #28) for a Court order directing the Bureau of Prisons forcibly to medicate Defendant to return him to competency.

**Procedural History**

On June 20, 2024, Defendant was charged by criminal complaint with violating 18 U.S.C. § 2261A(2)(B) (cyberstalking). (ECF #1).  On June 27,

2

2024, Defendant made an initial appearance pursuant to Rule 5 of the F.R.Cr.P. in the Northern District of California and was ordered detained. Several weeks later, Defendant made his initial appearance in this District. On August 1, 2024, Defendant is charged in a two-count indictment with stalking two different individuals in violation of 18 U.S.C. § 2261A(2)(B) (cyberstalking). (ECF #7).

On August 15, 2024, the government, in conjunction with Defendant's arraignment on the indictment, filed a motion for a hearing to determine Defendant's mental competency pursuant to 18 U.S.C. § 4241(a). (ECF #11). The government's motion was based, *inter alia*, on the allegations set forth in the criminal complaint. With no opposition from Defendant, Magistrate Judge Schroeder granted the government's motion. (ECF #13).

Thereafter, on August 19, 2024, Magistrate Judge Schroeder entered an order finding reasonable cause to believe that Defendant may presently be suffering from a mental disease or defect to the extent that he is unable to understand the nature and consequences of the proceedings against him and to assist properly in his defense, and ordered a psychiatric or psychological examination of Defendant pursuant to 18 U.S.C. §4241(b). (ECF #14).

On September 14, 2024, Defendant filed notice of his intention to assert a defense of insanity pursuant to Rule 12.2(a) of the Federal Rules of Criminal Procedure (ECF #15), and both parties jointly moved for a psychiatric examination under 18 U.S.C. § 4242 (ECF #16). Magistrate Judge Schroeder granted the joint motion. (ECF #17, 18).

Several weeks later, Dr. E. Morse, Psy. D. completed psychological evaluations of Defendant pursuant to 18 U.S.C. §§ 4241(b) and 4242 and concluded that Defendant was incompetent to proceed. (ECF #20).  On November 4, 2024, Magistrate Judge Schroeder granted the government's unopposed motion to adopt the evaluation's findings and remanded Defendant to the custody of the Attorney General for restoration treatment. (ECF #23).

From March 25, 2025, to July 22, 2025, Defendant was admitted to the Federal Medical Center (FMC) in Burtner, North Carolina. Dr. Megan Marks, Psy. D., issued a forensic evaluation report, dated July 30, 2025. (ECF #24).  In her report, Dr. Marks indicated that Defendant was suffering from "Schizoaffective disorder, bipolar type, multiple episodes, currently in acute episode."  *Id.*, p. 11. The report noted that Defendant "has repeatedly declined to take any psychiatric medication during his evaluation period." However, the evaluators opined that Defendant's "schizoaffective disorder

4

continues to render him not competent to proceed to trial" but that his "prognosis for competency restoration with adherence to a medication regimen is good." Defendant's psychiatrist, Dr. Sandy Lee, M.D., concurred with Dr. Marks' conclusion and submitted an individualized treatment plan. (ECF #26). Defendant refused voluntarily to accept the recommended medication treatment, despite repeated attempts to encourage him to do so. (ECF #24, pp. 15-16).

After receiving the report, the government filed a motion "pursuant to *Sell v. United States* to Forcibly Medicate Defendant to Restore Competency for Trial." (ECF #28). Defendant objected (ECF#31). Magistrate Judge Schroeder determined that a *Sell* hearing should be conducted, and such hearing took place on October 29, 2025.

### The *Sell* Hearing:

Megan Marks, Psy.D., a forensic psychologist, and Sandy Lee, M.D., a staff psychiatrist, both of whom work at FMC Butner testified at the *Sell* hearing. Defendant did not call any witnesses.

Dr. Marks testified that she conducted an evaluation of Defendant based upon her review of Defendant's medical records, as well as assessments, observation and interviews she conducted of Defendant's

family members, prior therapists, and Defendant himself.  Based upon her evaluation, Dr. Marks diagnosed Defendant with "schizoaffective disorder-bipolar type" which included "psychotic symptoms" such as delusions as well as a display of both manic and depressive symptoms. In her report, Dr. Marks stated as follows:

> Mr. Bloom is diagnosed with schizoaffective disorder, bipolar type. Schizoaffective disorder is defined by an uninterrupted period of illness during which there is a major mood disorder concurrent with psychotic symptoms, and the psychotic symptoms persist for two or more weeks in the absence of a mood episode. This disorder is characterized by the presence of delusions (an improbable, often highly personal, idea or belief system not endorsed by one's culture, that is maintained with conviction in spite of irrationality or evidence to the contrary), hallucinations (a false sensory perception that has a compelling sense of reality despite the absence of external stimuli), disorganized speech (speech or other communication in which ideas shift from one subject to another, seemingly unrelated), or disorganized behavior (behavior that is self-contradictory or inconsistent. It may include childlike silliness, aimless behavior, unpredictable agitation, or extreme emotional reaction), and negative symptoms (diminished emotional expression) for at least six months.

(ECF #24, pp. 11-12).

Dr. Marks also discussed her diagnosis of Defendant with Dr. Sandy Lee, a psychiatrist at FMC Butner, who developed a recommended treatment plan for Defendant which included the administration of antipsychotic medication.

In her meeting with Defendant, Dr. Marks discussed treatment options which included the administration of medication. As part of an alternative method of treatment in addressing Defendant's delusions, Dr. Marks "challenged" his delusional beliefs by providing information that was contradictory to his delusions, but Defendant "still held firm in his beliefs" that Dr. Marks believed were "delusional in nature."   Dr. Marks had multiple conversations with Defendant about medications but the defendant "was very firm that he would not consider psychiatric medication."

Dr. Marks admitted that since 2020, Defendant had been diagnosed with four different mental health disorders.  In her report, she noted that Defendant "began to experience symptoms of schizoaffective disorder in his later twenties, and possibly earlier."  She went on to state:

> In 2024, Mr. Bloom's mental health appears to have significantly deteriorated. He developed persecutory delusional beliefs that his landlord and parents were attempting to harm him, and that the local sheriff's department and her friend's husband were involved in harming his friend and keeping them from communicating with one another. During this same timeframe, he also displayed erratic behavior, sending communications, some of which were disorganized and/or threatening, to his co-workers, family members, co-workers of family members, his psychiatric provider, and his landlord. He also sent screen shots of messages he sent to his landlord to his coworkers for an unknown reason, and allegedly, he harassed one or more neighbors in his apartment complex. His behavior led to him being fired from his place of employment, evicted from his apartment, and the loss of relationships.

7

(ECF #24, p. 12).

Based on her evaluation and clinical experience with Defendant, Dr. Marks concluded that there was no other way to restore Defendant's competency without the administration of antipsychotic medications. Dr. Marks further opined that Defendant's prognosis for competency restoration with adherence to a medication regimen was "good" and that "definitely…he would be restored to competency."

Dr. Lee, a Psychiatrist at FMC Butner, testified that based on her first meeting with Defendant, her initial impression was that Defendant "had a psychotic disorder" causing her to recommend medications for Defendant. When Dr. Lee initially discussed the possibility of medication with Defendant, he declined and refused medications.  In a subsequent meeting with Defendant and Dr. Marks, Dr. Lee recommended medications which Defendant again declined. They also discussed the "possibility of involuntary medication" with Defendant.  Several meetings were held with Defendant thereafter, at which time Dr. Lee explained the benefits that he could obtain from the taking of prescribed medications, but Defendant declined each time they were discussed.  However, Defendant indicated that "he wanted to exercise his legal rights before considering medications only if they were court ordered." It is the professional opinion of Dr. Lee that

the administration of anti-psychotic medications is a "standard course of treatment for someone [like Defendant] with a psychotic disorder" and that "anti-psychotic medications are necessary to restore [Defendant] to competency" and that such medications "are substantially likely to restore [Defendant] to competency."  Her report predicted Defendant would require 4 to 6 months of medication to show a reduction in symptoms.

## **DISCUSSION**

The Supreme Court has recognized that "an individual has a constitutionally protected liberty 'interest in avoiding involuntary administration of antipsychotic drugs'—an interest that only an 'essential' or 'overriding' state interest might overcome.  *Sell*, 539 U.S. at 178–79 (*quoting Riggins v. Nevada*, 504 U.S. 127, 134 (1992)).  As the *Sell* Court observed, "involuntary administration of drugs solely for trial competence purposes [is proper] in certain instances. But those instances may be rare." *Sell*, 539 U.S. at 180.

In order involuntarily to medicate a mentally ill defendant to render him competent for trial, the government bears the burden of proving the following four factors—often referred to as the *Sell* factors: (1) that there are important governmental interests in trying the individual; (2) that the

treatment will significantly further those interests; (3) that the treatment is necessary to further those interests, considering any less intrusive alternatives; and (4) that the treatment is medically appropriate. *See*, *United States v. Gomes*, 387 F.3d 157, 159–60 (2d Cir. 2004) [hereinafter "*Gomes II*"] (discussing *Sell* factors); *see United States v. Magassouba*, 544 F.3d 387, 396 (2d Cir. 2008) (noting that the Supreme Court held in *Sell* that an incompetent defendant "may be involuntarily medicated for the sole purpose of rendering him competent to stand trial only if [the] four criteria are satisfied").

The Second Circuit has held that while "[t]he first of the four *Sell* factors, whether the [g]overnment's asserted interest is important, is a legal question" that will be reviewed *de novo* on appeal*,* "[t]he district court's findings with respect to the other *Sell* factors are factual in nature and are therefore subject to review for clear error." *United States v. Boima*, 114 F.4th 69, 75 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1099 (2025)(citations and quotations omitted). Importantly, "the government bears the burden of proof to establish each factor by 'clear and convincing evidence.'" *Boima*, 114 F.4th at 76 (quoting *Gomes II*, 387 F.3d at 160).

10

## 1. **The First *Sell* Factor:**

Consideration of the first *Sell* factor—*i.e.*, whether important governmental interests are at stake to authorize forced medication—involves a two-part inquiry. First, the Court is obligated to consider whether the alleged criminal conduct is sufficiently serious to establish an important government interest. *Boima*, 114 F.4th at 76. If it does, then the Court must also examine whether any "special circumstances" exist that may "lessen the importance of that interest." *Id*. (citing *Sell*, 539 U.S. at 180).

## A. **Seriousness**

In assessing whether a crime is "serious," the Second Circuit has instructed courts to examine "the possible penalty the defendant faces if convicted, as well as the nature or effect of the underlying conduct for which he was charged." *Boima*, 114 F.4th 76 (quoting *United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1226 (10th Cir. 2007)).

Here, Defendant is charged in a two-count indictment with stalking two different individuals in violation of 18 U.S.C. § 2261A(2)(B). (ECF #7). While Magistrate Judge Schroeder accurately observed, "a proven violation of the statute allows for a term of imprisonment, depending on the facts and circumstances of the violation, ranging from one (1) year up to life," (ECF

#48, p. 12), as applicable to this prosecution, Defendant is not facing a possible sentence of life imprisonment. Rather, Bloom, as charged, is facing a statutory maximum term of imprisonment of five (5) years imprisonment on each count. *See*, 18 U.S.C. § 2261(b)(5). Thus, if convicted under both counts and sentenced to consecutive terms of imprisonment at the statutory maximum under each, then Defendant would face a maximum term of imprisonment of ten (10) years. Such a potential sentence—though not life imprisonment—nevertheless seems to support Magistrate Judge Schroeder's conclusion that Bloom's crimes are serious. *See Boima*, 114 F.4th at 77 (citing with approval *United States v. Evans*, 404 F.3d 227, 236 (4th Cir. 2005) (concluding that the government had an important interest in trying a defendant charged with a felony carrying a maximum term of ten years)); *but see*, *United States v. Berry*, 911 F.3d 354, 362 (6th Cir. 2018)(in case in which government sought forced medication for an incompetent defendant charged with a crime carrying a five-year, the Sixth Circuit stated "we are hesitant to establish a *per se* rule either that five years is enough, or not enough. Also, as discussed below, the unique circumstances of [Defendant]'s case render it unnecessary to decide this issue here. Even assuming that a crime with a five-year statutory maximum sentence could qualify as a serious crime for *Sell* purposes, the

mitigating factors discussed below lessen the government's interest such that it is insufficient to warrant mandated medication here.").

In assessing seriousness, this Court is also obligated to consider the probable sentencing range under the U.S. Sentencing Guidelines ("Guidelines").  *See*, *Boima*, 114 F.4th at 77 ("district courts should properly consider a potential Guidelines range in assessing the seriousness of an offense for these purposes, provided that such a range can be assessed to some reasonable degree of reliability at the early point at which many *Sell* assessments are likely to occur.").  Under the government's calculations, the Guidelines range Bloom faces if convicted after trial of both counts of the Indictment against him will be 63 to 78 months' imprisonment.  (ECF #54, p. 14). According to Defendant, his post-trial Guidelines range would be 41-51 months' imprisonment. (ECF #51, p. 6; ECF #54, p. 14 n.7).[2] With the Second Circuit in *Boima*, "deem[ing] a Guidelines range of 51 to 63 months to itself suggest the seriousness of the offense," *see*, *Boima*,

---

[2] The discrepancy between the parties' Guideline calculations is apparently dependent upon whether there is a six-level increase pursuant to Guideline § 3A1.2(a) and § 3A1.2(b), as Victim 2 is "a government officer or employee" and "the offense of conviction was motivated by such status."  The government maintains that such adjustment applies, while Bloom argues it does not. Were Defendant to plead guilty prior to trial, his Guideline range, following a 3-level downward adjustment for acceptance of responsibility, would likely be 46 to 57 months imprisonment (under the government's calculations) or 30 to 37 months imprisonment (under the Defendant's calculations).

114 F.4th at 77, this Court determines that the potential Guidelines range that Bloom is facing is sufficiently serious to establish an important government interest.

The inquiry, however, does not end there. "In addition to the statutory maximum, mandatory minimum, and likely Guidelines range faced by the defendant, a judge may also consider, to the extent reasonably ascertainable, the individual facts of the case as they relate to the factors set forth in 18 U.S.C. § 3553(a)." *Boima*, 114 F.4th at 77.  Specifically, the Second Circuit suggested that "[t]o the extent that such facts would be considered by a sentencing judge when weighing the §3553(a) factors, they should also be considered when assessing whether the alleged crime is serious enough to establish an important government interest in prosecution." *Boima*, 114 F.4th at 78 (citing *United States v. Gillenwater*, 749 F.3d 1094, 1101 (9th Cir. 2014)).

Section 3553(a)(1) directs the Court to consider "the nature and circumstances of the offense and the history and circumstances of the defendant." Here, consideration of those factors establishes the following. Defendant is a 38 year-old male raised in a home with both parents and one younger sibling.  Defendant obtained his Bachelor of Arts degree from

University of Notre Dame in 2011, a Masters degree from University of San Diego in 2013, and a PhD from Duke University in 2019.

Defendant was married in 2011, and he began exhibiting mental health symptoms in 2017 as he went through a divorce. After his divorce, he endorsed paranoid—albeit inaccurate— beliefs that his roommate was trying to kill him and delusions that he had run over people in the parking lot while driving.  In 2019, while in graduate school, Defendant changed advisors frequently because he believed they were working against him and underappreciated his brilliance.  At around this same time, Defendant severed relationships with his friends.

After graduating with his doctorate degree, Defendant, while living in California, worked remotely as federal government contractor with the National Archives. From approximately 2019 to 2020, Defendant supervised Victim 1, who reside in the Western District of New York.  Victim 1 also worked as a remote contractor with the National Archives. Defendant has <u>never</u> met Victim 1 in person. Similarly, Victim 2, who is a Niagara County Family Court Judge, a relative of Victim 1, and a Western New York resident, has also never met Defendant in person.  In fact, there is no evidence that Defendant was ever physically present in the Western District

15

of New York before he was arrested in California and brought here to face the instant charges.

By 2020, Defendant exhibited atypical behaviors including informing his parents of plans for self-harm and then denying it when his parents came to check on him.  Between those episodes, however, there were periods when Defendant was more stable, and in 2021, he was able to secure a job at the National Archives and Records Administration (NARA).  However, the episodes in which he displayed psychotic and mood disorder became more frequent and severe.  In 2021, he cut ties with his parents because he believed they were trying to kill him for his inheritance. In 2022, he estranged himself from his entire family.

According to the report of the forensic psychiatrist who examined him, by 2024, Defendant "displayed clear psychotic and mood disordered symptoms[, and] [t]here was a sharp decline in his functionality affecting all aspects of his life."  He started having beliefs that his previous coworker/friend from NARA (*i.e.*, Victim 1) and her son were in danger and he sent her hundreds of messages that contained threatening and nonsensical language.  He also sent physically threatening and/or sexual messages to Victim 2 and to his own parents, sister-in-law, friend, as well as a previous classmate. His employer contacted his parents because of

his erratic behavior, but he slammed the door in his parents' faces when they came to check on him, claiming that they were stalking him. Defendant believed that he was being "aggressed" by his boss.

In July of 2024, Defendant was fired from his job at NARA for "conduct unbecoming of a federal employee," after he sent multiple inappropriate communications to individuals between January 16, 2024, and May 21, 2024, and refused to cease such behavior despite being instructed to do so.

As to the offense conduct with which he has been charged, Defendant, in late-January of 2024, began sending numerous text messages to Victim 1, many of which "contained threatening language notwithstanding Victim 1's demand that [] [D]efendant stop communicating with her. When Defendant continued to send unwanted messages to Victim 1, her husband called Defendant and told him to stop contacting Victim 1… and that if Defendant failed to comply, 'there would be legal repercussions.'" That warning was disregarded by Defendant, and he continued to send messages to Victim 1, using "vulgarities" and threats that "he w[ould] send people to Victim 1's house." Those threats caused Victim 1 "to suffer substantial emotional distress and fear for her physical safety

17

both at work and at home as she believe[d] [Defendant] [wa]s intent on assaulting her."

As a result, Victim 1 reported these events to the Niagara County Sheriff's Office ("NCSO"). An NCSO deputy sheriff attempted to contact Defendant and left a voicemail advising Defendant that he must cease all contact with Victim 1. Defendant responded to this voicemail by sending e-mails to Victim 1 wherein he indicated that the voicemail from the deputy sheriff was generated by artificial intelligence ("AI") and claimed that Victim 1 was in a conspiracy with her husband and the police and that he would involve the FBI if Victim 1 did not speak with him. Defendant continued to send vulgar, threatening, and violent messages to Victim 1.

On or about June 10, 2024, Defendant began sending messages to Victim 2, who is Victim 1's relative and a New York Family Court Judge. Defendant's messages to Victim 2 contained vulgarity as well as physical and sexual threats of a violent nature. He also sent Victim 2 a Google Earth image of Victim 2's of home thereby establishing that he knew where Victim 2 lived.

Within weeks of his alleged involvement in the conduct with which he is presently charged, Defendant was undergoing a court-ordered mental

health evaluation conducted by the government (ECF #20), and based upon that examination, it was determined that Defendant was incompetent to stand trial.  (ECF #48, p. 14).   Considering—as it must—the factors pursuant to § 3553(a)(1), *see, Boima*, 114 F.4th at 77, this Court finds that the temporal proximity between the conduct with which Bloom is charged and the finding that he was incompetent, combined with those behaviors and characteristics associated with Bloom's diagnosed mental illness, suggest that his individual circumstances and the circumstances of the offenses with which he has been charged are inextricably intertwined.

In that regard, this Court finds it extremely likely that Defendant's conduct as detailed in the criminal complaint represents a manifestation of his mental illness. The medical evidence presented supports the view that Defendant lacked the ability to control his delusional and psychotic behaviors.  While those delusional behaviors resulted in Defendant transmitting numerous unwanted electronic communications consisting of vile and offensive, emails, texts, and messages, and even some threats, there is no evidence that Defendant ever took any action—or had had the capacity, history, or intent, to take any action—in furtherance of his harassing and sometimes repulsive communications. *See*, *United States v. Ull*, 370 F. App'x 225, 226–27 (2d Cir. 2010)(in affirming an 18 month term

of imprisonment, which represented a downward variance from the otherwise applicable Guidelines range, in a stalking prosecution under 18 U.S.C. §2261A(2) involving a Defendant, who sent "more than 1400 letters, faxes and e-mails, as well as telephone messages and messages deposited at the victim's residence," the Second Circuit recognized that under §3553(a), the Court was obligated to "balance[] an understanding that the defendant's mental illness contributed to her offense, with the need for promoting respect for the law, providing just punishment, deterring defendant and others from committing similar offenses in the future, and protecting the public from further criminality."). Additionally, in this Court's view, the fact that Bloom's mental illness caused him—albeit irrationally and mistakenly—genuinely to believe that his electronic harassment of the two victims in this case was justified by his desire to protect one of those victims from spousal abuse, mitigates to some extent the seriousness of his conduct. Though delusionally misguided because of his mental state, his actions were, in his mind, at least in part motivated by his desire to protect—rather than harm—one of the victims.

In view of all the foregoing, this Court determines that the seriousness of the offenses with which Defendant has been charged is curtailed upon this Court's consideration of "the nature and circumstances

20

of the offense and the history and circumstances of the defendant"

pursuant to §3553(a)(1).  *See*, *Boima*, 114 F.4th at 78.

### B. Special Circumstances

Nevertheless, even if this Court agrees with Magistrate Judge

Schroeder's conclusion that the crimes with which Bloom has been

charged are sufficiently serious, this Court's inquiry does not end there. As

previously noted, in assessing the first *Sell* factor, the Court must "consider

not only the seriousness of the crime charged… but also countervailing

considerations that may diminish the governmental interest in moving

forward with this prosecution."  *Boima*, 114 F.4th at 78. "Even for a serious

crime, '[s]pecial circumstances may lessen the importance' of the

governmental interest in bringing a defendant to trial." *Id*. (quoting *Sell*, 539

U.S. at 180).

The Second Circuit has provided several examples of such

circumstances, "including the likelihood of civil confinement, which may

diminish the risks associated with releasing someone charged with an

offense, and a long delay in bringing someone to trial, which creates 'the

possibility that the defendant has already been confined for a significant

21

amount of time [ ]for which he would receive credit toward any sentence ultimately imposed.'" *Boima*, 114 F.4th at 78 (quoting *Sell*, 539 U.S. at 180).

Here, this Court determines that there is a likelihood that Bloom will be civilly committed if his competency cannot be restored. As Dr. Mark's July 30, 2025, report concluded:

> In the event the Court determines Mr. Bloom is not competent and unlikely to be restored in the foreseeable future (*i.e.*, involuntary medication is not warranted), he may be subject to further evaluation under §4246 for civil commitment. As such, a review of his potential suitability for civil commitment pursuant to §4246 was completed on July 18, 2025. Based on the information available at the time this report was written and as provided to members of the risk assessment consultation, a certificate of dangerousness was recommended to be filed in the Eastern District of North Carolina for further evaluation. This would be stayed pending a decision in the instant matter.

(ECF #24, p. 16). Subsequently, on September 11, 2025, a Special Assistant in the Eastern District of North Carolina initiated a civil commitment proceeding by filing a certificate in that District which indicated that "FMC Butner's Risk Consultation Panel opined in an initial assessment that [Bloom] meets criteria for commitment pursuant to 18 U.S.C. §4246(a)." (ECF #55-1).

In his decision, Magistrate Judge Schroeder, stated that "nothing has been presented on behalf of the defendant that would lessen the

government's interest in prosecuting the defendant or that the defendant faces lengthy civil confinement in an institution for the mentally ill that undermines the strength of the need for prosecution." (ECF #48, p. 13). This Court disagrees with that conclusion.

Initially, this Court observes that it is the government's burden to establish by clear and convincing evidence that it has an important interest in trying Defendant.  *See*, *Gomes II*, 387 F.3d at 160.  Here, the government's expert at the *Sell* hearing indicated in her report that Defendant was suitable for civil commitment pursuant to §4246 such that a certificate of dangerousness should be filed, and such certificate has been filed.  In this Court's view, Bloom's "[e]ligibility for civil commitment may 'diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime,' *Sell*, 539 U.S. at 180, thereby lessening the government's interest in prosecuting him."  *Gillenwater*, 749 F.3d at 1101.  As the government at the *Sell* hearing failed adequately to address the potential for Bloom's civil confinement, which to this Court seems likely, this Court determines that the government "has not satisfied the first *Sell* factor by clear and convincing evidence." *United States v. Gandia*, No. 1:20-MJ-1036-JJM, 2022 WL 556990, at *3 (W.D.N.Y. Feb. 24, 2022).

This Court also finds that any governmental interest in prosecuting Defendant is further diminished by the clear evidence in the record, as noted above, which indicates that Bloom's mental disorder contributed to his commission of the offenses with which he has been charged. *Id*.; *see also, United States v. Ruiz-Gaxiola*, 623 F.3d 684, 695 (9th Cir. 2010)("[i]n some cases, that the offense was the result of a mental disorder of this type might well render it less important that the government prosecute the particular defendant.").

Based on the evidence before it, this Court has no doubt that Bloom's psychotic symptoms and delusions existed at the time of and contributed to his offense conduct. *See*, *United States v. Weinberg*, 743 F. Supp. 2d 234, 237 (W.D.N.Y. 2010) (wherein Judge Larmier, in conluding that the government had failed to carry its burden under *Sell*, state "[a]lthough I do not minimize the charge—threatening a judicial officer—nonetheless, such a threat seems quite consistent with Weinberg's illness, schizophrenia with paranoid delusions. The fact that Weinberg publicized his ideation in such an open manner with copies to federal government officials and the FBI suggests that his actual intent to commit the act was delusional as well."). Bloom, like Weinberg, publicized his ideations openly sharing his threats with the NCSO.  (ECF #1, pp. 11-13).

24

While Defendant's conduct in engaging in an unrelenting campaign of electronic harassment towards, including threats of violence, understandably traumatized Victim 1 and Victim 2 and their families, the record also establishes that Defendant never had any in person contact with either victim. Moreover, until he was arrested and brought to this District, there is no evidence in the record to suggest that Defendant, who lived in California, ever got within 2,500 miles of either victim. Further, the record before this Court does not demonstrate that Defendant ever engaged in any act of violence, ever possessed any sort of weapon, or otherwise undertook any effort to act upon the threats of offensive statements that he made. Indeed, the uncontradicted record before this Court demonstrates that Defendant, because of his mental illness, erroneously and irrationally believed that his actions were undertaken in an effort to protect Victim 1 from abuse. (ECF #24, p. 5). Such record also establishes that Defendant lacked the ability to control his delusional and psychotic behaviors.

In short, unlike other threat cases in which other Courts have found an important governmental interest in pursuing prosecution, Bloom never demonstrated any intent or ability to carry out the threats he made. *Cf. United States v. Khoundara*, No. 22-CR-00061-DKW, 2024 WL 4276673, at

*4 (D. Haw. Sept. 24, 2024)(finding government had important interest in prosecuting defendant for cyberstalking where he engaged in five-month long campaign to harass and intimidate victim he believed was being sex trafficked "bombard[ing] her with text messages' and posting information about her online, while also "enter[ing] a…massage establishment, armed with a knife and bulletproof vest, and brandished a stick at employees while claiming that he was working with Homeland Security to save [victim] from kidnapping" and "driving around in a van with a metal cage and weapons in an attempt to kidnap and sexually assault [victim]."); *Gillenwater*, 749 F.3d at 1101 (finding a serious government interest in bringing to trial a defendant "accused of making lurid and distressing threats ... to, among other things, choke, rape, and kill people" which "continued for over a year, escalating in volume and violence" and who "evidenced a possible intent and ability to carry out th[e] threats.").

Dr. Marks, the government's expert, specifically noted in her report that Defendant does not "present an imminent risk of danger to himself or others while in the hospital setting."  (ECF #24, p. 16).  While this Court, of course, cannot be certain that Bloom will not become dangerous if and when he is ultimately released, the uncontested evidence before the Court demonstrates that in his current setting he poses no appreciable risk to

himself or others.  Such evidence further diminishes the necessary governmental interest required to justify this Court's authority to require his forced medication.

Likewise, while this Court cannot state with certainty that Bloom will be civilly committed, the chances of it are more than a mere possibility. Indeed, as already noted, the United States Attorney's Office for the Eastern District of North Carolina has already initiated a civil commitment proceeding against Bloom by filing a certificate indicating that "FMC Butner's Risk Consultation Panel opined in an initial assessment that [Bloom] meets criteria for commitment pursuant to 18 U.S.C. §4246(a)." (ECF #55-1).  Although Bloom is not a danger to other individuals under current conditions, this Court believes that there is a strong likelihood, given Bloom's delusional state, ongoing mental health issues, and statements to his doctors regarding his avowed motivation for committing the offense with which he is charged, that a court will find that Bloom's release, in an untreated state, would likely "create a substantial risk of bodily injury to another person. . .." 18 U.S.C. §4246(d). The probability that Bloom will be civilly committed significantly undercuts the governmental interest in prosecuting him, since even without prosecution, Bloom will likely remain in government custody for the foreseeable future.

27

Furthermore, *Sell* affirms the notion that Defendant's pretrial confinement may diminish the government's prosecutorial interest where a "defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed, *see* 18 U.S.C. § 3585(b))." *Sell*, 539 U.S. at 180. As mentioned previously, the parties' estimate that Bloom's Guidelines range, as a first-time offender, are as low as 30 to 37 months or as high as 63 to 78 months, depending on factors such as acceptance of responsibility following a plea agreement. See, pp. 11-12, *supra*. Were Bloom's case to result in a conviction and reach the sentencing stage, this Court presumably would credit the two-plus years Bloom has already served in pretrial detention—plus additional time accrued by that date—toward the sentence. *See* Sell, 539 U.S. at 180 (citing 18 U.S.C. § 3585(b)). This period would also include the time needed to restore Bloom to competency, which Dr. Marks estimated could take between at least four to six months, as well as the time required for any additional motion practice, as well as any plea or trial proceedings and sentencing. At this point, any such period of pretrial detention would almost assuredly be well in excess of 30 months. If Defendant's competency is restored and he is convicted of the crimes with which he is charged, then there is a distinct possibility that this Court, at sentencing, might determine

that a downward variance is appropriate. *See, e.g*., *United States v. Ull*, 370 F. App'x at 227. Such factor only further diminishes the importance of any governmental interest in prosecuting Defendant.

## **CONCLUSION**

In this Court's view, the government has failed to establish by clear and convincing evidence the first *Sell* factor—*i.e.*, that it has an important governmental interest in bringing Defendant to trial on the cyberstalking charges contained in the indictment.  Specifically, this Court determines that the government at the *Sell* hearing failed adequately to address: (1) the potential for Bloom's civil confinement; (2) the temporal proximity between Bloom's alleged offense conduct and his being adjudicated incompetent; (3) the fact that according to the mental health experts who examined him, such conduct occurred during a time in which the symptoms of Defendant's illness were manifesting themselves and involved behaviors which were consistent with the very illness with which he had been diagnosed; and (4) the significant time Defendant has already spent in custody.  Such deficiencies in the record, combined with the fact that Defendant never demonstrated any intent or actual ability to carry out the actions or behaviors he threatened, lead this Court to the conclusion that the government failed to carry its burden of establishing by clear and

convincing evidence that the first *Sell* factor—*i.e.*, that important governmental interests are implicated in the prosecution of Defendant — was met.

Since "a court 'must find' each of the four factors satisfied to order a defendant involuntarily medicated to restore his competency to stand trial," *Boima*, 114 F.4th at 75 (quoting *Sell*, 539 U.S. at 180–81), this Court's finding that the government failed to establish the first *Sell* factor: (1) compels that the government's request forcibly to medicate Defendant be **DENIED**; and (2) obviates any need for this Court to consider the remaining *Sell* factors.

Accordingly, this Court vacates Magistrate Judge Schroeder's decision (ECF #48) authorizing the involuntary administration of antipsychotic medication and **DENIES** the government's motion (ECF #28) for a Court order directing the Bureau of Prisons forcibly to medicate the Defendant to return him to competency.

**SO ORDERED.**

Dated: Buffalo, New York.  June 29, 2026.

*s/Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

30